UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ACCENT DEPOT, LLC on behalf of itself and all )
others similarly situated, )

          Plaintiff, )

   v. )

UNITED PARCEL SERVICE, INC., and )
UNITED PARCEL SERVICE SUPPLY CHAIN )
SOLUTIONS, )

          Defendants. )
)
)
)
)
)

**FILED**

FEB 17 2005
FEB. 17, 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**JUDGE SHADUR**

Case No.

**05C 0990**

**MAGISTRATE JUDGE MASON**

### DEFENDANTS' NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. § 1441

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION:

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1441, Defendants United Parcel

Service, Inc. and UPS Supply Chain Solutions, Inc. (erroneously sued as United Parcel Service

Supply Chain Solutions) (collectively "UPS") hereby remove to this Court the state court action

described below, which is within the original jurisdiction of this Court pursuant to 28 U.S.C.

§ 1331 (federal question) and 28 U.S.C. § 1332 (diversity), and is properly removed for the

following reasons:

    1.    On or about January 18, 2005, Plaintiff Accent Depot, LLC ("Accent Depot") filed a

purported class action in the County Department, Chancery Division, of the Circuit Court of

Cook County, Illinois, entitled *Accent Depot, LLC v. United Parcel Service, Inc., et al.*, case

number 05CH01029.

2.    UPS's agent for service of process was provided with a copy of the Complaint and a request to waive service of process no earlier than January 19, 2005. This notice is therefore timely under 28 U.S.C. § 1446(b). Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings, and orders served upon UPS in the action are attached to this Notice as Exhibit A.

3.    This is an action by a shipper and a putative class against a package delivery company for alleged delayed and missed pick-ups and deliveries, other alleged service failures, alleged duplicative charges, alleged improper charges for services that were not received, and alleged excessive charges that were based on miscalculation of the dimensions of packages. This action is within the original jurisdiction of this Court and removal is therefore proper on each of the following independent grounds, any of which is sufficient to establish jurisdiction and permit removal:

(a)    claims by a shipper for alleged breach of duties arising from shipments carried by a motor carrier are governed by the Carmack Amendment, 49 U.S.C. § 14706;

(b)    claims by a shipper arising from alleged delayed or missed shipments carried in international transportation are governed by the Warsaw Convention or, if that treaty does not apply, by federal common law;

(c)    claims by a shipper arising from alleged delayed or missed shipments carried in whole or in part by air transportation are governed by federal common law;

(d)    a well-pleaded complaint for overcharges by a motor carrier must allege that the shipper has complied with the notice requirements of 49 U.S.C. § 13710(a)(3)(B), and therefore presents a substantial federal question on its face;

(e)    through 49 U.S.C. § 14101(b)(1), Congress has created a federal remedy for, and thereby conferred federal jurisdiction over, a motor carrier's breach of a contract for specified rates and services; and

(f)    diversity jurisdiction exists because the parties are completely diverse and the amount in controversy exceeds $75,000.

## ALLEGATIONS OF THE COMPLAINT

4.     The Complaint alleges that UPS is a "package delivery company" that provides "specialized transportation and logistics services," including "air, ocean and ground freight, customs brokerage, and trade and materials management." (Compl. ¶¶ 9, 13.)

5.     The Complaint alleges that Accent Depot entered into a "carrier agreement" with United Parcel Service, Inc. on April 5, 2004 (the "Carrier Agreement"), and that other consumers have entered into comparable agreements. (*Id.* ¶¶ 24, 74 & Ex. G.)[1] Addendum B to the Carrier Agreement contains schedules of incentives that Accent Depot may receive on various UPS services, including Ground Commercial, Ground Residential, and various Worldwide Express Export and Export Worldwide Expedited services. The Complaint also alleges that Accent Depot accepted a "rate quote agreement" from UPS that set forth "the general fees associated with international shipping." (*Id.* ¶¶ 26-27 & Ex. A.)

6.     The Complaint alleges service problems with UPS shipments, including "late pickup, or failure to pickup, as well as supposed delays in customs and late delivery to Accent Depot," and billing problems. (*Id.* ¶ 28.)

7.     With respect to delays and pickup and delivery problems, the Complaint alleges that Accent Depot suffered losses because its agent had to contact a shipper in the middle of the night "because UPS had failed to collect" some packages; that the shipment "never shipped"; and that Accent Depot had to arrange for another carrier to transport the shipment after discovering two weeks later that it had never been shipped. (*Id.* ¶ 36.)

8.     With respect to billing, the Complaint alleges that UPS's invoices contained "only the summary charges," rather than a "detailed summary," which Accent Depot was only able to obtain upon request. (*Id.* at ¶¶ 29-30.) The Complaint alleges that UPS has improperly charged

---

[1] Paragraph 24 of the Complaint states that Accent Depot did not include a copy of the Carrier Agreement because the contract contains a confidentiality clause; however, paragraph 74 alleges that UPS enters into agreements with consumers and states "[a]n exemplar of this agreement, entered into with the Plaintiff, is attached as Exhibit G."

Accent Depot and class members "duplicative fees" and "imaginary fees" for services not actually provided. (*Id.* ¶¶ 32-35, 37, 51.) In addition, the Complaint alleges that, "when using certain services (e.g., UPS Next Day Air, 2nd Day Air, 3 Day Select)," UPS determines charges by using "a measuring system known as dimensional weight" that is based on the ratio between the dimensions of the package and the package weight, and that UPS has miscalculated the size of packages, resulting in overcharges based on dimensional weight. (*Id.* ¶¶ 17-19, 38-45, 51.)

9.    Based on these allegations, the Complaint purports to assert claims on behalf of Accent Depot and a putative nation-wide class of UPS customers who were allegedly overcharged based on "either (a) overmeasurement for the purposes of dimensional weight, or (b) charging superfluous or duplicative fees." (*Id.* ¶ 51.) The asserted claims are under the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.*, and the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, and for breach of contract, conversion, and common law fraud. The Complaint prays for relief including a permanent injunction preventing UPS "from continuing to deceive the public by utilizing [its] current billing scheme," restitution and/or compensatory damages, punitive damages, and attorneys' fees. (*Id.* at 20.)

## STANDARD FOR FEDERAL QUESTION JURISDICTION

10.    Federal courts have original jurisdiction over cases "arising under" federal law.[2] *See* 28 U.S.C. § 1331. An action arises under federal law when it "appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims," *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 13 (1983), or when "a federal cause of action completely pre-empts a state cause of action." *Id.* at 24; *see also Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 7 (2003) (quoting *Franchise Tax Bd.*).

11.    When a complaint — even one that purports to assert only a state cause of action — "fairly read, states a federal question, the defendant may remove the case to federal

---

[2] Under 28 U.S.C. § 1441(c), when an action contains any claim within a district court's federal question jurisdiction, the entire case may be removed.

court." *Bastien v. AT&T Wireless Servs. Inc.*, 205 F.3d 983, 986 (7th Cir. 2000); *see* 28 U.S.C.

§ 1441(a), (b). "[A] plaintiff may not defeat removal by omitting to plead necessary federal

questions in a complaint." *Franchise Tax Bd.*, 463 U.S. at 22; *see Burda v. M. Ecker Co.*, 954

F.2d 434, 438 (7th Cir. 1992) (court may look beyond face of complaint to determine if plaintiff

"artfully pleaded" matters under state law that actually raise a federal question). A federal court,

"will not be bound by the names and labels placed on a complaint by the plaintiff when that

complaint in fact raises a federal question." *Bastien*, 205 F.3d at 987. Thus, the absence of any

mention of federal law in a complaint does not resolve the jurisdictional analysis. *Beneficial

Nat'l Bank*, 539 U.S. at 6; *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 490 (7th Cir. 1998).

      12.     A defendant may remove a case where federal law provides the exclusive cause of

action for the wrong alleged. *Franchise Tax Bd.*, 463 U.S. at 22; *see Beneficial Nat'l Bank*, 539

U.S. at 9-11 (where federal statute provides "the exclusive cause of action" for particular claims,

"then the cause of action necessarily arises under federal law and the case is removable," even if

complaint "relies entirely on state law"); *Bastien*, 205 F.3d at 986 (removal is proper where

"Congress has so completely preempted a particular area that no room remains for any state

regulation and the complaint would be 'necessarily federal in character'" (citation omitted)).

## BASES FOR REMOVAL

      13.     Federal law exclusively governs the transportation of goods in interstate commerce.

The Supreme Court has held: "'As to interstate shipments . . . the parties are held to the

responsibilities imposed by the federal law, to the exclusion of all other rules of obligation.'"

*Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983) (citation omitted);

*see S. Express Co. v. Byers*, 240 U.S. 612, 614 (1916) ("rights and liabilities in connection [with

shipment in interstate commerce] depend upon acts of Congress, the bill of lading and common

law principles accepted and enforced by the Federal courts"). In short, "Congress has created a

broad, comprehensive scheme covering the interstate shipment of freight" that "has occupied the

field to the exclusion of state law." *N. Am. Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d

229, 233-34 (2d Cir. 1978). Congress's uniform federal framework for interstate cargo

transportation has remained in place even though Congress has substantially deregulated

interstate carriers through eliminating the Interstate Commerce Commission: "Since motor carrier transportation is a truly interstate industry, it is critical to the smooth functioning of commerce that there be *Federal* commercial rules established to ensure that all interstate transportation is subject to the *same* rules and procedures. Otherwise, a motor carrier would be potentially subject to *50 different rules* for operation." H.R. Rep. No. 104-311, at 85 (1995) (emphasis added), *reprinted in* 1995 U.S.C.C.A.N. 793, 797.

14.    Thus, actions such as this, which concern the obligations of a carrier and remedies of a shipper with respect to contracts of carriage for interstate and international shipments arise under federal law. *See Thurston*, 460 U.S. at 533-35 (carrier's action to recover charges pursuant to tariffs filed with the ICC arose under federal law). Specifically, this action is within the original jurisdiction of this Court under 28 U.S.C. § 1331 and properly removed on the following separate and independent grounds.

### A. The Carmack Amendment

15.    The Complaint alleges that UPS provides various transportation services, including "ground freight." (Compl. ¶ 13.) The Carrier Agreement between Accent Depot and UPS, which is offered as an exemplar of the contracts that UPS enters into with consumers, contains incentives for shipments using UPS's Ground Commercial and Ground Residential services. (*Id.* ¶¶ 24,74 & Ex. G at Addendum B.)

16.    Any claim in the Complaint that arises from shipments transported by means of ground transportation falls squarely within the scope of the Carmack Amendment, 49 U.S.C. § 14706, which provides the exclusive remedy for claims arising from a motor carrier's cargo delivery services, including claims for missed or delayed delivery and claims disputing the price charged for a carrier's services. A claim that falls within the scope of the Carmack Amendment is within the original jurisdiction of the district courts pursuant to 28 U.S.C. § 1331, and is properly removed regardless of whether the complaint references federal law.

17.    It is settled that Congress, in enacting the Carmack Amendment, intended to "supersede[] diverse state laws with a nationally uniform policy governing interstate carriers' liability." *N.Y., New Haven & Hartford R.R. Co. v. Nothnagle*, 346 U.S. 128, 131 (1953); *see*

*Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987) (purpose of Carmack Amendment, which is to eliminate uncertainty surrounding carrier's liability and establish uniform federal guidelines, precludes shippers from pursuing state remedies). Accordingly, *any* claim for breach of a motor carrier's contract of carriage arises under the Carmack Amendment. *See, e.g., S. Ry. Co. v. Prescott*, 240 U.S. 632, 636 (1916) ("As the shipment was interstate, and the bill of lading was issued pursuant to the Federal Act, the question whether the contract thus set forth had been discharged was necessarily a Federal question.").

18.     In cases where it applies, the Carmack Amendment is all-embracing. In particular, the Carmack Amendment encompasses claims for alleged delayed delivery, *see N.Y., Philadelphia & Norfolk R.R. Co. v. Peninsula Produce Exch. of Md.*, 240 U.S. 34, 36, 38-39 (1916) (Carmack Amendment governed shipper's claim arising from shipment delivered "hours later than the custom[a]ry time of arrival"); *Great Atlantic & Pacific Tea Co. v. Atchison, Topeka & Santa Fe R.R. Co.*, 333 F.2d 705, 707-08 (7th Cir. 1964), as well as claims disputing the price charged for a carrier's transportation services. *See, e.g., Duerrmeyer v. Alamo Moving & Storage One, Corp.*, 49 F. Supp. 2d 934, 936 (W.D. Tex. 1999) (shippers' overcharge claims were all within the scope of Carmack because they sought "damages flowing from the shipping contract"); *Constr. Servs., Inc. v. Watkins Motor Lines, Inc.*, No. CV 98-N-0628-NE, 1998 U.S. Dist. LEXIS 22818, at *9 (N.D. Ala. May 6, 1998) (claims for untimely delivery of goods or charging an improper rate for transporting goods are preempted by Carmack Amendment and are removable).[3]

19.     Accordingly, because Accent Depot's Complaint is based on UPS's alleged delayed or failed pick-ups and deliveries, and improper charges, this action is within the scope of the Carmack Amendment. Accent Depot's sole remedy, if any, for shipments at issue carried by ground transportation is under the Carmack Amendment.

---

[3] Copies of all decisions from an electronic database are attached to this Notice as Exhibit E.

20.     Because the Carmack Amendment provides the exclusive remedy for claims arising under a contract for ground transportation of goods, it displaces any state law claims coming within its ambit, and such claims are removable. As the Supreme Court held in *Beneficial National Bank*, where a federal statute provides "the exclusive cause of action" for particular claims, "then the cause of action necessarily arises under federal law and the case is removable," "even when a state complainant, as here, relies entirely on state law." 539 U.S. at 9-11 (holding usury claims that were asserted under state law were subject to removal under National Bank Act, 12 U.S.C. §§ 85-86, which created exclusive cause of action for usury claims against national banks). The Court held that "the proper inquiry [in assessing whether a claim is removable] focuses on whether Congress intended the federal cause of action to be exclusive." *Id.* at 9 n.5. Applying *Beneficial*, the Fifth Circuit has held that, because Congress intended for the Carmack Amendment to provide the exclusive cause of action for claims within its scope, state-law claims that fall within the statute's scope are subject to removal. *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003).

21.     Even before *Beneficial*, courts recognized that where, as here, a state-law claim falls within the scope of Carmack, it is within the original jurisdiction of the district courts and is properly removed, regardless of whether the complaint references federal law. *See, e.g., Great N. Ry. Co. v. Galbreath Cattle Co.*, 271 U.S. 99, 102 (1926) (upholding removal of claim for "non-performance of duties" owed under a bill of lading subject to Carmack); *Am. Synthetic Rubber Corp. v. Louisville & Nashville R.R. Co.*, 422 F.2d 462, 464-67 (6th Cir. 1970) (because case was within scope of Carmack, it was within original jurisdiction of the district court and was properly removed on that basis); *V.R. Compounding Corp. v. Occidental Chem. Corp.*, No. 99 C 8087, 2000 U.S. Dist. LEXIS 13624, at *12 (N.D. Ill. Sept. 13, 2000) ("Because this case arises from an alleged breach of the delivery contract, the Carmack Amendment applies and jurisdiction exclusively lies in federal court."); *Pierre v. United Parcel Serv., Inc.*, 774 F. Supp. 1149, 1151 (N.D. Ill. 1991) (upholding removal because shipper's tort and contract claims were completely preempted by Carmack).

22.     Accordingly, to the extent that the claims in the Complaint arise from packages transported via UPS by means of ground transportation, they are within the scope of the Carmack Amendment and are properly removed to this Court.

### B. Warsaw Convention

23.     The Complaint alleges that, in addition to domestic services, UPS delivers "to over 200 additional countries and territories." (Compl. ¶ 10.) The Carrier Agreement between Accent Depot and UPS, which is offered as an exemplar of the contracts that UPS enters into with consumers, contains incentives for shipments using UPS's Worldwide Express and Worldwide Expedited services. (*Id.* ¶¶ 24, 74 & Ex. G at Addendum B.) The "rate quote agreement" attached to the Complaint provides air freight rates for shipments between Taipei and Chicago, and between Shanghai and Chicago, and the Complaint also attaches invoices from certain international shipments. (*Id.* ¶¶ 26-27 & Ex. A-E.)

24.     Any claim in the Complaint that arises from delayed or missed international shipments is governed by the Warsaw Convention or federal common law, which provide the exclusive remedy for such claims. A claim that falls within the scope of the Warsaw Convention or federal common law is within the original jurisdiction of the district courts pursuant to 28 U.S.C. § 1331, and is properly removed regardless of whether the complaint references federal law.

25.     The Warsaw Convention, an international treaty, applies to "all international transportation of persons, baggage, or goods performed by aircraft for hire.'" Convention for the Unification of Certain Rules Relating to International Transportation by Air, *opened for signature* Oct. 12, 1929, Art. 18(1), 49 Stat. 3000, 3005, 137 L.N.T.S. 11, *reprinted in*, note following 49 U.S.C. § 40105 (adherence of United States proclaimed Oct. 29, 1934). The Convention has a dual purpose of "establishing world-wide uniformity with regard to liability rules and limiting air carriers' liability in the event of accident." *Ratnaswamy v. Air Afrique*, No. 95 C 7670, 1998 U.S. Dist. LEXIS 2683, *10 (N.D. Ill. March 3, 1998).

26.     The Warsaw Convention governs all claims arising out of delay in the international shipment of goods between countries that are adherents of the Convention. Under Article 19 of

the Convention: "The carrier shall be liable for damage occasioned by delay in the transportation by air of passengers, baggage or goods." 49 Stat. 3000, 3005. Thus, where a claim is based on alleged delayed delivery of goods, it is within the scope of the Warsaw Convention. *See, e.g., Paradis v. Ghana Airways*, 348 F. Supp. 2d 106 (S.D.N.Y 2004) (motion to dismiss claim for delay granted following removal under Warsaw Convention); *Rageb v. DHL Worldwide Express*, 1992 U.S. Dist. LEXIS 2822 (N.D. Ill. Mar. 12, 1992) (granting partial summary judgment on delay claim following removal under Warsaw Convention); *Ratnaswamy*, 1998 U.S. Dist. LEXIS 2683, at *1 (motion for partial summary judgment granted where plaintiffs state law claims arising from delay in transport preempted by Warsaw Convention).

27.     In cases falling within the scope of Article 19 of the Convention, the Warsaw Convention provides the exclusive basis of recovery for the damages to which it applies. *Ratnasway*, 1998 U.S. Dist. LEXIS 2683, at *14. Several circuit courts have held that the exclusive remedies of the Warsaw Convention preempt all state and federal claims. *See Husmann v. Trans World Airlines*, 169 F.3d 1151, 1153 (8th Cir. 1999); *Fishman v. Delta Airlines*, 132 F.3d 138 (2d Cir. 1998); *Boehringer-Mannheim Diagnostics v. Pan American World Airways*, 737 F.2d 456,458-59 (5th Cir. 1984). The Seventh Circuit has indicated approval of the line of cases finding preemption, and "[c]ourts in the Northern District have followed this reasoning." *GVA & BG v. Aeroflot Russian Int'l Airlines*, No. 01 C 1435, 2001 U.S. Dist. LEXIS 6549, *5 (N.D. Ill. May 17, 2001).

28.     Accordingly, because Accent Depot's Complaint is based in part on UPS's alleged delayed or failed pick-ups and deliveries, this action is within the scope of the Warsaw Convention. Accent Depot's sole remedy, if any, for delayed deliveries of international shipments between countries that are parties to that treaty is under the Warsaw Convention.

29.     Because the Warsaw Convention provides the exclusive remedy for claims arising from delayed deliveries of international shipments between countries that are parties to that treaty, it displaces any state law claims coming within its ambit, and such claims are removable. As explained in paragraph 20, above, the Supreme Court held in *Beneficial National Bank* that where a federal statute provides "the exclusive cause of action" for particular claims, "then the

cause of action necessarily arises under federal law and the case is removable." 539 U.S. at 9.

30.    Accordingly, to the extent that the claims in the Complaint arise from packages that were delayed in transport between countries that are parties to the Warsaw Convention, they arise under federal law and are properly removed to this Court. *See, e.g., Sahar v. American Airlines*, No. 93 C3878, 1993 U.S. Dist. LEXIS 17592, at *8 (N.D. Ill. Dec. 10, 1993) ("[the plaintiff's] claim 'arises under' the Warsaw Convention and was properly removed to federal court.").

31.    In the event that the Warsaw Convention does not apply to a particular international shipment, federal common law governs. *See Read-Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1195-97 (9th Cir. 1999) (holding that, in the absence of the Warsaw Convention, federal common law governs the construction of air waybills). Accordingly, to the extent that the claims in the Complaint arise from international packages that are not governed by the Warsaw Convention, they arise under federal law and are properly removed to this Court for the reasons stated in Part C, below.

## C. Federal Common Law

32.    The Complaint alleges that UPS provides various transportation services, including "air . . . freight." (Compl. ¶ 13.) The Complaint also alleges that UPS uses dimensional weight to calculate the charges for packages when using certain services, explicitly including UPS Next Day Air® and 2nd Day Air®. (*Id.* ¶ 17.)

33.    Just as the Carmack Amendment exclusively governs shippers' claims against motor carriers, federal common law exclusively governs claims arising from alleged failures in the transportation or delivery of packages carried in whole or in part by air transportation. *See, e.g., McCall-Thomas Eng'g Co. v. Fed. Express Corp.*, 81 F.3d 28, 30 n."*" (4th Cir. 1996) ("Claims involving shipments in interstate commerce by air carriers are governed by federal law."); *Neal v. Republic Airlines, Inc.*, 605 F. Supp. 1145, 1148 n.2 (N.D. Ill. 1985) ("contracts for interstate carriage are governed by federal law"); *Ill. Produce Int'l, Inc. v. Reliance Ins. Co.*,

388 F. Supp. 29, 35 (N.D. Ill. 1975) ("[t]he rights and liabilities of parties to a contract involving interstate and international air carriers are governed by federal law").

34.    The federal common law that governs air cargo transportation is patterned on the Carmack Amendment. *See, e.g.*, *Vogelsang v. Delta Air Lines, Inc.*, 302 F.2d 709, 712 (2d Cir. 1962) (relying on Carmack Amendment principles and cases in upholding air carrier's limitation of liability). Like the Carmack Amendment, federal common law governs claims against air carriers arising from missed or delayed deliveries. *See, e.g.*, *Husman Constr. Co. v. Purolator Courier Corp.*, 832 F.2d 459, 461 (8th Cir. 1987) (applying federal common law in enforcing carrier's limitation of liability in shipper's action for delayed delivery).

35.    Accordingly, because Accent Depot's Complaint is based in part on UPS's alleged delayed or failed pick-ups and deliveries, it is within the scope of federal common law. Accent Depot's sole remedy, if any, for delayed deliveries of packages transported in part by air carriage is a claim under federal common law.

36.    Claims governed by federal common law arise under federal law and are properly removed to this Court. *See, e.g.*, *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 923 (5th Cir. 1997) (upholding removal of shipper's action arising from lost packages because action "raises federal question jurisdiction based on the federal common law that controls an action seeking to recover damages against an airline for lost or damaged shipments"); *N. Am. Phillips*, 579 F.2d at 233-34 (shipper's claim against carrier for stolen goods arose under federal law and thus properly was removed despite "the lack of any reference to federal law in the complaint"). Accordingly, to the extent that the claims in the Complaint arise from packages transported in part by air carriage, they arise under federal law and are properly removed to this Court.

### D.   49 U.S.C. § 13710(a)(3)(B)

37.    Accent Depot's Complaint seeks to hold UPS liable in part for alleged overcharges. (*See, e.g.*, Compl. ¶ 72 (alleging that UPS engaged in "overbilling via mismeasurements and improper fees").)

38.    Where, as here, a shipper contests charges billed by a motor carrier of property, the shipper "must contest the original bill or subsequent bill within 180 days of receipt of the bill *in*

*order to have the right to contest such charges.*" 49 U.S.C. § 13710(a)(3)(B) (emphasis added). *See Carolina Traffic Servs. of Gastonia, Inc — Petition for Declaratory Order*. STB No. 41689, 1996 STB LEXIS 189, at *7-8 (STB May 31, 1996) ("providing notice to the other party within the statute's 180-day period is a *precondition for pursuing a claim*, whether the moving party chooses to pursue that claim initially at the [Surface Transportation] Board or in court" (emphasis added)). Because compliance with the 180-day notice requirement imposed by 49 U.S.C. § 13710(a)(3)(B) is a condition precedent to bringing suit for alleged overcharges, a well-pleaded complaint seeking to hold a carrier liable for alleged overcharges must allege that the shipper has complied with the notice requirement of § 13710(a)(3)(B).

39.     Because a shipper asserting an overcharge claim against a carrier must plead and prove compliance with the notice requirement of § 13710(a)(3)(B), the district courts have original jurisdiction of a complaint asserting an overcharge claim. *See Yellow Freight Sys., Inc. v. Adams Brush Mfg. Co.*, No. 97-2310EEO, 1997 U.S. Dist. LEXIS 13491, at *4 (D. Kan. Aug. 5, 1997) (upholding removal based on 49 U.S.C. §§ 13710 and 14704(b), which "concern the billing and collecting practices of motor carriers' rates in interstate transportation, and the rights and remedies of persons injured by carriers, respectively"). A federal question therefore appears on the face of a well-pleaded complaint for overcharges, and Accent Depot's Complaint is properly removed on that basis.

### E.     49 U.S.C. § 14101(b)(1)

40.     Congress has created a federal remedy for — and thereby conferred federal jurisdiction over — a motor carrier's breach of contracts for specified rates and services, such as the Carrier Agreement and "rate quote agreement." Section 14101 of Title 49 permits motor carriers such as UPS to "enter into a contract with a shipper . . . to provide specified services under specified rates and conditions." 49 U.S.C. § 14101(b)(1). Section 14101 further provides that the "exclusive remedy for any alleged breach of a contract entered into under this subsection shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree." 49 U.S.C. § 14101(b)(2).

41. By creating a remedy in the federal courts, Congress has conferred federal question jurisdiction over such breach of contract actions. *See Cleveland-Cliffs Iron Co. v. Chicago & N. W. Transp. Co.*, 516 F. Supp. 399, 400 (W.D. Mich. 1981) (language in former 49 U.S.C. § 10713(i)(2) identical to that in § 14101(b)(2) created federal question jurisdiction over shipper's claim to enforce tariff agreement with rail carrier), *aff'd mem.*, 701 F.2d 175 (6th Cir. 1982); *Iowa Power & Light Co. v. Burlington N. R.R. Co.*, No. 81-526-B, 1983 U.S. Dist. LEXIS 11443, at *20 (S.D. Iowa Nov. 22, 1983) (concluding that court had federal question jurisdiction pursuant to former 49 U.S.C. § 10713(i)(2)).

42. Courts and scholars overwhelmingly agree that such a grant of concurrent jurisdiction makes removal proper unless Congress explicitly has stated otherwise. *See, e.g.*, *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1196 (9th Cir. 1988) ("Since Congress has specifically prohibited removal in certain areas of concurrent jurisdiction, its omission or failure to do so in others indicates that federal removal jurisdiction is retained."). *Accord* 14B Charles A. Wright et al., *Federal Practice and Procedure* § 3721, at 303 (3d ed. 1998); *Dorsey v. City of Detroit*, 858 F.2d 338, 341 (6th Cir. 1988); *Whitfield v. Fed. Crop Ins. Corp.*, 557 F.2d 413, 414 (4th Cir. 1977).

43. Here, Accent Depot's allegations of the existence and breach of incentive shipping contracts establish that § 14101 applies. (*See* Compl. ¶¶ 74, 78 & Ex. G.) Because 49 U.S.C. § 14101 confers federal question jurisdiction over the claims in the Complaint challenging the charges imposed pursuant to incentive contracts with UPS, these claims arise under federal law and are properly removed.

### F. Diversity

44. This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity). Plaintiff Accent Depot is "a citizen and resident" of Illinois. (Compl. ¶ 6.) *See Snyder v. Harris*, 394 U.S. 332, 340 (1969) (residence of named plaintiff determinative for assessment of diversity jurisdiction). Defendant United Parcel Service, Inc. ("UPS (Delaware)") is, and at the time of the filing of the Complaint was, a citizen of Delaware, where it is incorporated, and Georgia, where it has its principal place of business. Defendant UPS Supply

Chain Solutions, Inc. ("UPS-SCS") is, and at the time of the filing of the Complaint was, a citizen of Delaware, where it is incorporated, and Georgia, where it has its principal place of business.

45.     As set forth below, the amount in controversy with respect to the claims of Accent Depot exceeds the $75,000 threshold specified in 28 U.S.C. § 1332.

46.     First, in addition to other relief, the Complaint seeks punitive damages. (Compl. at 20.)  The Complaint asserts entitlement to punitive damages pursuant to the tort claim for conversion, alleging that UPS's conduct was "willful and malicious." (*Id.* ¶ 84.)  The Seventh Circuit has held: "Where both actual and punitive damages are recoverable under a complaint each must be considered to the extent claimed in determining the jurisdictional amount." *Cadek v. Great Lakes Dragaway, Inc.*, 58 F.3d 1209, 1211 (7th Cir. 1995).

47.     Second, the Complaint asserts entitlement to attorneys' fees pursuant to the Consumer Fraud Act, 815 ILCS 505/10a, the Uniform Deceptive Trade Practices Act, 815 ILCS 510/3, and the tort claim for conversion. (Compl. ¶¶ 63, 70, 84 & p. 20.)  The Complaint further alleges that Accent Depot "has incurred significant expenses, including attorney's fees, in the investigation and prosecution of this action." (*Id.* ¶ 84.)  Where a prevailing party would be entitled to recover attorneys' fees, the amount of fees incurred in investigating and filing the complaint are properly considered in determining the amount in controversy. *See, e.g., Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955, 958 (7th Cir. 1998).

48.     Although UPS disputes its liability to Accent Depot for *any* relief, by praying for punitive damages and attorneys' fees based on UPS's allegedly improper conduct, Accent Depot has placed at least $75,000 in controversy in its claims.

49.     Third, in its Complaint, Accent Depot seeks "[a] permanent injunction preventing defendants from continuing to deceive the public by utilizing their current billing scheme of charging excess and duplicative fees, and mismeasuring packages to determine dimensional weight." (Compl. at 20).  The costs imposed on UPS in complying with the requested injunction are properly considered in determining the jurisdictional amount. *See Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 983 (7th Cir., 2002) ("it is established that the

jurisdictional amount should be assessed looking at either the benefit to the plaintiff or the cost to the defendant of the requested relief--the so-called 'either viewpoint' rule"); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 609 (7th Cir. 1997) (same).

50.     Although UPS disputes its liability to Accent Depot for *any* relief, and believes that the procedures in place for measuring packages are accurate, as set forth in the attached declarations of Daniel E. Okon and Thomas Bliss (attached hereto as Exhibits B & C), in the event that Accent Depot obtained the injunction sought in the Complaint as relief for its claims, UPS (Delaware) and UPS-SCS would each incur costs in excess of $75,000.

51.     As shown by the "rate quote agreement" and invoices attached to the Complaint (which indicate that Accent Depot has received packages shipped from Taipei and Shanghai), and the Carrier Agreement between Accent Depot and UPS (which indicates that Accent Depot has contracted with UPS for a variety of different types of air, ground, and international shipping services), Accent Depot may ship packages to, and receive packages from, anywhere in the United States or the world. (*Id.* Ex. A-G.) UPS has thousands of "dimensioning units" located in 51 locations throughout the United States, and in 29 countries throughout the world, which are used for measuring the dimensions of packages to calculate dimensional weight. (Okon Decl. ¶ 4.) If Accent Depot were awarded an injunction that required UPS to alter its established procedures for measuring packages and calculating dimensional weight, the costs of altering and re-certifying these units alone would exceed $75,000. (*Id.*) UPS would incur additional costs for revised training materials, internal certification materials, customer materials, and maintenance materials. (*Id.*) Over 6,000 Revenue Recovery employees would also need to be re-trained worldwide to follow the 'new' guidelines. (*Id.*)

52.     The costs to UPS-SCS to comply with an injunction that required UPS-SCS to change its practices and utilize a different method of measuring packages , then the costs to UPS-SCS of complying with that injunction would exceed $75,000. (Bliss Decl. ¶ 3.) These costs would include the cost of equipment, developing the new procedures, implementing them in the various UPS-SCS operating facilities, training employees to follow the new procedures, and follow up to ensure that the procedures are being followed. (*Id.*)

## CONCLUSION

53.     For all the reasons stated above, this action is within the original jurisdiction of this

Court pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity).

Accordingly, this action is removable pursuant to 28 U.S.C. § 1441(a) & (b).

54.     Counsel for UPS certifies that a copy of this Notice of Removal is being filed with

the Clerk of the Circuit Court of Cook County, Illinois, County Department, Chancery Division.

55.     In compliance with Local Rule 81.2, on February 16, 2005, UPS served Accent

Depot with an interrogatory and request for admission related to the amount in controversy.

Copies of the discovery requests are attached hereto as Exhibit D.

WHEREFORE, Defendant UPS gives notice that the above-described action pending

against it in the County Department, Chancery Division, of the Circuit Court of Cook County,

Illinois, is removed to this Court.

Dated:     February 17, 2005

Respectfully submitted,

Leonard S. Shifflett (ARDC#2587432)
Brendan O'Connor (ARDC#06276720)
QUARLES & BRADY LLP
Citicorp Center
500 West Madison Street
Suite 3700
Chicago, Illinois 60661-2511
Telephone: (312)-715-5000
Facsimile: (312) 715-5155

Paul T. Friedman (*Pro Hac Vice Application Pending*)
Ruth N. Borenstein (*Pro Hac Vice Application Pending*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

Attorneys for Defendants
United Parcel Service, Inc. and UPS Supply
Chain Solutions, Inc.

# **EXHIBIT A**

## Krislov & Associates, Ltd.
20 North Wacker Drive, Suite 1350
Chicago, Illinois  60606
Telephone: 312-606-0500
Facsimile:  312-606-0207

### Notice of Complaint and Request for Waiver of Formal Service

To:     United Parcel Service, Inc.
        55 Glenlake Parkway, N.E.
        Atlanta, GA 30328

Re:     Case Title:   Accent Depot, LLC v. United Parcel Service, Inc.
        Docket No.:   05 CH 01029
        Court: In the Circuit Court of Cook County, Illinois, County Dept., Chancery Division

        A lawsuit has been commenced against you (or the entity on whose behalf you are addressed) in the above-titled action.  A copy of the complaint is attached to this notice.

        This is not a formal summons or notification from the court, but rather my request that you sign and return the enclosed waiver of service in order to save the cost of serving you with a judicial summons and an additional copy of the complaint.  The cost of service will be avoided if we receive a signed copy of the waiver within 30 days after the date designated below as the date on which this Notice and Request is sent.  We have enclosed a stamped and addressed envelope for your use.  An extra copy of the waiver is also attached for your records.

        If you comply with this request and return the signed waiver, it will be filed with the court and no summons will be served on you.  The action will then proceed as if you had been served on the date the waiver is filed, except that you will not be obligated to appear or serve an answer to the complaint until 60 days from the date designated below as the date on which this request for waiver of service was sent.

        Further, your compliance with this request does not thereby waive any objection to the venue or to the jurisdiction of the court over your person.  You may refuse to waive service of this summons.  Summons will be served upon you if you do not return the enclosed waiver.

        I affirm that this request is being sent to you on behalf of the plaintiff, this **19th** day of **January, 2005**.

        KRISLOV & ASSOCIATES, LTD.

        By: _____
        Clinton A. Krislov
        Jason P. Stiehl

To:    Krislov & Associates, Ltd.
       20 North Wacker Drive, Suite 1350
       Chicago, Illinois  60606

Re:    Case Title:   Accent Depot, LLC v. United Parcel Service, Inc.
       Docket No.:   05 CH 01029
       Court: In the Circuit Court of Cook County, Illinois, County Dept., Chancery Division

### Acknowledgment of Receipt of Complaint and Waiver of Service

       I acknowledge receipt of your request that I waive service of a summons in the above-titled action.

       I have also received a copy of the complaint in the action from our Registered Agent, CT Corporation System, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

       I agree to save the cost of service of summons and an additional copy of the complaint in this lawsuit by not requiring that Named Defendant **United Parcel Service, Inc.**, be served with judicial process.

       **United Parcel Service, Inc.** will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

       I understand that a judgment may be entered against **United Parcel Service, Inc.** if an answer or appropriate motion is not served upon you within 60 days after the date this request was sent, **January 19 , 2005**.


**Named Defendant**_____


_____    by _____
**Date**                        Signature


**Printed / Typed name:**

_____

**Title:** _____

F:\CASES\UPS\waiver of service of summons (UPS, Inc.).wpd

To:    Krislov & Associates, Ltd.
       20 North Wacker Drive, Suite 1350
       Chicago, Illinois 60606

Re:    Case Title: <u>Accent Depot, LLC v. United Parcel Service, Inc.</u>
       Docket No.: <u>05 CH 01029</u>
       Court: <u>In the Circuit Court of Cook County, Illinois, County Dept., Chancery Division</u>

### Acknowledgment of Receipt of Complaint and Waiver of Service

I acknowledge receipt of your request that I waive service of a summons in the above-titled action.

I have also received a copy of the complaint in the action from our Registered Agent, CT Corporation System, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service of summons and an additional copy of the complaint in this lawsuit by not requiring that Named Defendant **United Parcel Service, Inc.**, be served with judicial process.

**United Parcel Service, Inc.** will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against **United Parcel Service, Inc.** if an answer or appropriate motion is not served upon you within 60 days after the date this request was sent, **January 19 , 2005**.

**Named Defendant** _____

by _____

**Date** _____          Signature

**Printed / Typed name:**

_____

**Title:** _____

F CASES:UPS\waiver of service of summons (UPS, Inc.).wpd

KRISLOV & ASSOCIATES, LTD.

20 North Wacker Drive
Suite 1350
Chicago, IL 60606
(312) 606-0500

F:\CASES\UPS\waiver of service-UPS, Inc.wpd

CASE NO. _____ 05c 990

FILE DATE: _____ 2·17·05 _____

ATTACHMENT #. _____ 1 _____

EXHIBIT _____ A _____

TAB (DESCRIPTION) _____

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ACCENT DEPOT, LLC on behalf of itself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | **05CH01949** |
| vs. | ) ) | CLASS ACTION COMPLAINT |
| UNITED PARCEL SERVICE, Inc. and UNITED PARCEL SERVICE SUPPLY CHAIN SOLUTIONS, | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

The Plaintiff, ACCENT DEPOT, LLC (hereinafter ("Accent Depot") for itself and as representative of a class of similarly situated consumers, by and through their attorneys, KRISLOV & ASSOCIATES, LTD., and for the Class Action Complaint against Defendants United Parcel Service, Inc. ("UPSI") and United Parcel Service Supply Chain Solutions ("UPSSCS"), collectively known as "UPS", state as follows:

### NATURE OF ACTION

I.      This is a class action arising under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, Breach of Contract, Breach of the Duty of Good Faith and Fair Dealing, and Unjust Enrichment. It is brought for the class of consumers who contracted with United Parcel Service, Inc. and/or any of its subsidiaries, including, but not limited to, United Parcel Services, Inc., to ship products and were charged the dimensional weight for a product.

2.    While the contract contained provisions which allowed UPS to charge dimensional weight, independent investigation has established that UPS improperly measures the dimensions of the shipments by adding dimension to the packages, thereby creating a greater dimensional weight.

3.    In addition, UPS adds additional and duplicative charges not bargained for between the parties, including, but not limited to, messenger fees, telephone fee, and Airline Terminal Charge.

## JURISDICTION AND VENUE

4.    Jurisdiction.  This Court has jurisdiction over this litigation pursuant to 735 ILCS 5/2-209(a)(1) (transaction of any business within this State), (a)(2) (commission of a tortious act within this State), (a)(7) (the making or performance of any contract or promise substantially connected with this State), (b)(4) (a corporation doing business within this State) and (c) (to the fullest extent allowed by the Illinois and U.S. Constitutions).

5.    Venue.  Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 because Defendants are not residents of Illinois and because the practices complained of herein took place, inter alia, in Cook County, Illinois through Defendants' package operating facility outside of Chicago, Illinois and its use of O'Hare International for shipment of packages.

## THE PARTIES

6.    Plaintiff Accent Depot, LLC is a limited liability company, operated by its member and manager, Eileen S. Boehne.  It is a citizen and resident of the State of Illinois, County of DuPage.  Plaintiff Accent Depot, LLC, by and through its member,

-2-

Eileen S. Boehne, contracted with UPSSC to ship packages and was subsequently overcharged for those packages, by overmeasurement of the dimensional weight, addition of unrelated fees, and duplicative fees.

7.     Upon information and belief, Defendant United Parcel Service, Inc. is a Delaware corporation with its principal place of business located at 55 Glenlake Parkway, N.E., Atlanta, Georgia 30328.

8.     Upon information and belief, Defendant United Parcel Service Supply Chain Solutions is a wholly-owned subsidiary of United Parcel Service, Inc., located in Alpharetta, Georgia 30005.

## FACTUAL ALLEGATIONS

9.     <u>Defendant UPS's Business</u>. UPS is the world's largest package delivery company and a leading global provider of specialized transportation and logistics services. UPS delivers packages each day for 1.8 million shipping customers to 6.1 million consignees. In 2003, they delivered an average of 13 million pieces per day worldwide, with total revenue of over $33 billion.

10.     In addition to their domestic delivery service, they also deliver to over 200 additional countries and territories. They claim to have established a global transportation infrastructure and developed a comprehensive portfolio of guaranteed delivery services, and support those services with advanced technology.

11.     In addition to their general delivery services, they have also developed integrated supply chain solutions for major companies. Their growth strategy is to grow UPS's package business by leading the transformation of the supply chain management into the broader business arena of synchronized commerce, where the flow of goods,

- 3 -

information and funds are seamlessly connected to help their customers grow their business.

12.      UPS manages supply chains in 120 countries, with approximately 25 million square feet of distribution space and over 750 facilities worldwide.

13.      In addition they provide air, ocean and ground freight, customs brokerage, and trade and materials management.

14.      To do this, in the fourth quarter of 2002, UPS merged two of its existing business segments, UPS Freight Services and UPS Logistics Group, to form UPS Supply Chain Solutions. UPSSCS was formed to meet customers' supply chain needs by selecting the most appropriate solution from a portfolio of over 60 services, including: (1) logistics and distribution, (2) international trade management, and (3) transportation and freight. Through the use of its other business segments, such as UPS Capital and UPS Consulting, UPSSCS also can offer customers financial advice and consulting. More information regarding this particular business segment of UPS can be found at www.ups-scs.com.

15.      In 2003, UPSSCS did $2.12 billion in sales, up 8% from the previous year.

16.      <u>Actual Weight v. Dimensional Weight</u>. When shipping packages, UPS utilizes two different measuring techniques. Actual weight, as it sounds, is simply the weight of the package in pounds or kilograms. Any fraction of a pound or kilogram is rounded to the next full pound or kilogram.

17.      Alternatively, when using certain services (*e.g.*, UPS Next Day Air, 2nd Day Air, 3 Day Select), UPS utilizes a measuring system know as dimensional weight, when that weight is greater than the actual weight.

- 4 -

18.    Dimensional weight is calculated by measuring the cubic size in inches (LxWxH) and dividing by 194 (for pounds), or measuring in centimeters and dividing by 6000 for kilograms.



After the calculation, the weight is then rounded to the next nearest pound. *See* www.ups.com/content/us/en/resources/prepare/dim_weight.html.

19.    For example, if a package sent weighs 1 pound, but is 10x10x10, UPS would utilize dimensional weight.  (1000/166 = approx 6.02; rounded to 6.0 lbs).

20.    <u>Accent Depot's business</u>.  Accent Depot is a small limited liability company located in Naperville, IL.  It is in the business of providing low cost decorative binder clips, called "brads", for the retail scrapbook and rubber stamping industries

21.    The brads are manufactured in China, and shipped to Accent Depot, for distribution worldwide.

22.    Accent Depot relies upon its shippers, in the present case Defendants, to efficiently, and per the terms of the contract, pickup and deliver their goods to them within the time requested.

23.    Any delay in the process potentially costs Accent Depot customers, and any non-bargained for or superfluous fees reduce the profits Accent Depot makes on any given shipment.

24.    Specific Allegations.  On April 5, 2004, Eileen S. Boehne, agent for
Accent Depot LLC, entered into a carrier agreement with United Parcel Services, Inc, as
prepared by its agent Oliver Dewgaard.  Because the agreement contains a confidentiality
clause, it is not included herein.  However, upon request of the Defendants, a copy of said
agreement will be provided.

25.    The agreement incorporates, by way of reference, the UPS Rate and
Service Guide and UPS Tariff in effect at the time of shipping.  Although it is more
recently updated, and thus some of the rates may have changed, an exemplary version can
be found at http://www.ups.com/media/en/2005_DailyPickup_BK.pdf

26.    In addition, Mr. Dewgaard provided Accent Depot with a rate quote
agreement on June 14, 2004, explaining the general fees associated with international
shipping, including an Airline Terminal Fee, a Formal Customs Entry Fee, and additional
fees which would be added only if applicable, such as a communications fee, or a
messenger fee.  A copy of the rate quote is attached hereto as Exhibit A.

27.    Accent Depot accepted the rate quote, and faxed back a signed copy of the
Rate Agreement on July 7, 2004.

28.    Although various problems existed with the actual shipping and timing of
UPS's service, such as late pick-up, or failure to pickup, as well as supposed delays in
customs and late delivery to Accent Depot, the biggest problem associated with the
deliveries was the billing.

29.    To begin, although invoices were sent to Accent Depot, they provided
only the summary charges, and no detail as to how the charges were calculated.  Mrs.

Boehne immediately questioned the numbers utilized, and requested a detailed summary of her bills.

30.     She spoke with two representatives of UPSSCS, Jordan Bell and Ed Arguilla, who indicated that they would promptly provide her with the necessary paperwork.

31.     Finally, on September 17, 2004, Ed Arquilla faxed the invoices to Jordan Bell, who then faxed a copy of the full invoices for July 13, 2004 and August 17, 2004 to Accent Depot. A copy of this fax with the invoices is attached hereto as Exhibit B.

32.     Duplicative Fees. Within the July 13, 2004 invoice, Mrs. Boehne immediately noticed some unusual charges. For example, Mrs. Boehne identified on the first page that there was an "airline terminal charge" of $69.25. This alone was not unusual; however, on page seven of the invoice, where the freight charges are totaled, she realized that the "airline terminal charge" was also included within the freight charges.

33.     Thus, although she contracted to pay an "airline terminal charge" once, UPS buried an additional "airline terminal charge" within her freight charges, resulting in a double billing of this fee.

34.     Imaginary Fees. Further examination of the July 12, 2004 invoice turned up additional discrepancies. For example, on the first page of the invoice listing the summary of charges, there was an addition of a "telephone services" charge, and a "messenger" charge.

35.     However, these were fees, under the terms of the general form rate agreement, which would be included "only if applicable". Accent Depot, however, never utilized any telephone or messenger services.

36.     In fact, Mrs. Boehne suffered additional loss because she had to contact the shipper in China directly, in the middle of the night (local time), because UPS had failed to collect some of the packages. Additionally, they were led to believe that a shipment was on the way from Taiwan, when, in reality, it never shipped. Instead, they had to arrange for another shipper, after two weeks later discovering that it never left Taiwan.

37.     When she questioned why these charges were added, she was informed that these were charges added to <u>everyone's bill</u>, because it was too difficult to track who utilized these services—although the services were never explained, nor their explanation described in either of the agreements she signed, or the incorporated Rate and Service Guide.

38.     <u>Overmeasurement of the boxes</u>. Perhaps most egregious, though, was the simple overmeasurement of her packages.

39.     Mrs. Boehne, as an agent of the Accent Depot, recognizes the boxes utilized by her shipper in China, as she orders similar products on every shipment, and the shipper uses the same limited number of box sizes each time.

40.     When she reviewed the sizes identified on pg. 7 of her invoice, she immediately became suspicious that she was being overcharged.

41.     For one, the boxes utilized by her shipper in China had the dimensions of the box identified on the outside of the box, thus she could immediately compare those numbers with the sizes utilized by UPS.

42.     Below is a comparison of those numbers:

**UPS's calculations**

| # of boxes | UPS Bill | cm3 per box | Total Dim | dim kg |
|---|---|---|---|---|
| 67 | 44x37x33 | 53724 | 3599508 | 599.92 |
| 2 | 38x35x33 | 43890 | 87780 | 14.63 |
| 5 | 59x43x34 | 86258 | 431290 | 71.88 |
| 1 | 46x21x35 | 33810 | 33810 | 5.64 |
| 75 | | Total Volume Per kg | 4118.58 | 686.43     692.5<br>2.98      2.98 |
| | | Total | | 2045.56   2063.65 |

**Accent Depot's Calculations**

| # of boxes | Actual Size | cm3 per box | Total Dim | dim kg |
|---|---|---|---|---|
| 67 | 44x36x32.5 | 51480 | 3449160 | 574.86 |
| 3 | 37.5x34.5x32.5 | 42047 | 126141 | 21.02 |
| 5 | 55x42.5x34 | 79475 | 397375 | 66.23 |
| 75 | | Total Weight Per kg | 3972.68 | 662.11<br>2.98 |
| | | Total | | 1973.10 |

43.    Not only did the actual calculations not add up, but, they used false dimensions to make their calculations. For example, 5 of the boxes received by Accent Depot had dimensions (written on the outside of the box) of 55x42.5x34[1]. However, UPS charged Accent Depot for a box of dimensions 59x43x34, resulting in an approximate five (5) kilogram difference.

---

[1] UPS notes on its website that weights should be rounded to the nearest whole dimension. It is questionable whether .5 should be rounded up, rather than down when measuring for dimensional weight. Even with this taken in favor of the Defendants, they are still egregiously off on multiple measurements.

44.     Similar mismeasurements were made on all of her additional invoices. Attached hereto as Exhibits C, D, and E.  In addition, Accent Depot has created a spreadsheet detailing the differences between each invoice, attached hereto as Exhibit F.

45.     When she contacted UPS to explain these discrepancies, she was informed that the measurements on the outside of the boxes accounted for the "internal" measurements of the box, not the external.  However, after measuring the boxes manually, Mrs. Boehne produced the same results.

46.     Still doubting Accent Depot's calculations, UPS sent a representative to her house, Mr. Dewgaard.  After conducting the measurements himself, he concluded that the boxes had been mismeasured.

47.     Mr. Doug Moorad, Director of Business Development, came from Tennessee to meet with Mrs. Boehne twice to discuss these discrepancies.  After reviewing Mrs. Boehne's claims, as to both the mismeasurements and the superfluous fees, Mr. Moorad noted that these invoices were indeed wrong, that the Chicago office was having "problems", and that the invoices would be reconciled.

48.     To date, those discrepancies have not been corrected.  Accent Depot paid the first two invoices, minus the disputed amount, and has not paid the remaining three invoices.

49.     In addition, despite promises from Mr. Moorad that these problems would be resolved, she is still receiving billing from UPSSCS's billing department.

## CLASS ALLEGATIONS

50.     The Plaintiffs properly bring this action individually and as a class action pursuant to Section 2-801 of the Illinois Code of Civil Procedure.

51.    **Class Definition**. The class so represented by the Plaintiff in this action, and of which the Plaintiffs are members, would be defined as:

> All consumers of UPS or its affiliates (collectively the "UPS Affiliates"), who utilized UPS shipping within the previous five (5) years from a date of decision in this matter, in the United States, with respect to which one of the UPS affiliates utilized the practice of overcharging customers by either (a) overmeasurement for the purposes of dimensional weight, or (b) charging superfluous or duplicative fees, such as an airport terminal fee, messenger fee, or telephone (communication) fee.

52.    **Numerosity**. The proposed class is so numerous that the individual joinder of all members is impracticable. While the exact number of members of the class as herein defined and described is unknown to Plaintiff at this time, Plaintiff believes the class of consumers who shipped with UPS and were overcharged numbers at least in the hundreds of thousands, perhaps more.

53.    **Adequacy of Representation**. The plaintiff representative parties will fairly and adequately protect the interests of the Class. Plaintiff has no interests adverse to those of the class. Undersigned counsel is very experienced in class actions and complex litigation of this kind, and well-qualified to pursue this litigation vigorously and fully.

54.    **Commonality**. Questions of law or fact exist arising from the Defendants' billing scheme and related conduct. Such questions are common to all class members and predominate over any questions affecting only individual members of the class. The myriad of questions of law or fact common to the class, includes, *inter alia*:

> a.  Whether Defendants mismeasure packages shipped by their customers;
>
> b.  Whether Defendants intentionally mismeasure the packages;

- 11 -

c.  Whether the Defendants intentionally add superfluous and/or duplicative fees to the bills of UPS customers;

d.  Whether Defendants have a national uniform practice/mode of operation in overbilling its customers;

e.  Whether Defendants use or employ deception, fraud, false pretenses, false promises or misrepresentations when selling its products;

f.  Whether Defendants conceal, suppress, or omit any material facts regarding the billing of packages shipped;

g.  Whether Defendant intended that the class rely upon such concealment, suppression or omission of such material fact regarding the billing of packages shipped;

h.  Whether Defendant breached its contractual terms with its clients by overbilling customers;

i.  Whether Defendants' practice of overbilling violates the Illinois Consumer Fraud and Deceptive Business Practices Act by charging consumers for inflated measurements and superfluous and duplicative fees;

j.  Whether class members have been damaged and, if so, what is the proper measure of damages;

k.  Whether the class members are entitled to injunctive and/or declarative relief, and the scope of such relief;

l.  Whether the actions complained of herein justify an award of punitive damages; and

m. Whether Defendants have been unjustly enriched as a result of their overbilling practices.

55. **Appropriateness**. This class litigation is an appropriate method for fair and efficient adjudication of the claims involved. The miscellaneous fees added range from $7.50 per shipment, to approximately $70.00, and the mismeasurements are typically done in such small increments as to be unnoticeable to most consumers, and increase the general price in such a small way as to be virtually unnoticeable. Furthermore, each member of the class seeks prospective equitable relief to prevent further deception of class members by Defendants. Given the size of individual claims and the nature of the relief, the size of the expected recovery for any individual class member is not substantial enough for class members to incur the costs and expenses of litigation, or pursue these claims on an individual basis.

## JURY DEMAND

56. Plaintiffs and Class members demand a trial by jury.

## CAUSES OF ACTION

### Count I—Consumer Fraud Act

57. Plaintiff repeats and re-alleges paragraphs 1 through 56, as if fully set forth herein.

58. At all relevant times there was in full force and effect the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. (the "Consumer Fraud Act") and similar deceptive practice acts in other states.

59. Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, provides, in pertinent part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act. (footnotes omitted)

60.     Defendants have violated the Consumer Fraud Act by engaging in the following unfair and deceptive acts and practices:

      a.  Advertising its shipping services with intent not to sell them as advertised;

      b.  Overcharging for the dimensional weight of the shipped packages; and

      c.  Charging for services not provided.

      d.  Engaging in conduct that creates a likelihood of confusion or misunderstanding.

61.     The Defendants representations are unlawful and amount to unfair and/or deceptive acts or practices which violate Section 2 of the Consumer Fraud Act.

62.     Defendants' actions described herein similarly violated the consumer protection statutes in effect in every state in which Defendants or their affiliates do business.

63.     Section 10a of the Consumer Fraud Act, 815 ILCS 505/10a, and similar provisions in the Consumer Fraud Acts of other jurisdictions within the United States, provide, in pertinent part:

(a)     Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion, may award

- 14 -

actual economic damages or any other relief which the court deems proper…

* * *

(b)     Except as provided in subsection (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

64.     As a direct and proximate result of these violations, Plaintiff and the class have suffered pecuniary damages, in at least the amount of fees and overmeasurements, for which they should be compensated, including, but not limited to:

      a.  Damages for any mismeasurements;

      b.  Damages for overcharges (duplicative charges);

      c.  Damages for fees on services not provided.

### Count II—Uniform Deceptive Trade Practices Act

65.     Plaintiff repeats and re-alleges paragraphs 1 – 37, as if fully set forth herein.

66.     At all relevant times, the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq., ("Uniform Act") was in full force and effect.

67.     The Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, et seq., provides at Section 2, 815 ILCS 510/2, in pertinent part:

§ 2.  A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:

(11)  advertises goods or services with intent not to sell them as advertised;

***

(12)  engages in any conduct which similarly creates a likelihood of confusion or misunderstanding.

- 15 -

> In order to prevail in an action under this Act, a plaintiff need not prove competition between parties or actual confusion or misunderstanding.
>
> This Section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State.

68.    Defendants have violated the Deceptive Trade Practices Act by engaging in the following practices:

> a.    Advertising its shipping services with intent not to sell them as advertised;
>
> b.    Overcharging for the dimensional weight of the shipped packages; and
>
> c.    Charging for services not provided.
>
> d.    Engaging in conduct that creates a likelihood of confusion or misunderstanding.

69.    Defendants' actions described herein similarly violated the consumer protection statutes in effect in every state in which Defendants or their affiliates do business.

70.    Section 3 of the Uniform Act provides, in pertinent part:

> § 3.    A person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required. ... Costs or attorneys' fees or both may be assessed against a Defendant only if the court finds that he has willfully engaged in deceptive trade practices.

71.    Plaintiff and the class members are likely to be damaged by Defendants' deceptive trade practices as Defendants continue to disseminate misleading information. Thus, injunctive relief enjoining this deceptive practice is proper.

72.    The Defendants have knowingly and willfully engaged in the deceptive trade practice of overbilling via mismeasurements and improper fees, thus making both costs and attorneys' fees appropriate.

- 16 -

## Count III—Breach of Contract

73.    Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

74.    Defendants and their affiliates entered into agreements with consumers, including Plaintiff and members of the Class.  An exemplar of this agreement, entered into with the Plaintiff, is attached as Exhibit G.

75.    Through their agreements, Defendants promised a certain rate quote and the inclusion of fees.

76.    Through their agreements, Defendants guaranteed that the agreements included all fees and that those would be the final and complete summary of fees.

77.    Plaintiff and members of the Class performed their contractual obligations under their agreements with Defendants.

78.    Defendants and their affiliates materially breached and repudiated their duties under their agreements with Plaintiff and members of the class by:

     a.    unilaterally charging fees that were not utilized by the Plaintiff and class members, such as telephone (communication) fee and messenger fees;

     b.    unilaterally charging duplicative fees, once in line item and once buried within freight charges, such as the airport terminal fee;

     c.    overmeasuring the dimensions of the packages so that (1) dimensional weight would be used instead of conventional actual weight, and (2) the dimensional weight of the packages would be much greater than the actual dimensional weight of the packages.

79.    As a result of the foregoing, Plaintiff and members of the Class were actually and proximately damaged by the additional fees and the duplicative fees, and the mismeasurement of

their packages, beyond their contractual terms, and have suffered pecuniary damages, in at least the amount of fees and overmeasurements, for which they should be compensated.

## Count IV-- Conversion

80. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

81. Defendants and their affiliates have converted funds owed to the Plaintiff and the class members in the following respects: ·

     a.    charging fees above and beyond those contracted for;

     b.    inducing additional fees beyond those contracted for; and

     c.    Charging Plaintiff and class members fees for services never contracted for and/or never used.

82. Each of these acts constitutes an authorized taking by the Defendants and their affiliates, into their possession, of funds owed to the Plaintiff and the class members. These acts were committed by Defendants with the intent, at the time of taking, to appropriate said funds.

83. As a direct and proximate result of the conversion committed by the Defendants and their affiliates, Plaintiff and class members have suffered pecuniary damages, in at least the amount of fees and overmeasurements, for which they should be compensated.

84. In addition, the conversion committed by Defendants was willful and malicious. Plaintiff will demonstrate that it has incurred significant expenses, including attorney's fees, in the investigation and prosecution of this action. Their conduct warrants imposition of punitive damages in this case.

## Count V---Common Law Fraud

85. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

86. Defendants, and their affiliates, intended to deceive Plaintiff and class members to believe that UPS offered the best shipping price, with the best rates.

87. In addition, they intended to deceive Plaintiff and class members into believing that the fees offered would be the only fees charged, and that certain fees would be charged only if applicable.

88. In addition, they intended to deceive Plaintiff and class members into believing that they would charge the appropriate weight for their packages, and that if they did have to utilize dimensional weight, that they would appropriately and fairly measure the size of their packages.

89. Plaintiff and class members relied upon Defendants representations that they could ship at the rate quote provided, that the fees listed were all those to be charged, and that if dimensional weight were to be used, the dimensions of their packages would be measured fairly and correctly.

90. As a result of Defendants fraudulent misrepresentations, Plaintiff and the class members were actually and proximately deceived and damaged by said misrepresentations, fees and mismeasurements, and have suffered pecuniary damages, in at least the amount of fees and overmeasurements, for which they should be compensated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for the following relief:

A. Find and certify that this action is a class action under § 2-801 of the Illinois Code of Civil Procedure;

B. Designate Plaintiff as class representative;

C.    A declaration that UPS and their affiliates' conduct violates the laws as alleged in

each cause of action;

D.    A permanent injunction preventing the Defendants from continuing to deceive the

public by utilizing their current billing scheme of charging excess and duplicative

fees, and mismeasuring packages to determine dimensional weight;

E.    Judgment for the Plaintiff and the class for restitution and/or compensatory

damages sustained as a result of the Defendants' conduct;

F.    Reasonable attorneys' fees;

G.    Punitive damages; and

H.    Such other legal or equitable relief as the Court deems just and proper.

Dated: January 18, 2005                                RESPECTFULLY SUBMITTED,


Attorney for Plaintiff


Clinton A. Krislov
Jason P. Stiehl
KRISLOV & ASSOCIATES, LTD.
20 N. Wacker, Suite 1350
Civic Opera House
Chicago, Illinois 60606
(312) 606-0500
Firm I.D. No. 91198

# UPS Supply Chain Solutions

**Accent Depot**
*1939 Phaeton Ct., Naperville, IL 60565*
*Contact: Eileen Boehne, Tel# 630-548-2133*

Date: June 14, 2004
Quote No: DV20040153

Faxed 7-7-04

1 of 4

Origin:       Taipei, Shanghai, China Airport
Destination: Door Naperville, IL 60565
Commodity: Spices

## AIR FREIGHT RATE - AIRPORT TO AIRPORT - PREFERRED SERVICE

| Origin Airport | Destination Airport | Min | -45K | +45K | +100K | +500K | +1000K | Transit |
|---|---|---|---|---|---|---|---|---|
| Taipei (TPE) | Chicago (ORD) | $75 | $4.35 | $3.50 | $3.20 | $2.60 | $2.50 | 3 - 5 Days |
| Shanghai (PVG) | Chicago (ORD) | $60.37 | $4.06 | $3.56 | $3.05 | $2.98 | $2.92 | 3 - 4 Days |

## USA Air Destination Charges:

| | | |
|---|---|---|
| Fuel Surcharge per Kg | $0.25 | |
| Security Surcharge per Kg | $0.14 | |
| Pick up from Hangzhou | $150.00 Min or $0.09 | Per Kg |
| Customs Clearance at Shanghai | $30.00 | Per Shipment |
| Airline Terminal Fee | $25.00 Min or $0.10 | Per Kg |
| Document Turnover to UPS-SCS CHB | $20.00 | Per HAWB |
| Document Turnover to outside forwarder | $50.00 | Per HAWB |
| In-bond preparation fee (CF-7512 - IT) | $35.00 | Per HAWB |
| Courier Fee (if applicable) | $15.00 | Per Run |
| Local Delivery to Door Naperville, IL | $50.00 Min or $0.10 | Per Kg |
| Break Bulk handling | $45.00 | Min |

UPS SUPPLY CHAIN SOLUTIONS

PROPRIETARY & CONFIDENTIAL                                                          07/07/2004

It is understood and agreed that the prices and rates set forth in this proposal presume and are premised upon the regulations, procedures and requirements as of the effective beginning date stated herein. UPS Supply Chain Solutions shall be additionally compensated at a price or rate to be mutually agreed upon, in the event of any changes in regulations procedures or requirements beyond UPS Supply Chain Solutions' control during the term of this agreement, which either increases the cost to UPS Supply Chain Solutions of providing the services set forth in this agreement or which require UPS Supply Chain Solutions to provide additional services.

**EXHIBIT**
*A*

**UPS Supply Chain Solutions**

### Accent Depot
*1939 Phaeton Ct., Naperville, IL 60565*
*Contact: Eileen Boehne, Tel# 630-548-2133*

Date: June 14, 2004
Quote No: DV20040153

Faxed 7-7-04

1 of 4

Origin: Taipei, Shanghai, China Airport
Destination: Door Naperville, IL 60565
Commodity: Spices

## AIR FREIGHT RATE - AIRPORT TO AIRPORT - PREFERRED SERVICE

| Origin Airport | Destination Airport | Min | -45K | +45K | +100K | +500K | +1000K | Transit |
|---|---|---|---|---|---|---|---|---|
| Taipei (TPE) | Chicago (ORD) | $75 | $4.35 | $3.50 | $3.20 | $2.60 | $2.50 | 3 - 5 Days |
| Shanghai (PVG) | Chicago (ORD) | $60.37 | $4.06 | $3.56 | $3.05 | $2.98 | $2.92 | 3 - 4 Days |

## USA Air Destination Charges:

| | | |
|---|---|---|
| Fuel Surcharge per Kg | $0.25 | |
| Security Surcharge per Kg | $0.14 | |
| Pick up from Hangzhou | $150.00 Min or $0.09 | Per Kg |
| Customs Clearance at Shanghai | $30.00 | Per Shipment |
| Airline Terminal Fee | $25.00 Min or $0.10 | Per Kg |
| Document Turnover to UPS-SCS CHB | $20.00 | Per HAWB |
| Document Turnover to outside forwarder | $50.00 | Per HAWB |
| In-bond preparation fee (CF-7512 - IT) | $35.00 | Per HAWB |
| Courier Fee (if applicable) | $15.00 | Per Run |
| Local Delivery to Door Naperville, IL | $50.00 Min or $0.10 | Per Kg |
| Break Bulk handling | $45.00 | Min |

UPS SUPPLY CHAIN SOLUTIONS

PROPRIETARY & CONFIDENTIAL                                    07/07/2004

It is understood and agreed that the prices and rates set forth in this proposal presume and are premised upon the regulations, procedures and requirements as of the effective beginning date stated herein. UPS Supply Chain Solutions shall be additionally compensated at a price or rate to be mutually agreed upon, in the event of any changes in regulations procedures or requirements beyond UPS Supply Chain Solutions' control during the term of this agreement, which either increases the cost to UPS Supply Chain Solutions of providing the services set forth in this agreement or which require UPS Supply Chain Solutions to provide additional services.

**EXHIBIT**

*A*

# UPS Supply Chain Solutions

**Accent Depot**
*1939 Phaeton Ct., Naperville, IL  60565*
*Contact: Eileen Boehne, Tel# 630-548-2133*

Date:  June 14, 2004
Quote No: DV20040153

## IMPORT SERVICE FEES – U.S. PORTS OF ENTRY

UPS Supply Chain Solutions effects U.S. Customs clearance and release of shipments with the following basis for fee application:

| | |
|---|---|
| • One Commercial Invoice on Entry Summary | • 1 U.S. Customs Tariff Classification |
| • Delivery Orders for Domestic Transportation | • Quota Requirements |
| • Use of Importer's Bond | • All Necessary Documents on Hand Timely |

| 4030 | Formal Customs Entry | $ 97.50 |
|---|---|---|

### ADDITIONAL SERVICES - (ONLY IF APPLICABLE)

| 4034 | Additional Invoice | 20.00 each |
|---|---|---|
| 4040 | Additional line item | 6.50 each |
| 4042 | Additional B/L's on entry | 20.00 each |
| 4080 | OGA Release | 20.00 each |
| 4114 | User Fee Calculation | 2.00 per line / 6 minimum |
| 4120 | Valuation Charge, over 20,000 | .00075 of value |
| 4174 | Advance Disbursement Fee *** | See note below |
| 6811 | Communication | 7.50 |
| 6841 | Messenger | 15.00 |
| 4050 | Additional Delivery Order | 20.00 each |

### ADDITIONAL SERVICES - (ONLY IF APPLICABLE)

| 4060 4064 4090 | Additional Services, i.e. G.O. release, Lay order, Proforma Invoice Preparation, Manipulation, CF 4453 | 37.50 each |
|---|---|---|
| 4100 | Landed Cost | |
| 4220 | Customs Exam | 6.50 per item |
| 4230 | Special Handling/Over time services | 37.50 plus cost |
| 4260 | Surety Bonds (Continuous Bond) | 100.00/hour |
| | | 550. ($50K Bond) 500. (Subsequent years) If over $50K contact local office |
| 4260 | STB(Single Trans Bond) | 5.00 per 1000 / 60.00 minimum |
| 4320 | Centralized Entry Services | 15.00 |
| 4074 | SPI Application Services | 15.00 |

It is understood and agreed that the prices and rates set forth in this proposal presume and are premised upon the regulations, procedures and requirements as of the effective beginning date stated herein.  UPS Supply Chain Solutions shall be additionally compensated at a price or rate to be mutually agreed upon, in the event of any changes in regulations procedures or requirements beyond UPS Supply Chain Solutions' control during the term of this agreement, which either increases the cost to UPS Supply Chain Solutions of providing the services set forth in this agreement or which require UPS Supply Chain Solutions to provide additional services.

# UPS Supply Chain Solutions



### Accent Depot
*1939 Phaeton Ct., Naperville, IL 60565*
*Contact: Eileen Boehne, Tel# 630-548-2133*

Date: June 14, 2004
Quote No: DV20040153

3 of 4

| 6851 | Courier, if used | 10.00 |
|------|------------------|-------|

\*\*\* Note on Advance Disbursement fee:
Customs Brokerage fees as quoted assuming that UPS Supply Chain Solutions remains in net neutral or better cash position, relative to advances. Unless cargo moves on UPS Supply Chain Solutions Bills of Lading, an advance disbursement fee must be considered if cash advances are made for freight. Unless client is on ACH direct pay to Customs an advance fee must be considered if payments are made after duty submission date

## NOTES:

1. Airfreight charges will be based on chargeable weight. Chargeable weight may be the dimensional weight as calculated or the actual weight, whichever is greater.
2. Airfreight rates are Airport to Airport only.
3. Airfreight rates are subject to change with 2 weeks notice. Rates are subject to review as the market changes.
4. Rates are not inclusive of Fuel Surcharge, if applicable.
5. Carrier(s) will be chosen from our portfolio of carriers that offer the best combination of transit time, container/chassis availability, local customer service, ideal cutoff, space availability, etc.
6. Rates apply to general cargo, excluding dangerous goods, perishables, valuables or oversized cargo.
7. Rates apply only for cargo of legal weight and dimensions, which can vary by country.
8. Rates are exclusive of duties and taxes.
9. Transit times are estimates and do not include time allotted fro customs clearance.
10. All rates are in U.S. Dollars unless noted otherwise.
11. Rates not specified on quotation are as mutually agreed.
12. All aspects of this proposal are subject to credit approval. UPS-SCS reserves the right to withdraw this proposal or alter the content of this proposal based upon the results of our credit analysis.

### Quote is valid until April 30, 2005

UPS SUPPLY CHAIN SOLUTIONS      PROPRIETARY & CONFIDENTIAL      07/07/2004
It is understood and agreed that the prices and rates set forth in this proposal presume and are premised upon the regulations, procedures and requirements as of the effective beginning date stated herein. UPS Supply Chain Solutions shall be additionally compensated at a price or rate to be mutually agreed upon, in the event of any changes in regulations procedures or requirements beyond UPS Supply Chain Solutions' control during the term of this agreement, which either increases the cost to UPS Supply Chain Solutions of providing the services set forth in this agreement or which require UPS Supply Chain Solutions to provide additional services.

# UPS Supply Chain Solutions



## Accent Depot
**1939 Phaeton Ct., Naperville, IL 60565**
**Contact: Eileen Boehne, Tel# 630-548-2133**

Date: June 14, 2004
Quote No: DV20040153

## Rate Quote Agreement

*To accept this quote, please complete the required section below and fax to:*
*UPS Supply Chain Solutions at (630) 588-8515.*

Name _Eileen S. Boehne_          Date _7-7-04_

Signature _Eileen S Boehne_          Company Name _Accent Depot, LLC_

Co. Stamp or Title _President_

Additional Services Offered by UPS Supply Chain Solutions:

| | | |
|---|---|---|
| • Air Freight Import/Export | • Flex Internet | • US Domestics |
| • Ocean Freight Import/Export | • Packing/ Crating | • UPS Logistics |
| • Customs Clearance | • Consolidation | • Material Management & Distribution |
| • Customs Bond | • Cargo Insurance | • Trade Management Services |

PROPRIETARY & CONFIDENTIAL          07/07/2004
It is understood and agreed that the prices and rates set forth in this proposal presume and are premised upon the regulations, procedures and requirements as of the effective beginning date stated herein. UPS Supply Chain Solutions shall be additionally compensated at a price or rate to be mutually agreed upon, in the event of any changes in regulations procedures or requirements beyond UPS Supply Chain Solutions' control during the term of this agreement, which either increases the cost to UPS Supply Chain Solutions of providing the services set forth in this agreement or which require UPS Supply Chain Solutions to provide additional services.

SEP-09-2004 05:52 FROM UPS-SCS    630-585-5933 TO 916309390434    P.01/15



UPS-SCS Department
775 East Drive
Carol Stream, IL 60188

# Fax

| | | | |
|---|---|---|---|
| To | *Eileen Palone* | From | *Jordan Beal* |
| Company | | Department | |
| Fax number | 630 - 839 - 0431 | Fax number | 630 - 588 - 8513 |
| Tel number | | Tel number | |
| Date | | Subject | |
| Total pages | (14) | | |

Eileen,
As Discussed here are the and invoices
in question.

- THANKS -
Jordan

This facsimile message is intended only for the use of the individual or entity named above, and as such, it is confidential and may contain proprietary information. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any reading, dissemination, distribution, disclosure, copying or other use of this fax or the information contained therein is strictly prohibited. If you have received this message in error, please immediately notify us by telephone and return the original message to us at the above address.

Legal entity name. This area is only used for legally required information which may be translated into the local language. Do not use this area for addresses or for any type of information or graphics that are not required by law.

**EXHIBIT**
B

UPS SUPPLY CHAIN SOLUTIONS
490 Supreme Drive
Bensenville, IL 60106
EMAIL : ed.arquilla@ups-scs.com

Angela 588 8593

# Fax

| | | | |
|---|---|---|---|
| To | Jordan Bell | From | Ed Arquilla |
| Company | | Department | Import |
| Fax number | 588-8513 | Fax number | 630-350-2520 |
| Tel number | 588-8351 | Tel number | 630-787-3003 |
| Date | 9/17/04 | Subject | |
| Total pages | | | |

file 41006323

INU# 041923332

Jordan.bell@ups-scs.com

Thank you!

Ed Arquilla

UPS-SCS / ChiCAGO

This facsimile message is intended only for the use of the individual or entity named above, and as such, it is confidential and may contain proprietary information. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any reading, dissemination, distribution, disclosure, copying or other use of this fax or the information contained therein is strictly prohibited. If you have received this message in error, please immediately notify us by telephone and return the original message to us at the above address.

UPS Supply Chain Solutions ℠    UPS SUPPLY CHAIN SOLUTIONS, INC.
                                 FEDERAL MARITIME COMMISSION NO:2 .4

**PLEASE MAIL REMITTANCE TO**

UPS SUPPLY CHAIN SOLUTIONS
P. O. BOX 360302
PITTSBURGH, PA      152506302

ISSUED BY: BENSENVILLE

ACCT. NO.   0207480

ACCENT DEPOT LLC
1939 PHAETON CT
NAPERVILLE
IL                60565

| | |
|---|---|
| **INVOICE NO.** | 041923332 |
| **DATE** | 07/13/04 |
| **FILE NO.** | 41006323    EA |
| **CARRIER** | QANTAS AIRWAY LT |
| | VOYAGE# 7583 |

**YOUR REF.**

ENTRY NO. 110-4518932-3      7/06/04

INVOICES ARE DUE UPON RECEIPT. LATE PAYMENTS WILL BE SUBJECT TO A LATE PAYMENT CHARGE AT THE RATE OF 1 1/2% PER MONTH (ONE MONTH MINIMUM) EXCEPT WHERE CONTRARY TO APPLICABLE LAW.

SHIPMENT:     75 CTNS  BRADS/LR

B/L# 08133624021         H B/L# 540000413258

| | | |
|---|---|---|
| 2064 | ADVANCE TO CUSTOMS—USER FEES | 25.00 |
| 4010 | DOCUMENTATION & HANDLING | 29.00 |
| 4030 | SERVICES TO ENTRY | 97.50 |
| 4114 | USER FEES | 12.00 |
| 4210 | TRANS/LOCAL DRAYAGE SERVICES | 121.12 |
| 4540 | AIRLINE TERMINAL CHARGE | 69.15 |
| 6811 | TELEPHONE SERVICE | 7.50 |
| 6841 | MESSENGER SERVICE | 15.00 |
| 9982 | FREIGHT CHARGES | 2,592.98 |

S/B 1788.00

THIS INVOICE IS PAYABLE IN TOTAL UPON RECEIPT.  IN US $     2,950.35
PLEASE RETURN AN INVOICE COPY WITH YOUR REMITTANCE.
041011-000-0703

2636.62.

PLEASE DIRECT INQUIRIES TO:
490 SUPREME DRIVE
IL                60106         BENSENVILLE
                                 PHONE:  (630) 595-8808

UPS SUPPLY CHAIN SOLUTIONS, INC LIMITS ITS LIABILITY TO $50 PER SHIPMENT WHEN ACTING AS A FREIGHT FORWARDER OR CUSTOMS BROKER PURSUANT TO THE NCBFAA TERMS
CONDITIONS INCORPORATED ON THE REVERSE SIDE OF THIS INVOICE.

**NOTICE TO IMPORTERS**

MERCHANDISE IS RELEASED BY CUSTOMS IS DONE UNDER BOND AND IS SUBJECT TO REDELIVERY TO CUSTOMS ON DEMAND. FAILURE TO RETURN MERCHANDISE MAKES CONSIGNEE SUBJECT TO PENALTY FOR FULL AMOUNT OR BOND. IF YOU ARE THE IMPORTER OF RECORD, PAYMENT TO THE BROKER WILL NOT RELIEVE YOU OF LIABILITY FOR CUSTOMS CHARGES DUTIES, TAXES, OR OTHER DEBTS OWED CUSTOMS IN THE EVENT THE CHARGES ARE NOT PAID BY THE BROKER. THEREFORE, IF YOU PAY BY CHECK, CUSTOMS CHARGES MAY BE PAID WITH A SEPARATE CHECK PAYABLE TO THE "U.S. CUSTOMS SERVICE" WHICH SHALL BE DELIVERED TO CUSTOMS BY THE BROKER.

**NOTICE TO EXPORTERS**

UPS SUPPLY CHAIN SOLUTIONS INC. HAS A POLICY AGAINST PAYMENT, SOLICITATION DIRECTLY OR INDIRECTLY, WHICH WOULD BE UNLAWFUL UNDER THE UNITED STATES LAWS. UPON REQUEST WE SHALL PROVIDE A DETAILED BREAKDOWN OF THE COMPONENTS OF AND A TRUE COPY OF EACH PERTINENT DOCUMENT RELEVANT TO THESE CHARGES.

31373

FEB 17 2004 15:58  FR UPS-SCS          630 595 5922 TO 916503590431       P.04/10

**ENTRY SUMMARY**

| | | | |
|---|---|---|---|
| ① Entry No. 4518952-5 | ② Entry Type Code 01 ABI/A | | CST: 504 |
| ④ Entry Date 07/06/04 | ⑤ Port Code 3901 | | |
| 7. Bond Type Code 09 | 8. Broker/Importer File No. 41006323 | | PAPERLESS |

UPS SUPPLY CHAIN SOLUTIONS
490 SUPREME DRIVE
BENSENVILLE, IL  60106

PREP BY 000-041011  0207480

| 9. Ultimate Consignee Name and Address | 10. Consignee No. 20-0170539900 | ⑪ Importer of Record Name and Address | ⑫ Importer No. 20-0170539900 |

IL
State

ACCENT DEPOT LLC
1939 PHAETON CT
NAPERVILLE IL 60565

| ⑬ Exporting Country CN CHINA M | 14. Export Date 07/03/04 |
| ⑮ Country of Origin CN CHINA M | 16. Missing Documents |
| ⑰ I.T. No. | ⑱ I.T. Date |

| ⑲ B/L or AWB No. 08133624021 | 20. Mode of Transportation 40 | 21. Manufacturer I.D. CNNINFREO902NIN | 22. Reference No. |
| ㉓ Importing Carrier OF QANTAS AIRWAY LIM 7593 | 24. Foreign Port of Lading 57035 | ㉕ Location of Goods/G.O. No. FIRMS CODE: J283 UPSFS CHICAGO | |
| 26. U.S. Port of Unlading 3901 CHICAGO ILLINOIS | ㉗ Import Date 07/03/04 | | |

| ㉘ Line No. | 30. (A) T.S.U.S.A. No. (B) ADA CVD Case No. | 31. (A) Gross Weight (B) Manifest Qty. | ㉜ Net Quantity in T.S.U.S.A. Units | 33. (A) Entered Value (B) CHGS (C) Relationship | 34. (A) T.S.U.S.A. Rate (B) ADA/CVD Rate (C) I.R.C. Rate (D) Visa No. | ㉟ Duty and I.R. Tax Dollars | Cents |
|---|---|---|---|---|---|---|---|
| | B/L NUMBERS 08133624021 | 75 TOTAL CTNS HBL NUMBERS 540000413259 | | NOT RELATED CONT. NUMBERS | | | |
| 001 | OTHER COATED ROUGH WIRE NA 7317.00.5590   604 KG | 600 KG | | 4500 C 2583 | FREE .21% | 0 00 | 9 45 |
| | MERCHANDISE PROCESSING FEE USA DOLLAR S.I.V.          4,500.00 N.E.V.          4,500.00 | X 2.98 = 1788 | | | | | |
| | BLOCK 39 SUMMARY: MERCHANDISE PROCESSING FEE   499 TOTAL: | | | 25.00 25.00 | | | |
| | | | T.E.V. | 4500 | | | |

| ㊽ Declaration of Importer of Record (Owner or Purchaser) or Authorized Agent | | ▼ U.S. CUSTOMS USE ▼ | TOTALS |
|---|---|---|---|

I declare that I am the ☐ importer of record and that the actual owner, purchaser, or consignee for customs purposes is as shown above.  OR  ☐ owner or purchaser of agent thereof

was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoice as to value or price are true to the best of my knowledge and belief

I further declare that the merchandise ☒ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoice are true.

I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed. I will immediately furnish to the appropriate customs officer any information showing a different state of facts.

Notice required by Paperwork Reduction Act of 1980. This information is needed to ensure that importers/exporters are complying with U.S. Customs laws, to allow us to compute and collect the right amount of money, to enforce other agency requirements, and to collect accurate statistical information on imports. Your response is mandatory.

| A. Liq. Code | B. Ascertained Duty | ㊲ Duty | 0 00 |
| | C. Ascertained Tax | ㊳ Tax | 0 00 |
| | D. Ascertained Other | ㊴ Other | 25 00 |
| | E. Ascertained Total | ㊵ Total | 25 00 |

| ㊶ Signature of Declarant, Title, and Date   07/02/04 | A-I-F |

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

041   41006323

# ENTRY/IMMEDIATE DELIVERY

ENTRY DOCS REQUIRED
7/06/04 14:21

UPS SUPPLY CHAIN SOLUTIONS
490 SUPREME DRIVE
BENSENVILLE, IL   60106

ABI CERTIFIED

| 1. ARRIVAL DATE 070304 | 2. ELECTED ENTRY DATE | ENTRY TYPE CODE 01 | 110-4518832-3 |
|---|---|---|---|
| 5. PORT 3901 | 6. SINGLE TRANS BOND | 7. BROKER/IMPORTER FILE NUMBER 41006323 | |
| | 8. CONSIGNEE NUMBER 20-0170539000 | | 9. IMPORTER NUMBER SAME |
| 10. ULTIMATE CONSIGNEE NAME ACCENT DEPOT LLC 1939 PHAETON CT NAPERVILLE IL 60565 | | 11. IMPORTER OF RECORD NAME SAME | |
| 12. CARRIER CODE QF | 13. VOYAGE/FLIGHT/TRIP 7583 | 14. LOCATION OF GOODS CODE J283   UPSFS CHICAGO | |
| 15. VESSEL CODE/NAME QANTAS AIRWAY LIMIT | | | |
| 16. U.S. PORT OF UNLADING 3901 | 17. MANIFEST NUMBER | 18. G.O. NUMBER | 19. TOTAL VALUE 4500 |

| 20. DESCRIPTION OF MERCHANDISE 75 CTNS  BRADS/LR | | | | |
|---|---|---|---|---|
| 21. H 08133624021 | | 7317005590 | CN | CNNINFRE0902NIN |
| H 540000413258 | 75 | | | |

27. CERTIFICATION

I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid and current, and that all requirements of 19 CFR Part 142 have been met.

X _Herb Reddy_    ATTY-IN-FACT

(630) 595-8808    07/06/04

28. CUSTOMS USE ONLY

☐ OTHER AGENCY ACTION REQUIRED, NAMELY:
☐ CUSTOMS EXAMINATION REQUIRED
☐ ENTRY REJECTED, BECAUSE:

29. BROKER OR OTHER GOVT AGENCY USE

EXAM SITE:

DELIVERY AUTHORIZED

Customs Form 3461 (010169)

# 中 成 宁 波 进 出 口 有 限 公 司
## COMPLANT NINGBO IMP. & EXP. CO.,LTD.

ADD: 93 ZHONG SHAN EAST ROAD,

NINGBO 315000

ZHEJIANG, CHINA.

L/C No.:

发 票

INVOICE

INVOICE NO.: ECO04206

DATE: JUN.30, 2004

S/C No :

From    **SHANGHAI**    to    **CHICAGO**

To Messrs: ACCENT DEPOT

| Marks & Nos | Description of Goods | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| | BRADS | 600KGS | FOB SHANGHAI USD 0.0625 /KG | USD37.50 |
| | TOTAL: | 600KGS | | USD37.50 |

7317.00.5590

中 成 宁 波 进 出 口 有 限 公 司
COMPLANT NINGBO IMP.& EXP.CO.,LTD

# 中 成 宁 波 进 出 口 有 限 公 司
## COMPLANT NINGBO IMP. & EXP. CO.,LTD.

SHIPPING MARK:  N/M

### 装 箱 单
### PACKING LIST

INVOICE NO.: ECO04206

DATE: JUN 30, 2004

S/C No.:

CONSIGNEE:  ACCENT DEPOT

SHIPPED BY:  FROM  SHANGHAI  TO  CHICAGO

| Item No. | Description of Goods | Quantity | Pieces | Gross Weight | Net Weight | Measurement |
|---|---|---|---|---|---|---|
| | BRADS | 600KGS | 75 CTNS | 604 KGS | 600KGS | 3.0 M3 |
| | TOTAL: | 600KGS | 75 CTNS | 604 KGS | 600KGS | 3.0 M3 |

中 成 宁 波 进 出 口 有 限 公 司
COMPLANT NINGBO IMP.& EXP.CO.,LTD.

UPS AIR FREIGHT SERVICES, INC.
Not Negotiable
**Air Waybill**
Issued by
55 SECOND STREET
SAN FRANCISCO CA 94105
UNITED STATES OF AMERICA

Copies 1,2 and 3 of this Air Waybill are originals and have the same validity.

Shipper's Name and Address — Shipper's Account Number 7453709
NINGBO FREE TRADE ZONE ECO
INTERNATIONAL CO.,LTD.
809-02 YINXIN GREAT MANSIONS,NINGBO
315040 CHINA TEL:86-574-87065432

Consignee's Name and Address — Consignee's Account Number 207530
ACCENT DEPOT
1939 PHAETON CT.NAPERVILLE IL60565
USA. TEL:630-548-2133

Issuing Carrier's Agent Name and City
FRITZ LOGISTICS SERVICE (TIANJIN)
SHANGHAI
CHINA

Accounting Information
Our Ref: S40-000413258

Agent's IATA Code         Account No.

FREIGTH COLLECT

Airport of Departure (Addr. of First Carrier) and Requested Routing
PVG-PUDONG

| To | By First Carrier Routing and Destination | to | by | to | by | Currency | CHGS Code | WT/VAL PPD COLL | Other PPD COLL | Declared Value for Carriage | Declared Value for Customs |
|----|------|----|----|----|----|----------|------|------|------|------|------|
| ORD | QF | | | | | USD | | | | NVD | NVD |

Airport of Destination
O'HARE AIRPORT/CH
Flight/Date QF7583/03    Flight/Date NIL    Amount of Insurance

INSURANCE - If carrier offers insurance, and such insurance is requested in accordance with the conditions thereof, indicate amount to be insured in figures in box marked "Amount of Insurance".

Handling Information
INV NO:EC004206.P/L ATT'D DOOR TO AIRPORT

| No. of Pieces RCP | Gross Weight | kg lb | Rate Class — Commodity Item No. | Chargeable Weight | Rate / Charge | Total | Nature and Quantity of Goods (incl. Dimensions or Volume) |
|------|------|------|------|------|------|------|------|
| 75 | 604.0 | K | Q | 692.5 | 2.98 | 2063.65 | GRADS 67x44x33x37 cm 5x59x43x34 cm 1x46x21x35 cm 2x38x35x33 cm |

MARKS:
N/N
7SCTNS
SHPT WITH NO SOLID WOODEN PACKING

QF 7583/3
@ UPS

| 75 | 604.0 | | | | | 2063.65 | Tot.Vol. : 4.153 |

| Prepaid | Weight Charge | Collect 2063.65 | Other Charges |
|------|------|------|------|
| | | | Fuel Surchar    173.13  Security Cha  96.95 |
| | Valuation Charge | | Terminal Chg    69.25 Exp Customs  30.00 |
| | | | Pick Up        150.00 |
| | Tax | | |
| | Total Other Charges Due Agent  519.33 | | Shipper certifies that the particulars on the face hereof are correct and that insofar as any part of the consignment contains dangerous goods, such part is properly described by name and is in proper condition for carriage by air according to the applicable Dangerous Goods Regulations. |
| | Total Other Charges Due Carrier | | |

Signature of Shipper or his Agent

| Total Prepaid | Total Collect 2582.98 | FRITZ LOGISTICS SERVICE (TIANJIN) |
|------|------|------|
| Currency Conversion Rates | CC Charges in Dest. Currency | Cherry X Zhang |

Executed on 02-Jul-2004 (Date) at PVG/ART (place)    Signature of Issuing Carrier or its Agent

| For Carrier's Use only at Destination | Charges at Destination | Total Collect Charges |
|------|------|------|



UPS SUPPLY CHAIN SOLUTIONS
2490 Supreme Drive
Bensenville, IL 60106
Email : ed.arquilla@ups-scs.com

# Fax

To _Jordan Bell_

Company

Fax number _588-8513_

Tel number

Date _9/17/04_

Total pages

From _Ed Arquilla_

Department _Import_

Fax number _630-350-2520_

Tel number _630-787-3003_

Subject

file  41006323

INV# 041923332

41007407

INV# 041925544

7 pages

Thank you!
Ed Arquilla
UPS-SCS/CHICAGO

This facsimile message is intended only for the use of the individual or entity named above, and as such, is is confidential and may contain proprietary information. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any reading, dissemination, distribution, disclosure, copying or other use of this fax or the information contained therein is strictly prohibited. If you have received this message in error, please immediately notify us by telephone and return the original message to us at the above address.

UPS SUPPLY CHAIN SOLUTIONS, INC.
FEDERAL MARITIME COMMISSION NO. 275-F

**UPS**

Supply Chain Solutions™

PLEASE MAIL REMITTANCE TO
UPS SUPPLY CHAIN SOLUTIONS
P. O. BOX 360302
PITTSBURGH, PA    152506302

ISSUED BY:  BENSENVILLE

| | |
|---|---|
| INVOICE NO. | 041925544 |
| DATE | 08/17/04 |
| FILE NO. | 41007407    EA |
| CARRIER | AIR FRANCE VOYAGE# 6450 |

ACCT. NO.  0207480

ACCENT DEPOT LLC
1939 PHAETON CT
NAPERVILLE    60565
IL

ENTRY NO. 110-4520525-9    8/16/04

YOUR REF.    IMP REF:  EJA

INVOICES ARE DUE UPON RECEIPT. LATE PAYMENTS WILL BE SUBJECT TO A LATE PAYMENT CHARGE AT THE RATE OF 1 1/2% PER MONTH (ONE MONTH MINIMUM) EXCEPT WHERE CONTRARY TO APPLICABLE LAW.

SHIPMENT:    39 CTNS  BRGDS    EJA
B/L# 05729607686    H B/L# 540000433608

| | | |
|---|---|---|
| | ADVANCE TO CUSTOMS—USER FEES | 2.00 |
| | | 20.00 |
| | | 12.00 |
| | | 153.20 |
| 2064 | ADVANCE TO CUSTOMS—USER FEES | |
| 1010 | DOCUMENTATION & HANDLING | |
| 3114 | USER FEES | |
| 4210 | TRANS/LOCAL DRAYAGE SERVICES | |
| | DELIVERY $103.20 ÷ $50 SPECIAL/SAME DAY | 25.00 |
| | DELIVERY | 7.50 |
| 4540 | AIRLINE TERMINAL CHARGE | 15.00 |
| 5811 | TELEPHONE SERVICE | 1,537.60 |
| 6841 | MESSENGER SERVICE | |
| 9982 | FREIGHT CHARGES | |
| | | 1,772.30 |

THIS INVOICE IS PAYABLE IN TOTAL UPON RECEIPT, IN US $
PLEASE RETURN AN INVOICE COPY WITH YOUR REMITTANCE.
041011-000-0815

PLEASE DIRECT INQUIRIES TO:    BENSENVILLE
490 SUPREME DRIVE    PHONE:  (630) 595-8808
IL    60106

UPS SUPPLY CHAIN SOLUTIONS, INC. LIMITS ITS LIABILITY TO $50 PER SHIPMENT WHEN ACTING AS A FREIGHT FORWARDER OR CUSTOMS BROKER PURSUANT TO THE NCBFAA TERMS AND CONDITIONS INCORPORATED ON THE REVERSE SIDE OF THIS INVOICE.

**NOTICE TO IMPORTERS**

MERCHANDISE RELEASED BY CUSTOMS IS DONE UNDER BOND AND IS SUBJECT TO REDELIVERY TO CUSTOMS ON DEMAND. FAILURE TO RETURN MERCHANDISE MAKES CONSIGNEE SUBJECT TO PENALTY FOR FULL AMOUNT OF BOND. IF YOU ARE THE IMPORTER OF RECORD, PAYMENT TO THE BROKER WILL NOT RELIEVE YOU OF LIABILITY FOR DUTIES AND CHARGES (DUTIES, TAXES, OR OTHER DEBTS OWED CUSTOMS) IN THE EVENT THE CHARGES ARE NOT PAID BY THE BROKER. THEREFORE, IF YOU PAY BY CHECK, CUSTOMS CHARGES MAY BE PAID WITH A SEPARATE CHECK PAYABLE TO THE "U.S. CUSTOMS SERVICE" WHICH SHALL BE DELIVERED TO CUSTOMS BY THE BROKER.

**NOTICE TO EXPORTERS**

UPS SUPPLY CHAIN SOLUTIONS, INC. HAS A POLICY AGAINST PAYMENT OR ACCEPTANCE, OR RECEIPT OF ANY REBATE DIRECTLY OR INDIRECTLY, WHICH WOULD RELATE, ABSOLUTE, OR LOWER THE COMPONENTS OF ALL CHARGES ASSESSED. UPON REQUEST WE SHALL PROVIDE A DETAILED BREAKOUT OF THE CHARGES ASSESSED AND A TRUE COPY OF EACH PERTINENT DOCUMENT RELATING TO THOSE CHARGES.

2004  3:08 PM FR
DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

**ENTRY SUMMARY**

Customs Form 7501

AUG 06 2004  3:08 PM FR

DEPARTMENT OF TREASURY
UNITED STATES CUSTOMS SERVICE

041  41007407

**ENTRY/IMMEDIATE DELIVERY**

ENTRY DOCS REQUIRED
8/16/04 18:16

UPS SUPPLY CHAIN SOLUTIONS
470 SUPREME DRIVE
BENSENVILLE, IL  60106

ABI CERTIFIED

110-4520525-9

081504

11

3901

41007407

SAME

20-017053900

SAME

ACCENT DEPOT LLC

1939 PHAETON CT
NAPERVILLE IL 60565

6450          J283          UPS CFS

AF

AIR FRANCE

791

3901

39 CTNS  BRADS          EJA

M   05729607686                    ZS17205590      CN    CNNINFRE0992NIN

H   5400024433608              39

Y CERTIFICATION

X _Ed Argila_          ATTY-IN-FACT

(630) 595-8808          08/16/04

EXAM SITE:  CDC

EP.17 2004 18:01 FR UPS-SCS
2004 3:09 PM FR

# 宁波保税区亿科国际贸易有限公司
## NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO.,LTD.

ADD: B09-02 YINXIN GREAT MANSIONS

NINGBO 315040,

CHINA

发 票
**INVOICE**

INVOICE NO.: ECO040804

DATE: Aug.04th, 2004

S/C No.:

L/C No.:

From      NINGBO      to      CHICAGO

To Messrs: ACCENT DEPOT

| Marks & Nos | Description of Goods | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| | | FOB NINGBO | | |
| N/M | BRADS | 325 KGS | USD 3.05 /KG | USD 991.25 |

**TOTAL:**      325 KGS      USD 991.25

7317.00-5590/

SAY US DOLLARS NINE HUNDRED AND NINETY ONE POINT TWO FIVE ONLY

COUNTRY OF ORIGIN: CHINA

NO SOLID WOOD PACKING MATERIALS

宁波保税区亿科国际贸易有限公司
NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO.,LTD.

110-
4520525-9

宁 波 保 税 区 亿 科 国 际 贸 易 有 限 公 司

# NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO.,LTD.

SHIPPING MARK: N/M

装 箱 单

PACKING LIST

INVOICE NO.: ECO040804

DATE: Aug.04th, 2004

S/C No.:

CONSIGNEE:     ACCENT DEPOT

SHIPPED BY     FROM     SHANGHAI     TO     CHICAGO

| Item No. | Description of Goods | Quantity | Pieces | Gross Weight | Net Weight | Measurement |
|---|---|---|---|---|---|---|
| | BRADS | 325 KGS | 39 CARTONS | 365 KGS | 325 KGS | 2.8 CBM |
| | TOTAL: | 325 KGS | 39 CARTONS | 365 KGS | 325 KGS | 2.8 CBM |

SAY THIRTY NINE CARTONS ONLY

宁波保税区亿科国际贸易有限公司
NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO.,LTD.

ATTN: Ms 

Fr:

**Air Waybill** SAN FRANCISCO CA 94105
UNITED STATES OF AMERICA

Issued by

7449201

NINGBO FREE TRADE ZONE ECO
INTERNATIONAL CO.LTD. 1609-02 YINXIN
GREAT MANSIONS NINGBO 315040
PEOPLE'S REPUBLIC OF CHINA
FAX:0571-89486098

Copies 1 2 and 3 of this Air Waybill are originals and have the same validity.

Consignee's Account Number    20/530

ACCENT DEPOT
1939 PHAETON CT.NAPERVILLE IL 60565
USA
TEL:630-548-435

Issuing Carrier's Agent Name and City    SERVICE (TIANJIN)
FRITZ LOGISTICS
SHANGHAI
CHINA

Accounting Information
OUR REF: 540 000433608

Agent's IATA Code | Account No.

FREIGHT COLLECT

Airport of Departure (Addr. of First Carrier) and Requested Routing
PVG-PUDONG

| | By first Carrier | Routing and Destination | to | By | to | By | Currency | CHGS Code | WT/VAL | Other | Declared Value for Carriage | Declared Value for Customs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ORD | Fritz Air Logistics | | | | | USD | | NVD | PPD COLL | NVD | NVD |

Airport of Destination    ORD/ORD AIRPORT/CH | Requested Flight/Date  AF0731/12 | Flight/Date  N L | Amount of Insurance | INSURANCE - If carrier offers insurance, and such insurance is requested in accordance with the conditions thereof, indicate amount to be insured in figures in box marked "Amount of Insurance".

Handling Information
INV.NO:ECO040804.P/L ATT'D DOOR TO AIRPORT

| No. of Pieces RCP | Gross Weight | kg lb | Rate Class | Commodity Item No. | Chargeable Weight | Rate / Charge | Total | Nature and Quantity of Goods (incl. Dimensions or Volume) |
|---|---|---|---|---|---|---|---|---|
| | 355.0 X Q | | | 303.5 | 7.05 | 1169.68 | BRAPS |
| | | | | | | | | 10x36x34x45 cm |
| | | | | | | | | 2x59x45x35 cm |
| MARKS: | | | | | | | | 12x34x35x38 cm |
| N/M | | | | | | | | 19x49x33x42 cm |
| 39CTNS | | | | | | | | |
| SHPT WITH NO SOLID WOODEN PACKING | | | | | | | | |
| 39 | 355.0 | | | | | 1169.68 | Tot.Vol.=2.799 | |

| Prepaid | Weight Charge | Collect | Other Charges |
|---|---|---|---|
| | | 1169.68 | Security Cha      53.00Fuel Surchar      95.85 |
| | Valuation Charge | | Terminal Chg     38.35Exp Customs      30.00 |
| | | | Pick Up     150.00 |
| | Tax | | |
| | Total Other Charges Due Agent      367.92 | | Shipper certifies that the particulars on the face hereof are correct and that insofar as any part of the consignment contains dangerous goods, such part is properly described by name and is in proper condition for carriage by air according to the applicable Dangerous Goods Regulations. |
| | Total Other Charges Due Carrier | | |
| | | | Signature of Shipper or his Agent |
| Total Prepaid | Total Collect      1537.60 | | FRITZ LOGISTICS SERVICE (TIANJIN) |
| Currency Conversion Rates | CC Charges in Dest. Currency | | Linkey Ni |
| | | | 31-Aug-2004     PVG/ABI |
| For Carrier's Use only at Destination | Charges at Destination | Total Collect Charges | Executed on (Date)     at (Place)     Signature of Issuing Carrier or its Agent |

** TOTAL PAGE.27 **
** TOTAL PAGE.15 **

UPS Supply Chain Solutions

**PLEASE MAIL REMITTANCE TO:**
UPS SUPPLY CHAIN SOLUTIONS
P. O. BOX 360302
PITTSBURGH, PA    152506302

ISSUED BY: BENSENVILLE

ACCT. NO.  0207480

| | |
|---|---|
| **INVOICE NO.** | 041923332 |
| **DATE** | 07/13/04 |
| **FILE NO.** | 41006323    EA |
| **CARRIER** | QANTAS AIRWAY LI VOYAGE# 7583 |

ACCENT DEPOT LLC
1939 PHAETON CT
NAPERVILLE
IL                60565

ENTRY NO. 110-4518832-3    7/06/04

**YOUR REF.**

INVOICES ARE DUE UPON RECEIPT. LATE PAYMENTS WILL BE SUBJECT TO A LATE PAYMENT CHARGE AT THE RATE OF 1 1/2% PER MONTH (ONE MONTH MINIMUM) EXCEPT WHERE CONTRARY TO APPLICABLE LAW.

SHIPMENT:        75 CTNS   BRADS/LR

B/L# 08133624021     H B/L# 540000413258

| | | |
|---|---|---|
| 2064 | ADVANCE TO CUSTOMS--USER FEES | 25.00 |
| 4010 | DOCUMENTATION & HANDLING | 20.00 |
| 4030 | SERVICES TO ENTRY | 97.50 |
| 4114 | USER FEES | 12.00 |
| 4210 | TRANS/LOCAL DRAYAGE SERVICES | 121.12 |
| 4540 | AIRLINE TERMINAL CHARGE | 69.25 |
| 6811 | TELEPHONE SERVICE | 7.50 |
| 6841 | MESSENGER SERVICE | 15.00 |
| 9982 | FREIGHT CHARGES | 2,582.98 |

ORIGINAL

THIS INVOICE IS PAYABLE IN TOTAL UPON RECEIPT, IN US $        2,950.35
PLEASE RETURN AN INVOICE COPY WITH YOUR REMITTANCE.
041011-000-0703

PLEASE DIRECT INQUIRIES TO:
   490 SUPREME DRIVE
   IL                60106

BENSENVILLE
PHONE:  (630) 595-8808

UPS SUPPLY CHAIN SOLUTIONS, INC. LIMITS ITS LIABILITY TO $50 PER SHIPMENT WHEN ACTING AS A FREIGHT FORWARDER OR CUSTOMS BROKER PURSUANT TO THE NCBFAA TERMS AND CONDITIONS INCORPORATED ON THE REVERSE SIDE OF THIS INVOICE.

**NOTICE TO IMPORTERS**

MERCHANDISE RELEASED BY CUSTOMS IS DONE UNDER BOND AND IS SUBJECT TO REDELIVERY TO CUSTOMS ON DEMAND. FAILURE TO RETURN MERCHANDISE MAKES CONSIGNEE SUBJECT TO PENALTY FOR FULL AMOUNT OF BOND. IF YOU ARE THE IMPORTER OF RECORD, PAYMENT TO THE BROKER WILL NOT RELIEVE YOU OF LIABILITY FOR CUSTOMS CHARGES (DUTIES, TAXES, OR OTHER DEBTS OWED CUSTOMS) IN THE EVENT THE CHARGES ARE NOT PAID BY THE BROKER. THEREFORE, IF YOU PAY BY CHECK, CUSTOMS CHARGES MAY BE PAID WITH A SEPARATE CHECK PAYABLE TO THE "U.S. CUSTOMS SERVICE" WHICH SHALL BE DELIVERED TO CUSTOMS BY THE BROKER.

**NOTICE TO EXPORTERS**

UPS SUPPLY CHAIN SOLUTIONS, INC. HAS A POLICY AGAINST PAYMENT, SOLICITATION, OR RECEIPT OF ANY REBATE, DIRECTLY OR INDIRECTLY, WHICH WOULD BE UNLAWFUL UNDER THE UNITED STATES SHIPPING ACT, 1984, AS AMENDED. UPON REQUEST WE SHALL PROVIDE A DETAILED BREAKOUT OF THE COMPONENTS OF ALL CHARGES ASSESSED AND A TRUE COPY OF EACH PERTINENT DOCUMENT RELATING TO THESE CHARGES.

FCH.INV (REV 4/02)

EXHIBIT

**UPS Supply Chain Solutions** ℠

UPS SUPPLY CHAIN SOLUTIONS, INC.
FEDERAL MARITIME COMMISSION NO. 275-F

**PLEASE MAIL REMITTANCE TO**

UPS SUPPLY CHAIN SOLUTIONS
P.O. BOX 360900
PITTSBURGH, PA      15250-6901

ISSUED BY: BENSENVILLE

ACCT. NO.   0207480

ACCENT DEPOT LLC
1935 PHAETON CT
NAPERVILLE
IL                     60565

| | |
|---|---|
| **INVOICE NO.** | 041923332 |
| **DATE** | 07/13/04 |
| **FILE NO.** | 41006323        EA |
| **CARRIER** | QANTAS AIRWAY LI VOYAGE# 7563 |

**YOUR REF.**

ENTRY NO. 110-4918832-3    7/06/04

INVOICES ARE DUE UPON RECEIPT. LATE PAYMENTS WILL BE SUBJECT TO A LATE PAYMENT CHARGE AT THE RATE OF 1 1/2% PER MONTH (ONE MONTH MINIMUM), EXCEPT WHERE CONTRARY TO APPLICABLE LAWS.

SHIPMENT    75 LIME  BRACELET

B/L# OS133624021    H B/L# 5400004132258

| | | |
|---|---|---|
| 2064 | ADVANCE TO CUSTOMS--USER FEES | 25.00 |
| 4010 | DOCUMENTATION & HANDLING | 20.00 |
| 4030 | SERVICES TO ENTRY | 97.50 |
| 4114 | USER FEES | 12.60 |
| 4210 | TRANS/LOCAL DRAYAGE SERVICES | 131.12 |
| 4540 | AIRLINE TERMINAL CHARGE | 69.25 |
| 6811 | TELEPHONE SERVICE | 7.50 |
| 6841 | MESSENGER SERVICE | 15.00 |
| 9902 | FREIGHT CHARGES | 2,582.58 |

THIS INVOICE IS PAYABLE IN TOTAL UPON RECEIPT, IN US $      2,930.35
PLEASE RETURN AN INVOICE COPY WITH YOUR REMITTANCE.
041011-000-0703

PLEASE DIRECT INQUIRIES TO:
490 SUPREME DRIVE                    BENSENVILLE
IL                60106        PHONE: (630) 595-5906

UPS SUPPLY CHAIN SOLUTIONS, INC. LIMITS ITS LIABILITY TO $50 PER SHIPMENT WHEN ACTING AS A FREIGHT FORWARDER OR CUSTOMS BROKER PURSUANT TO THE NCBFAA TERMS AND CONDITIONS INCORPORATED ON THE REVERSE SIDE OF THIS INVOICE.

**NOTICE TO IMPORTERS**

MERCHANDISE RELEASED BY CUSTOMS IS DONE UNDER BOND AND IS SUBJECT TO REDELIVERY TO CUSTOMS ON DEMAND. FAILURE TO RETURN MERCHANDISE MAKES CONSIGNEE SUBJECT TO PENALTY FOR FULL AMOUNT OF BOND. IF YOU ARE THE IMPORTER OF RECORD, PAYMENT TO THE BROKER WILL NOT RELIEVE YOU OF LIABILITY FOR CUSTOMS CHARGES (DUTIES, TAXES, OR OTHER DEBTS OWED CUSTOMS) IN THE EVENT THE CHARGES ARE NOT PAID BY THE BROKER. THEREFORE, IF YOU PAY BY CHECK, CUSTOMS CHARGES MAY BE PAID WITH A SEPARATE CHECK PAYABLE TO THE "U.S. CUSTOMS SERVICE" WHICH SHALL BE DELIVERED TO CUSTOMS BY THE BROKER.

**NOTICE TO EXPORTERS**

UPS SUPPLY CHAIN SOLUTIONS, INC. HAS A POLICY AGAINST PAYMENT, SOLICITATION, OR RECEIPT OF ANY REBATE, DIRECTLY OR INDIRECTLY, WHICH WOULD BE UNLAWFUL UNDER THE UNITED STATES SHIPPING ACT, 1984, AS AMENDED. UPON REQUEST WE SHALL PROVIDE A DETAILED BREAKOUT OF THE COMPONENTS OF ALL CHARGES ASSESSED AND A TRUE COPY OF EACH PERTINENT DOCUMENT RELATING TO THESE CHARGES.

**ENTRY SUMMARY**

| | | |
|---|---|---|
| **1. Entry No.** 42169?2-3 | **2. Entry Type Code** 01 ABI P | **3. Entry Summary Date** |

SUPPLY CHAIN SOLUTIONS
EUGENE DRIVE
NAPERVILLE, IL 60130

| **4. Entry Date** 07/26/04 | **5. Port Code** 3901 |
|---|---|

ASSOC ON ONE MANTAGE CONTAINS

| **6. Bond No.** 421 | **7. Bond Type Code** 9?? | **8. Broker / Importer File No.** PAPERLESS |
|---|---|---|

**9. Ultimate Consignee Name and Address**

| **10. Consignee No.** 26-0170?3920 | **11. Importer of Record Name and Address**

ACCENT DEPOT LLC
1939 PHAETON CT
NAPERVILLE IL 60565 | **12. Importer No.** 26-0170?3920 |
|---|---|---|

| **13. Exporting Country** CN CHINA M | **14. Export Date** 07/?3/04 |
|---|---|
| **15. Country of Origin** CN CHINA M | **16. Missing Documents** |
| **17. I.T. No.** | **18. I.T. Date** |

| **19. B/L or AWB No.** 08133624921 | **20. Mode of Transportation** 40 | **21. Manufacturer I.D.** CNNINFRE0902NIM | **22. Reference No.** |
|---|---|---|---|

| **23. Importing Carrier** 7593 QF QANTAS AIRWAY LIM | **24. Foreign Port of Lading** 57675 | **25. Location of Goods/G.O. No.** FIRMS CODE: 3283 |
|---|---|---|

| **26. U.S. Port of Unlading** 3901 CHICAGO, ILLINOIS | **27. Import Date** 07/03/04 | UPSFS CHICAGO |
|---|---|---|

| 28. | 30. (A) T.S.U.S.A. No. (B) ADA CVD Case No. | 31. (A) Gross Weight (B) Manifest Qty. | 32. Net Quantity in T.S.U.S.A. Units | 33. (A) Entered Value (B) CHGS (C) Relationship | 34. (A) T.S.U.S.A. Rate (B) ADA/CVD Rate (C) I.R.C. Rate (D) Visa No. | 35. Duty and I.R. Tax Dollars | Cents |
|---|---|---|---|---|---|---|---|
| Line No. | Description of Merchandise | | | | | | |
| | 75 TOTAL CTNS B/L NUMBERS HBL NUMBERS 08133624907 | | NOT RELATED CONT. NUMBERS 84200241325? | | | | |
| 001 | OTHER COATED ROUGH WIRE NO 7217.90.?5?? 604 KG | 600 KG | 404 C 2583 | FREE .3% | 0 00 | 9 45 |
| | MERCHANDISE PROCESSING FEE USA DOLLAR 4.509.88 S.I.V. 4.509.88 N.E.V. 4.509.88 | | | | | | |
| | BLOCK 39 SUMMARY: MERCHANDISE PROCESSING FEE 499 TOTAL: | | 25.00 25.00 | | | | |
| | | | N.E.V. 4501 | | | | |

| 36. Declaration of Importer of Record (Owner or Purchaser) or Authorized Agent | | ▼ U.S. CUSTOMS USE ▼ | | TOTALS | |
|---|---|---|---|---|---|
| I declare that I am the ☐ importer of record and that the actual owner, purchaser, or consignee for customs purposes is as shown above. **OR** ☐ owner or purchaser or agent thereof. | | A. Liq. Code | B. Ascertained Duty | **37. Duty** | 9 00 |
| I further declare that the merchandise ☐ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoice are true. **OR** ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoice as to value or price are true to the best of my knowledge and belief. | | C. Ascertained Tax | | **38. Tax** | 00 |
| I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed. I will immediately furnish to the appropriate customs officer any information showing a different state of facts. | | D. Ascertained Other | | **39. Other** | 00 |
| Notice required by Paperwork Reduction Act of 1980. This information is needed to ensure that importers/exporters are complying with U.S. Customs laws, to allow us to compute and collect the right amount of money, to enforce other agency requirements, and to collect accurate statistical information on imports. Your response is mandatory. | | E. Ascertained Total | | **40. Total** | 00 |
| | | **41. Signature of Declarant, Title, and Date** | | | |

Customs Form 7501

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

Form Approved
OMB No. 1515-0069

# ENTRY/IMMEDIATE DELIVERY

04) 41846325

ENTRY DOCS REQUIRED
7/05/04 14:21

UPS SUPPLY CHAIN SOLUTIONS
490 SUPREME DRIVE
BENSENVILLE, IL  60106

ABI CERTIFIED

19 CFR 142.3, 142.16, 142.22, 142.24

| 1. ARRIVAL DATE 070304 | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE/NAME 01 | 4. ENTRY NUMBER 110-4518832-3 |
|---|---|---|---|
| 5. PORT 3901 | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER 41846323 | |
| | 8. CONSIGNEE NUMBER 20-017053989 | | 9. IMPORTER NUMBER SAME |
| 10. ULTIMATE CONSIGNEE NAME ACCENT DEPOT LLC 1939 PHAETON CT NAPERVILLE IL 60565 | | 11. IMPORTER OF RECORD NAME SAME | |
| 12. CARRIER CODE QF | 13. VOYAGE/FLIGHT/TRIP 7583 | 14. LOCATION OF GOODS-CODE(S)/NAME(S) D283    UPSES CHICAGO | |
| 15. VESSEL CODE/NAME QANTAS AIRWAY LIMIT | | | |
| 16. U.S. PORT OF UNLADING 3901 | 17. MANIFEST NUMBER | 18. G.O. NUMBER | 19. TOTAL VALUE 4509 |
| 20. DESCRIPTION OF MERCHANDISE 75 CTNS  BRADS/LR | | | |

| 21. IT/BL/AWB CODE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER ID. |
|---|---|---|---|---|---|
| M | 86135474024 | | 7317000550 | CN | CNNINFRE0902GJN |
| M | 54000041325 | 75 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 27. CERTIFICATION | 28. CUSTOMS USE ONLY |
|---|---|

27. CERTIFICATION

I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met.

SIGNATURE OF APPLICANT

X _____   ATTY-IN-FACT

PHONE NO. (630)595-8904

DATE 07/04/04

28. CUSTOMS USE ONLY

☐ OTHER AGENCY ACTION REQUIRED, NAMELY:

☐ CUSTOMS EXAMINATION REQUIRED

☐ ENTRY REJECTED, BECAUSE:

29. BROKER OR OTHER GOVT. AGENCY USE

EXAM SITE:

DELIVERY AUTHORIZED:    SIGNATURE    DATE

Statement Required by 5 CFR 1320.21: The estimated average burden associated with this collection of information is 15 minutes per respondent or recordkeeper depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to U.S. Customs Service, Paperwork Management Branch, Washington, DC 20229, or the Paperwork Reduction Project (1515-0069), Office of Management and Budget, Washington, DC 20503.

Paperwork Reduction Act Notice: This information is needed to determine the admissibility of imports into the United States and to provide the information for the examination of the cargo and to establish the liability for payment of duties and taxes. Your response is necessary.

Customs Form 3461 (010189)

2004  08:23    6308390431

NNINFRE0902NIN

# 宁波保税区亿科国际贸易有限公司
## NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO.,LTD.

ECOO4206

ADD: B09-02 YINXIN GREAT MANSIONS

NINGBO 315040,

CHINA.

L/C No.:

### 发票
### INVOICE

INVOICE NO.: ~~ECO031017~~

DATE: June 08, 2004

S/C No.:

To Messrs: Accent Depot
1939 Phaeton Ct. Naperville, IL 60565, U.S.A.

| Marks & No. | Description of Goods | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| | | | FOB Shanghai | |
| N/M | BRADS | 600 kg | $7.5 per kg | US$4,500.00 |
| | TOTAL: | | | US$4,500.00 |

SAY US DOLLARS FOUR THOUSAND FIVE HUNDRED ONLY

7317.00.5590

110-9518832-3

| | |
|---|---|
| Shipper's Name and Address    Shipper's Account Number   7453709 <br> NINGBO FREE TRADE ZONE ECO <br> INTERNATIONAL CO.,LTD. <br> BO9-02 YINXIN GREAT MANSIONS,NINGBO <br> 315040 CHINA TEL:86-574-87065432 | 540-000413258 <br> **Air Waybill** Not Negotiable <br> UPS AIR FREIGHT SERVICES, INC. <br> 55 SECOND STREET <br> SAN FRANCISCO CA 94105 <br> UNITED STATES OF AMERICA <br> Issued by |

Copies 1,2 and 3 of this Air Waybill are originals and have the same validity.

| | |
|---|---|
| Consignee's Name and Address    Consignee's Account Number   207530 <br> ACCENT DEPOT <br> 1939 PHAETON CT.NAPERVILLE IL60565 <br> USA TEL:630-548-2133 | |

| | |
|---|---|
| Issuing Carrier's Agent Name and City <br> FRITZ LOGISTICS SERVICE (TIANJIN) <br> SHANGHAI <br> CHINA | Accounting Information <br> Our ref: 540-000413258 |
| Agent's IATA Code      Account No. | FREIGTH COLLECT |
| Airport of Departure (Addr. of First Carrier) and Requested Routing <br> PVG-PUDONG | |

| to | By first Carrier | Routing and Destination | to | by | to | by | Currency | CHGS Code | WT/VAL PPD COLL | Other PPD COLL | Declared Value for Carriage | Declared Value for Customs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ORD | QF | | | | | | USD | | | | NVD | NVD |

| Airport of Destination <br> O'HARE AIRPORT/CH | Flight/Date   For Carrier Use only   Flight/Date <br> QF/583/03 | Amount of Insurance <br> NIL | INSURANCE - If carrier offers insurance, and such insurance is requested in accordance with the conditions thereof, indicate amount to be insured in figures in box marked 'Amount of Insurance'. |
|---|---|---|---|

Handling Information
INV NO:EC004206,P/L ATT'D DOOR TO AIRPORT

| No. of Pieces RCP | Gross Weight kg lb | Rate Class   Commodity Item No. | Chargeable Weight | Rate Charge | Total | Nature and Quantity of Goods (Incl. Dimensions or Volume) |
|---|---|---|---|---|---|---|
| 75 | 604.0 K Q | | 692.5 | 2.98 | 2063.65 | BRADS <br> 67x44x33x37 cm <br> 5x59x43x34 cm <br> 1x46x21x35 cm <br> 2x38x35x33 cm |
| | | | | | | MARKS: <br> N/M <br> 75CTNS <br> SHPT WITH NO SOLID WOODEN PACKING |
| | | | | | | QF 7583/3 <br> @ UPS |
| 75 | 604.0 | | | | 2063.65 | Tot.Vol. : 4.153 |

| Prepaid | Weight Charge | Collect | Other Charges |
|---|---|---|---|
| | | 2063.65 | Fuel Surchar 173.13 Security Cha 96.95 <br> Terminal Chg 69.25 Exp Customs 30.00 <br> Pick Up 150.00 |
| | Valuation Charges | | |
| | Tax | | |
| | Total Other Charges Due Agent | 519.33 | Shipper certifies that the particulars on the face hereof are correct and that insofaras any part of the consignment contains dangerous goods, such part is properly described by name and is in proper condition for carriage by air according to the applicable Dangerous Goods Regulations. |
| | Total Other Charges Due Carrier | | |
| | | | Signature of Shipper or his Agent |
| Total Prepaid | Total Collect <br> 2582.98 | | FRITZ LOGISTICS SERVICE (TIANJIN) <br> Cherry X Zhang |
| Currency Conversion Rates | CC Charges in Dest. Currency | | 02-Jul-2004   PVG/APT |
| For Carrier's Use only at Destination | Charges at Destination    Total Collect Charges | | Executed on (Date) at (place)   Signature of Issuing Carrier or its Agent |

# MER CONFIRMATION

**UPS**

DATE:
SHIPPER NO.:
REF. NO.:

AGENTS NO.:

UPS Supply Chain Solutions™

THE MERCHANDISE DESCRIBED BELOW WILL BE ENTERED AND FORWARDED AS FOLLOWS. IF NOT IN ACCORDANCE PLEASE CONTACT US.

UPS DELIVER CHAIN SOLUTIONS

498 SUPREME DRIVE
BENSENVILLE, IL    60106

**C A R R I E R** UPS CARGO

SIGNEE:

ACCENT DEPOT LLC
1939 PHAETON CT
NAPERVILLE IL 60565

**S H I P P E R**

ACCENT DEPOT LLC
1939 PHAETON CT
NAPERVILLE IL 60565

| OCATION: PSFS CHICAGO | ENTRY No./Date | 118-4515852-7 | 47/05/04 |
|---|---|---|---|
| **OFTING CARRIER** QANTAS AIRWAY LIMIT   7503 | **FROM PORT OF** | SHANGHAI APT | |
| **OF LADING WAYBILL** 08133352422; | **DATE OF ARRIVAL:** 97/05/04 | **LAST FREE DAY** | |
| QAWB# 5400/04/3258 | | | |

| NUMBER PACKAGES | DESCRIPTIONS | WEIGHT | RATE | CHK COL | FREIGHT CHARGES |
|---|---|---|---|---|---|
| 73 | CTNS    BRADS/LR | 1332 LB | | | PREPAID |
| | | 1302 LB | | | |

BILL FREIGHT CHARGES TO:
UPS SUPPLY CHAIN SOLUTIONS, IN
CHICAGO OFFICE
498 SUPREME DRIVE
BENSENVILLE, IL 60106

SUPPLY CHAIN SOLUTIONS, INC. WILL NOT BE
PONSIBLE FOR ANY DEMURRAGE, LOADING OR
ER CHARGES NOT AUTHORIZED IN ADVANCE.

The agreed or declared value of the property is hereby stated

by the shipper to be not exceeding                    per

**NOTE:** **Forwarding instructions of merchandise described has been issued as described above, in the event this is not in accordance with your instructions – contact UPS SUPPLY CHAIN SOLUTIONS, INC. issuing office immediately by telephone.      THANK YOU**

**UPS SUPPLY CHAIN SOLUTIONS, INC.**
FEDERAL MARITIME COMMISSION NO. 275-F



ps Supply Chain Solutions℠

**PLEASE MAIL REMITTANCE TO:**
UPS SUPPLY CHAIN SOLUTIONS
P. O. BOX 360302
PITTSBURGH, PA   152506302

ISSUED BY: BENSENVILLE

ACCT. NO.  0207430

| | |
|---|---|
| **INVOICE NO.** | 041925544 |
| **DATE** | 08/17/04 |
| **FILE NO.** | 41007407    EA |
| **CARRIER** | AIR FRANCE VOYAGE# 6450 |

ACCENT DEPOT LLC
1939 PHAETON CT
NAPERVILLE
IL              60565

YOUR REF:                           ENTRY NO. 110-4520525-9    8/16/04
IMP REF: EJA

INVOICES ARE DUE UPON RECEIPT. LATE PAYMENTS WILL BE SUBJECT TO A LATE PAYMENT CHARGE AT THE RATE OF 1 1/2% PER MONTH (ONE MONTH MINIMUM), EXCEPT WHERE CONTRARY TO APPLICABLE LAW.

SHIPMENT:      39 CTNS   BRADS    EJA

B/L# 05729607686      H B/L# 540000433608

| | | |
|---|---|---|
| 2064 | ADVANCE TO CUSTOMS--USER FEES | 2.00 |
| 4010 | DOCUMENTATION & HANDLING | 20.00 |
| 4114 | USER FEES | 12.00 |
| 4210 | TRANS/LOCAL DRAYAGE SERVICES | 153.20 |
| | DELIVERY $103.20 + $50 SPECIAL/SAME DAY | |
| | DELIVERY | |
| 4540 | AIRLINE TERMINAL CHARGE | 25.00 |
| 6911 | TELEPHONE SERVICE | 7.50 |
| 6841 | MESSENGER SERVICE | 15.00 |
| 9982 | FREIGHT CHARGES | 1,537.60 |

*ORIGINAL*

THIS INVOICE IS PAYABLE IN TOTAL UPON RECEIPT, IN US $        1,772.30
PLEASE RETURN AN INVOICE COPY WITH YOUR REMITTANCE.
   041011-000-0815

PLEASE DIRECT INQUIRIES TO:
   490 SUPREME DRIVE            BENSENVILLE
   IL             60106     PHONE:   (630) 595-8809

UPS SUPPLY CHAIN SOLUTIONS, INC. LIMITS ITS LIABILITY TO $50 PER SHIPMENT WHEN ACTING AS A FREIGHT FORWARDER OR CUSTOMS BROKER PURSUANT TO THE NCBFAA TERMS AND CONDITIONS INCORPORATED ON THE REVERSE SIDE OF THIS INVOICE.

FCI-INV (REV 4/02)

**NOTICE TO IMPORTERS:**
MERCHANDISE RELEASED BY CUSTOMS IS DONE UNDER BOND AND IS SUBJECT TO REDELIVERY TO CUSTOMS ON DEMAND. FAILURE TO RETURN MERCHANDISE MAKES CONSIGNEE SUBJECT TO PENALTY FOR FULL AMOUNT OF BOND. IF YOU ARE THE IMPORTER OF RECORD, PAYMENT TO THE BROKER WILL NOT RELIEVE YOU OF LIABILITY FOR CUSTOMS CHARGES (DUTIES, TAXES, OR OTHER DEBTS OWED CUSTOMS) IN THE EVENT THE CHARGES ARE NOT PAID BY THE BROKER. THEREFORE, IF YOU PAY BY CHECK, CUSTOMS CHARGES MAY BE PAID WITH A SEPARATE CHECK PAYABLE TO THE "U.S. CUSTOMS SERVICE" WHICH SHALL BE DELIVERED TO CUSTOMS BY THE BROKER.

**NOTICE TO EXPORTERS:**
UPS SUPPLY CHAIN SOLUTIONS, INC. HAS A POLICY AGAINST PAYMENT, SOLICITATION, OR RECEIPT OF ANY REBATE, DIRECTLY OR INDIRECTLY, WHICH WOULD BE UNLAWFUL UNDER THE UNITED STATES SHIPPING ACT, 1984, AS AMENDED. UPON REQUEST WE SHALL PROVIDE A DETAILED BREAKOUT OF THE COMPONENTS OF ALL CHARGES ASSESSED AND A TRUE COPY OF EACH PERTINENT DOCUMENT RELATING TO THESE CHARGES.

**UPS Supply Chain Solutions™**

UPS SUPPLY CHAIN SOLUTIONS, INC.
FEDERAL MARITIME COMMISSION NO. 875-F
P. O. BOX 360522
PITTSBURGH, PA          152501302

**PLEASE MAIL REMITTANCE TO**

ISSUED BY: BENSENVILLE

ACCT. NO.    0207430

| | |
|---|---|
| INVOICE NO. | 041925544 |
| DATE | 08/17/04 |
| FILE NO. | 41007407      EA |
| CARRIER | AIR FRANCE  VOYAGE# 6450 |

ACCENT DEPOT LLC
1939 PHAETON CT
NAPERVILLE
IL              60565

YOUR REF.          IMP REF:  EJA                ENTRY NO: 110-4520525-9        8/16/04

INVOICES ARE DUE UPON RECEIPT. LATE PAYMENTS WILL BE SUBJECT TO A LATE PAYMENT CHARGE AT THE RATE OF 1 1/2% PER MONTH (ONE MONTH MINIMUM), EXCEPT WHERE CONTRARY TO APPLICABLE LAWS.

SHIPMENT:      BY CHAS  BRODE      EJA

B/L# 05729607686        H B/L# 540000433608

| | | |
|---|---|---|
| 2044 | ADVANCE TO CUSTOMS--USER FEES | 2.00 |
| 4010 | DOCUMENTATION & HANDLING | 20.00 |
| 4114 | USER FEES | 12.00 |
| 4210 | TRANS/LOCAL DRAYAGE SERVICES | 153.20 |
| | DELIVERY $103.20 + $50 SPECIAL/SAME DAY | |
| | DELIVERY | |
| 4540 | AIRLINE TERMINAL CHARGE | 25.00 |
| 6811 | TELEPHONE SERVICE | 7.50 |
| 6841 | MESSENGER SERVICE | 15.00 |
| 9982 | FREIGHT CHARGES | 1,537.60 |

THIS INVOICE IS PAYABLE IN TOTAL UPON RECEIPT, IN US $          1,772.30
PLEASE RETURN 1 INVOICE COPY WITH YOUR REMITTANCE.
041011-08...215

PLEASE DIRECT INQUIRIES TO:
470 SUPREME DRIVE                    BENSENVILLE
IL              60106      PHONE:  (630) 595-8808

UPS SUPPLY CHAIN SOLUTIONS, INC. LIMITS ITS LIABILITY TO $50 PER SHIPMENT WHEN ACTING AS A FREIGHT FORWARDER OR CUSTOMS BROKER PURSUANT TO THE NCBFAA TERMS AND CONDITIONS INCORPORATED ON THE REVERSE SIDE OF THIS INVOICE.

**NOTICE TO IMPORTERS:**

MERCHANDISE RELEASED BY CUSTOMS IS DONE UNDER BOND AND IS SUBJECT TO REDELIVERY TO CUSTOMS ON DEMAND. FAILURE TO RETURN MERCHANDISE MAKES CONSIGNEE SUBJECT TO PENALTY FOR FULL AMOUNT OF BOND. IF YOU ARE THE IMPORTER OF RECORD, PAYMENT TO THE BROKER WILL NOT RELIEVE YOU OF LIABILITY FOR CUSTOMS CHARGES (DUTIES, TAXES, OR OTHER DEBTS OWED CUSTOMS) IN THE EVENT THE CHARGES ARE NOT PAID BY THE BROKER. THEREFORE, IF YOU PAY BY CHECK, CUSTOMS CHARGES MAY BE PAID WITH A SEPARATE CHECK PAYABLE TO THE "U.S. CUSTOMS SERVICE" WHICH SHALL BE DELIVERED TO CUSTOMS BY THE BROKER.

**NOTICE TO EXPORTERS:**

UPS SUPPLY CHAIN SOLUTIONS, INC. HAS A POLICY AGAINST PAYMENT, SOLICITATION, OR RECEIPT OF ANY REBATE, DIRECTLY OR INDIRECTLY, WHICH WOULD BE UNLAWFUL UNDER THE UNITED STATES SHIPPING ACT, 1984, AS AMENDED. UPON REQUEST WE SHALL PROVIDE A DETAILED BREAKOUT OF THE COMPONENTS OF ALL CHARGES ASSESSED AND A TRUE COPY OF EACH PERTINENT DOCUMENT RELATING TO THESE CHARGES.

REMITTANCE ADVICE

UNITED STATES CUSTOMS SERVICE

| | | |
|---|---|---|
| (1) Entry No. | (2) Entry Type Code | (3) Entry Summary Date |
| (4) Entry Date | (5) Port Code | |
| (6) Bond No. | (7) Bond Type Code | (8) Broker / Importer File No. |
| (10) Consignee No. | (11) Importer of Record Name and Address | (12) Importer No. |

ACCENT DEPOT LLC
1930 PHAETON CT
NAPERVILLE IL 60540

| (13) Exporting Country | (14) Export Date |
|---|---|
| CN CHINA M | 02/15/04 |
| (15) Country of Origin | 16. Missing Documents |
| CN CHINA M | |
| (17) I.T. No. | (18) I.T. Date |

IMP REF :EDA

| (19) B L or AWB No. | 20. Mode of Transportation | 21. Manufacturer I.D. | 22. Reference No. |
|---|---|---|---|
| 05729607696 | 40 | CNNINFREQS02NIN | |
| (23) Importing Carrier | 24. Foreign Port of Lading | 25. Location of Goods/G.O. No. | FIRMS CODE: T283 |
| AF AIR FRANCE | 57035 | UPS CFS | |
| 26. U.S. Port of Unlading | (27) Import Date | | |
| 3901 CHICAGO, ILLINOIS | 02/15/04 | | |

| (28) Line No. | (29) Description of Merchandise / 30. (A) T.S.U.S.A. No. (B) ADA CVD Case No. | 31. (A) Gross Weight (B) Manifest Qty. | (32) Net Quantity in T.S.U.S.A. Units | 33. (A) Entered Value (B) CHGS (C) Relationship | 34. (A) T.S.U.S.A. Rate (B) ADA/CVD Rate (C) I.R.C. Rate (D) Visa No. | (35) Duty and I.R. Tax |
|---|---|---|---|---|---|---|
| | | | | | | Dollars / Cents |
| | MBL NUMBERS | 39 TOTAL CTNS | | NOT RELATED CONT. NUMBERS | | |
| | 05729607696 | 540004371426 | | | | |
| 001 | OTHER COATED ROUGH WIRE MA 7317.00.5506 325 KG | 325 KG | | 991 C 1522 | FREE | 0 00 |
| | USA DOLLAR 6.I.V. 991.25 N.E.V. 991.25 | | | | | |
| | BLOCK 39 SUMMARY: MERCHANDISE PROCESSING FEE 311 TOTAL: | | | | 2 00 2 00 | |
| | | | | T.E.V. 991 | | |

| 36. Declaration of Importer of Record (Owner or Purchaser) or Authorized Agent | ▼ U.S. CUSTOMS USE ▼ | | TOTALS | |
|---|---|---|---|---|
| I declare that I am the importer of record and that the actual owner,purchaser,or consignee for customs purposes is as shown above. OR [X] owner or purchaser or agent thereof. | A. Liq. Code | B. Ascertained Duty | (37) Duty | |
| I further declare that the merchandise was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoice are true. OR was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoice as to value or price are true to the best of my knowledge and belief. | C. Ascertained Tax | | (38) Tax | |
| I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed; I will immediately furnish to the appropriate customs officer any information showing a different state of facts. | D. Ascertained Other | | (39) Other | |
| Notice required by Paperwork Reduction Act of 1980. This information is needed to ensure that importers/exporters are complying with U.S. Customs laws, to allow us to compute and collect the right amount of money, to enforce other agency requirements, and to collect accurate statistical information on imports. Your response is mandatory. | E. Ascertained Total | | (40) Total | |
| | (41) Signature of Declarant, Title, and Date | | | |

BILLING COPY

Customs Form 7501

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

Form Approved
OMB No. 1515-0069

# ENTRY/IMMEDIATE DELIVERY

UPS SUPPLY CHAIN SOLUTIONS
490 SUPREME DRIVE
BENSENVILLE, IL   60106

ENTRY DOCS REQUIRE
8/16/04 18:15

ABI CERTIFIED

19 CFR 142.3, 142.16, 142.22, 142.24

| 1. ARRIVAL DATE 081504 | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE/NAME 11 | 4. ENTRY NUMBER 118-4520525-9 |
|---|---|---|---|
| 5. PORT 3901 | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER 41097407 | |
| | 8. CONSIGNEE NUMBER 20-0170539 | | 9. IMPORTER NUMBER SAME |
| 10. ULTIMATE CONSIGNEE NAME ACCENT DEPOT LLC 1939 PHAETON CT | | 11. IMPORTER OF RECORD NAME SAME | |
| 12. CARRIER CODE AF | 13. VOYAGE/FLIGHT/TRIP 6450 | 14. LOCATION OF GOODS-CODE(S)/NAME(S) J283   UPS CFS | |
| 15. VESSEL CODE/NAME AIR FRANCE | | | |
| 16. U.S. PORT OF UNLADING 3901 | 17. MANIFEST NUMBER | 18. G.O. NUMBER | 19. TOTAL VALUE 991 |

20. DESCRIPTION OF MERCHANDISE

39 CTNS   BRADS       EJA

| 21. IT/BL/AWB CODE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER ID. |
|---|---|---|---|---|---|
| | 05729467685 | | 7317005542 | CN | CNNINFEE0902NIN |
| H | 540000433403 | 39 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

### 27. CERTIFICATION

I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met.

SIGNATURE OF APPLICANT
X _____     ATTY-IN-FACT

PHONE NO. (630)595-8608

DATE 08/16/04

### 28. CUSTOMS USE ONLY

☐ OTHER AGENCY ACTION REQUIRED, NAMELY:

☐ CUSTOMS EXAMINATION REQUIRED.

☐ ENTRY REJECTED, BECAUSE:

| DELIVERY AUTHORIZED: | SIGNATURE | DATE |
|---|---|---|
| | | |

### 29. BROKER OR OTHER GOVT. AGENCY USE

EXAM SITE:  CDC

Paperwork Reduction Act Notice: This information is needed to determine the admissibility of imports into the United States and to provide the necessary information for the examination of the cargo and to establish the liability for payment of duties and taxes. Your response is necessary.

Statement Required by 5 CFR 1320.21: The estimated average burden associated with this collection of information is 15 minutes per respondent or recordkeeper depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to U.S. Customs Service, Paperwork Management Branch, Washington, DC 20229, or the Paperwork Reduction Project (1515-0069), Office of Management and Budget, Washington, DC 20503.

宁波保税区亿科国际贸易有限公司
# NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO.,LTD.

ADD: B09-02 YINXIN GREAT MANSIONS

NINGBO 315040,

CHINA.

发 票
## INVOICE

INVOICE NO.: ECO040804

DATE: Aug.04th, 2004

S/C No.:

L/C No.:

From    NINGBO                    to              CHICAGO

To Messrs: ACCENT DEPOT

| Marks & Nos | Description of Goods | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| | | FOB NINGBO | | |
| N/M | BRADS | 325 KGS | USD 3.05 /KG | USD 991.25 |

TOTAL:          325 KGS                              USD 991.25

7317.00-5590/

SAY US DOLLARS NINE HUNDRED AND NINETY ONE POINT TWO FIVE ONLY

COUNTRY OF ORIGIN: CHINA

NO SOLID WOOD PACKING MATERIALS

宁波保税区亿科国际贸易有限公司
NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO.,LTD.

110-
4520525-9

# 宁 波 保 税 区 亿 科 国 际 贸 易 有 限 公 司
## NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO.,LTD.

SHIPPING MARK: N/M

## 装 箱 单
## PACKING LIST

INVOICE NO.: ECO040804

DATE: Aug.04th, 2004

S/C No.:

CONSIGNEE: ACCENT DEPOT

SHIPPED BY     FROM     SHANGHAI     TO     CHICAGO

| Item No. | Description of Goods | Quantity | Pieces | Gross Weight | Net Weight | Measurement |
|----------|---------------------|----------|--------|--------------|------------|-------------|
| | BRADS | 325 KGS | 39 CARTONS | 365 KGS | 325 KGS | 2.8 CBM |
| | TOTAL: | 325 KGS | 39 CARTONS | 365 KGS | 325 KGS | 2.8 CBM |

SAY THIRTY NINE CARTONS ONLY

宁波保税区亿科国际贸易有限公司
NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO., LTD.

ATTN: Ms 岳

Fr: 亿's

**Air Waybill**

UPS AIR FREIGHT SERVICES
601 SECOND STREET
SAN FRANCISCO CA 94105
UNITED STATES OF AMERICA

Issued by

Copies 1,2 and 3 of this Air Waybill are originals and have the same validity.

Shipper's Name and Address
FREE TRADE ZONE ECC
INTERNATIONAL CO.LTD. RDG 02 YINYTN
GREAT MANSIONS NINGBO 315010
PEOPLE'S REPUBLIC OF CHINA
FAX:0571-88486099

Consignee's Name and Address
AGENT DEPOT
1939 PHAETON CT.NAPERVILLE IL 60565
USA
TEL:630-542-433

Consignee's Account Number
207530

Issuing Carrier's Agent Name and City
FRITZ LOGISTICS SERVICE (TIANJIN)
SHANGHAI
CHINA

Accounting Information
OUR REF: 540-000433608

Agent's IATA Code

Account No.

FREIGHT COLLECT

Airport of Departure (Addr. of First Carrier) and Requested Routing
PVG-*ORD/CH

| To | By first Carrier | Routing and Destination | to | by | to | by | Currency | Chgs Code | WT/VAL PPD COLL | Other PPD COLL | Declared Value for Carriage | Declared Value for Customs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ORD | AF | | | | | | USD | | | | NVD | NVD |

Airport of Destination
O'HARE AIRPORT/CH

Flight/Date
AF0731/12

Flight/Date
NIL

Amount of Insurance

INSURANCE - If carrier offers insurance, and such insurance is requested in accordance with the conditions thereof, indicate amount to be insured in figures in box marked "Amount of Insurance".

Handling Information
ATTN ADTEC00040804,P/L ATT'D DOOR TO AIRPORT

| No. of Pieces RCP. | Gross Weight | kg lb | Rate Class Commodity Item No. | Chargeable Weight | Rate Charge | Total | Nature and Quantity of Goods (incl. Dimensions or Volume) |
|---|---|---|---|---|---|---|---|
| | | | | | 3.05 | 1169.68 | CARS |
| MARKS: N/M 39CTNS SHPT WITH NO SOLID WOODEN PACKING | | | | | | | 0x38x31x45 cm 2x59x45x35 cm 2x34x35x38 cm 5x49x33x42 cm |
| 39 | 365.0 | | | | | 1169.68 | Tot.Vol. : 2.299 |

| Prepaid | Weight Charge | Collect |
|---|---|---|
| | | 1169.68 |

Valuation Charge

Tax

Total Other Charges Due Agent
367.92

Total Other Charges Due Carrier

Total Prepaid

Total Collect
1537.60

Currency Conversion Rates

CC Charges in Dest. Currency

| Other Charges | | |
|---|---|---|
| Security Cha | 53.69 | Fuel Surchar 95.88 |
| Terminal Chg | 38.35 | Exp Customs 30.00 |
| Pick Up | 150.00 | |

Shipper certifies that the particulars on the face hereof are correct and that insofaras any part of the consignment contains dangerous goods, such part is properly described by name and is in proper condition for carriage by air according to the applicable Dangerous Goods Regulations.

Signature of Shipper or his Agent

FRITZ LOGISTICS SERVICE (TIANJIN)
Linkey Ni

Executed on 11-Aug-2004 (Date) at PVG/ACT (place)

Signature of Issuing Carrier or its Agent

For Carrier's Use only at Destination

Charges at Destination

Total Collect Charges

**COPY 5 (FOR AIRPORT OF DESTINATION)**

**...MER CONFIRMATION**    UPS

DATE: 08/17/04
SHIPPER NO.:
REF. NO.: 043 4152739...

AGENTS NO.:

**UPS Supply Chain Solutions™**

THE MERCHANDISE DESCRIBED BELOW WILL BE ENTERED AND/
FORWARDED AS FOLLOWS; IF NOT IN ACCORDANCE PLEASE
CONTACT US.

UPS SUPPLY CHAIN SOLUTIONS

490 SUPREME DRIVE
BENSENVILLE, IL   60106

CARRIER    EQS/PHOENIX

...NSIGNEE:

ACCENT DEPOT LLC
ATTN EILEEN 630-548-2133
1939 PHAETON CT
NAPERVILLE IL 60565

| | |
|---|---|
| **SHIPPER** | ACCENT DEPOT LLC<br>1939 PHAETON CT<br>NAPERVILLE IL 60565 |

...OCATION: UPS CFS

ENTRY No./Date    110-4520525-9         08/14/04

...ORTING
...ARRIER    AIR FRANCE          A450

FROM
PORT OF:    SHANGHAI APT

...L OF LADING
...R WAYBILL    05729407684

DATE OF ARRIVAL    08/15/04

LAST FREE DAY

H2033 5402004737/08

FREIGHT CHARGES

| NUMBER PACKAGES | PAGES ... DEPT ... | DESCRIPTIONS | WEIGHT | RATE | CHK. COL. | |
|---|---|---|---|---|---|---|
| 3 | 3/ | CTNS  BRADS    EJA<br>* SAME DAY DELIVERY*MUST DELIVER TODAY* | 895 LB | | | PREPAID |
| | | | 895 LB | | | |

BILL FREIGHT CHARGES TO:
UPS SUPPLY CHAIN SOLUTIONS,
CHICAGO OFFICE
490 SUPREME DRIVE
BENSENVILLE, IL 60106

...S SUPPLY CHAIN SOLUTIONS, INC. WILL NOT BE
...SPONSIBLE FOR ANY DEMURRAGE, LOADING OR
...HER CHARGES NOT AUTHORIZED IN ADVANCE.

The agreed or declared value of the property is hereby stated

by the shipper to be not exceeding              per

**NOTE:** Forwarding instructions of merchandise described has been issued as described above,
in the event this is not in accordance with your instructions – contact UPS SUPPLY
CHAIN SOLUTIONS, INC. issuing office immediately by telephone.      **THANK YOU**

UPS Supply Chain Solutions℠

**UPS SUPPLY CHAIN SOLUTIONS, INC.**
FEDERAL MARITIME COMMISSION NO. 275-F

**PLEASE MAIL REMITTANCE TO:**

UPS SUPPLY CHAIN SOLUTIONS
P. O. BOX 360302
PITTSBURGH, PA       152506302

ISSUED BY: BENSENVILLE

ACCT. NO.   0207480

ACCENT DEPOT LLC
1939 PHAETON CT
NAPERVILLE
IL          60565

| | |
|---|---|
| **INVOICE NO.** | 041927518 |
| **DATE** | 09/13/04 |
| **FILE NO.** | 41008542    EA |
| **CARRIER** | QANTAS AIRWAY LI<br>VOYAGE# 7583 |

**YOUR REF:**  EC004209          ENTRY NO. 110-4521417-8      9/08/04
TMP REF:    BMO

INVOICES ARE DUE UPON RECEIPT. LATE PAYMENTS WILL BE SUBJECT TO A LATE PAYMENT CHARGE AT THE RATE OF 1 1/2% PER MONTH (ONE MONTH MINIMUM) EXCEPT WHERE CONTRARY TO APPLICABLE LAW.

SHIPMENT:    35 CTNS   BRADS/BMO

B/L# 08133646126    H B/L# 540000446068

| | | |
|---|---|---|
| 2064 | ADVANCE TO CUSTOMS--USER FEES | 2.00 |
| 4010 | DOCUMENTATION & HANDLING | 20.00 |
| 4030 | SERVICES TO ENTRY | 97.50 |
| 4210 | TRANS/LOCAL DRAYAGE SERVICES | 92.62 |
| 4540 | AIRLINE TERMINAL CHARGE | 35.00 |
| 6811 | TELEPHONE SERVICE | 7.50 |
| 6841 | MESSENGER SERVICE | 15.00 |
| 9982 | FREIGHT CHARGES | 1,524.00 |

*ORIGINAL*

*never received refund for damage*

S/B 1571.12

THIS INVOICE IS PAYABLE IN TOTAL UPON RECEIPT, IN US $        1,793.62
PLEASE RETURN AN INVOICE COPY WITH YOUR REMITTANCE.
041011-000-0904

PLEASE DIRECT INQUIRIES TO:
490 SUPREME DRIVE                BENSENVILLE
IL              60106            PHONE:  (630) 595-8808

UPS SUPPLY CHAIN SOLUTIONS, INC. LIMITS ITS LIABILITY TO $50 PER SHIPMENT WHEN ACTING AS A FREIGHT FORWARDER OR CUSTOMS BROKER PURSUANT TO THE NCBFAA TERMS AND
CONDITIONS INCORPORATED ON THE REVERSE SIDE OF THIS INVOICE.

**NOTICE TO IMPORTERS**

MERCHANDISE RELEASED BY CUSTOMS IS DONE UNDER BOND AND IS SUBJECT TO REDELIVERY TO CUSTOMS ON DEMAND. FAILURE TO RETURN MERCHANDISE MAKES CONSIGNEE SUBJECT TO PENALTY FOR FULL AMOUNT OF BOND. IF YOU ARE THE IMPORTER OF RECORD, PAYMENT TO THE BROKER WILL NOT RELIEVE YOU OF LIABILITY FOR CUSTOMS CHARGES (DUTIES, TAXES, OR OTHER DEBTS OWED CUSTOMS) IN THE EVENT THE CHARGES ARE NOT PAID BY THE BROKER. THEREFORE, IF YOU PAY BY CHECK, CUSTOMS CHARGES MAY BE PAID WITH A SEPARATE CHECK PAYABLE TO THE "U.S. CUSTOMS SERVICE" WHICH SHALL BE DELIVERED TO CUSTOMS BY THE BROKER.

**NOTICE TO EXPORTERS**

UPS SUPPLY CHAIN SOLUTIONS, INC. HAS A POLICY AGAINST PAYMENT, SOLICITATION, OR RECEIPT OF ANY REBATE DIRECTLY OR INDIRECTLY, WHICH WOULD BE UNLAWFUL UNDER THE UNITED STATES SHIPPING ACT, 1984, AS AMENDED. UPON REQUEST WE SHALL PROVIDE A DETAILED BREAKOUT OF THE COMPONENTS OF ALL CHARGES ASSESSED AND A TRUE COPY OF EACH PERTINENT DOCUMENT RELATING TO THESE CHARGES.

FCI-INV (REV 4/02)

**EXHIBIT**
E

UPS Supply Chain Solutions℠ **UPS**

FEDERAL MARITIME COMMISSION NO. 275-F

UPS SUPPLY CHAIN SOLUTIONS
P. O. BOX 360345
PITTSBURGH, PA    152504345

ISSUED BY: BENSENVILLE

ACCT. NO.   0207-450

| | |
|---|---|
| ACCENT DEPOT LLC | **INVOICE NO.** 041927013 |
| 1932 PHAETON CT | **DATE** 09/13/04 |
| NAPERVILLE | **FILE NO.** 41008343    EA |
| IL         60565 | **CARRIER** QANTAS AIRWAY LI |
| | VOYAGE# 7383 |

**YOUR REF.** EL004207    THE ESS. DMD
ENTRY NO. 110-4521417-8    7/08/04

*INVOICES ARE DUE UPON RECEIPT. LATE PAYMENTS WILL BE SUBJECT TO A LATE PAYMENT CHARGE AT THE RATE OF 1 1/2% PER MONTH (ONE MONTH MINIMUM), EXCEPT WHERE CONTRARY TO APPLICABLE LAW.*

SHIPMENT:    35 CTNS   BRADS/BRD

B/L# 08135845126    H B/L# 5400U0445060

| | | |
|---|---|---|
| 2056 | ADVANCE TO CUSTOMS--USER FEES | 2.00 |
| 4010 | DOCUMENTATION & HANDLING | 25.00 |
| 4030 | SERVICES TO ENTRY | 37.50 |
| 4210 | TRANS/LOCAL DRAYAGE SERVICES | 35.00 |
| 4540 | AIRLINE TERMINAL CHARGE | 52.02 |
| 6911 | TELEPHONE SERVICE | 7.50 |
| 6941 | MESSENGER SERVICE | 15.00 |
| 9792 | FREIGHT CHARGES | 1,524.00 |

THIS INVOICE IS PAYABLE IN TOTAL UPON RECEIPT, IN US
PLEASE RETURN AN INVOICE COPY WITH YOUR REMITTANCE.
041011-      04

1,795.62

PLEASE DIRECT INQUIRIES TO:
490 SUPREME DRIVE                   BENSENVILLE
IL         60106        PHONE: (630) 575-8808

UPS SUPPLY CHAIN SOLUTIONS, INC. LIMITS ITS LIABILITY TO $50 PER SHIPMENT WHEN ACTING AS A FREIGHT FORWARDER OR CUSTOMS BROKER PURSUANT TO THE NCBFAA TERMS AND
CONDITIONS INCORPORATED ON THE REVERSE SIDE OF THIS INVOICE.

**NOTICE TO IMPORTERS**

MERCHANDISE RELEASED BY CUSTOMS IS DONE UNDER BOND AND IS SUBJECT TO REDELIVERY TO CUSTOMS ON DEMAND. FAILURE TO RETURN MERCHANDISE MAKES CONSIGNEE SUBJECT TO PENALTY FOR FULL AMOUNT OF BOND. IF YOU ARE THE IMPORTER OF RECORD, PAYMENT TO THE BROKER WILL NOT RELIEVE YOU OF LIABILITY FOR CUSTOMS CHARGES (DUTIES, TAXES, OR OTHER DEBTS OWED CUSTOMS) IN THE EVENT THE CHARGES ARE NOT PAID BY THE BROKER. THEREFORE, IF YOU PAY BY CHECK, CUSTOMS CHARGES MAY BE PAID WITH A SEPARATE CHECK PAYABLE TO THE "U.S. CUSTOMS SERVICE" WHICH SHALL BE DELIVERED TO CUSTOMS BY THE BROKER.

**NOTICE TO EXPORTERS**

UPS SUPPLY CHAIN SOLUTIONS, INC. HAS A POLICY AGAINST PAYMENT, SOLICITATION, OR RECEIPT OF ANY REBATE, DIRECTLY OR INDIRECTLY, WHICH WOULD BE UNLAWFUL UNDER THE UNITED STATES SHIPPING ACT, 1984 AS AMENDED. UPON REQUEST WE SHALL PROVIDE A DETAILED BREAKOUT OF THE COMPONENTS OF ALL CHARGES ASSESSED AND A TRUE COPY OF EACH PERTINENT DOCUMENT RELATING TO THESE CHARGES.

FCH-INV (REV 4/02)

Case: 1:05-cv-00990 Document #: 1-2 Filed: 02/17/05 Page 81 of 178 PageID #:81

UNITED STATES CUSTOMS SERVICE

| | | |
|---|---|---|
| 1. Entry No. | 2. Entry Type Code | 3. Entry Summary Date |
| 4. Entry Date | 5. Port Code | |
| 6. Bond No. | 7. Bond Type Code | 8. Broker / Importer File No. PHP8201P05 |

9. Ultimate Consignee Name and Address

10. Consignee No. 04-0170012960

11. Importer of Record Name and Address

ACCENT DEPOT LT
1057 PARKS[IDE] CT
NAPERVILLE IL 60540

12. Importer No. 04-0170012960

| 13. Exporting Country | 14. Export Date |
|---|---|
| CN CHINA M | 05/28/2004 |
| 15. Country of Origin | 16. Missing Documents |
| CN CHINA M | |
| 17. I.T. No. | 18. I.T. Date |

CUST REF: ECO44009
INP REF: E040

| 19. B/L or AWB No. WPI/394612s | 20. Mode of Transportation 40 | 21. Manufacturer I.D. CNWINTREEPRZ247N | 22. Reference No. |
|---|---|---|---|
| 23. Importing Carrier OF CANTAS AIRWAY LTD 7933 | 24. Foreign Port of Lading 57075 | 25. Location of Goods/G.O. No. UPSCS CHICAGO | FIRMS CODE: 0293 |
| 26. U.S. Port of Unlading 3911 PEKFORD, ILLINOIS | 27. Import Date 05/30/2004 | | |

| 28. Line No. | 30. A. T.S.U.S.A. No. B. ADA CVD Case No. | 31. A. Gross Weight B. Manifest Qty. | 32. Net Quantity in T.S.U.S.A. Units | 33. A. Entered Value B. CHGS C. Relationship | 34. A. T.S.U.S.A. Rate B. ADA/CVD Rate C. I.R.C. Rate D. Visa No. | 35. Duty and I.R. Tax Dollars | Cents |
|---|---|---|---|---|---|---|---|
| 1 | B/L NUMBERS 00120166120 | 35 TOTAL CTNS 182 NUMBERS 540640446068 | | MLT RELATED CONT. NUMBERS | | | |
| 001 | OTHER COATED ROUGH WIRE N- 7317.00.5570 382 KG 314 KG | | | 961 C 1579 | FREE | 0 | 00 |
| | USA DOLLAR G.T.V. M.R.V. | | 162.79 180.79 | | | | |
| | BLOCK 39 SUMMARY MERCHANDISE PROCESSING FEE 311 TOTAL: | | | | 2.00 2.00 | | |
| | | | | | T.E.V. 961 | | |

| 36. Declaration of Importer of Record (Owner or Purchaser) or Authorized Agent | | ▼ U.S. CUSTOMS USE ▼ | TOTALS |
|---|---|---|---|

I declare that I am the ☐ importer of record and that the actual owner, purchaser, or consignee for customs purposes is as shown above. OR ☒ owner or purchaser or agent thereof.

I further declare that the merchandise ☐ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoice are true. OR ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoice as to value or price are true to the best of my knowledge and belief.

I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed. I will immediately furnish to the appropriate customs officer any information showing a different state of facts.

Notice required by Paperwork Reduction Act of 1980. This information is needed to ensure that importers/exporters are complying with U.S. Customs laws, to allow us to compute and collect the right amount of money, to enforce other agency requirements, and to collect accurate statistical information on imports. Your response is mandatory.

| A. Liq. Code | B. Ascertained Duty | 37. Duty | 0 00 |
|---|---|---|---|
| | C. Ascertained Tax | 38. Tax | 0 00 |
| | D. Ascertained Other | 39. Other | 2 00 |
| | E. Ascertained Total | 40. Total | 2 00 |

41. Signature of Declarant, Title, and Date

Customs Form 75

BILLING COPY

DEPARTMENT OF THE TREASURY
Form Approved
OMB No. 1515-0069

# ENTRY/IMMEDIATE DELIVERY

UPS SUPPLY CHAIN SOLUTIONS
490 SUPREME DRIVE
BENSENVILLE, IL  60106

ENTRY DOCS REQUIRED
9/27/04 15:17

A&I CERTIFIED

19 CFR 142.3, 142.16, 142.22, 142.24

| 1. ARRIVAL DATE | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE/NAME | 4. ENTRY NUMBER |
|---|---|---|---|
| 9/04/04 | | 1<br>01 | 110-4521417-2 |

| 5. PORT | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER | |
|---|---|---|---|
| 3901 | | 41008542 | |

| | 8. CONSIGNEE NUMBER | | 9. IMPORTER NUMBER |
|---|---|---|---|
| | 20-01739519043 | | SAME |

| 10. ULTIMATE CONSIGNEE NAME | 11. IMPORTER OF RECORD NAME |
|---|---|
| ACCENT DEPOT LLC<br>1939 PHAETON CT | SAME |

| 12. CARRIER CODE | 13. VOYAGE/FLIGHT/TRIP | 14. LOCATION OF GOODS-CODE(S)/NAME(S) |
|---|---|---|
| GF | 7583 | J283      UPSPS CHICAGO |

| 15. VESSEL CODE/NAME |
|---|
| QANTAS AIRWAY LIMIT |

| 16. U.S. PORT OF UNLADING | 17. MANIFEST NUMBER | 18. G.O. NUMBER | 19. TOTAL VALUE |
|---|---|---|---|
| 3901 | | | 956 |

| 20. DESCRIPTION OF MERCHANDISE |
|---|
| 35 CTNS  BAGS/BAG |

| 21. IT/BL/AWB CODE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER ID. |
|---|---|---|---|---|---|
| | 00157174412 | | 3714700500 | CN | CHNSUNSIN202003 |
| M | 54000044605D | 35 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 27. CERTIFICATION | 28. CUSTOMS USE ONLY |
|---|---|

I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met.

☐ OTHER AGENCY ACTION REQUIRED, NAMELY:

SIGNATURE OF APPLICANT

X _(signature)_ ATTY-IN-FACT

☐ CUSTOMS EXAMINATION REQUIRED.

| PHONE NO. | DATE |
|---|---|
| (630) 595-8208 | 09/27/04 |

☐ ENTRY REJECTED, BECAUSE:

### 29. BROKER OR OTHER GOVT. AGENCY USE

EXAM SITE:  CDC

| DELIVERY AUTHORIZED: | SIGNATURE | | DATE |
|---|---|---|---|

Paperwork Reduction Act Notice: This information is needed to determine the admissibility of imports into the United States and to provide the information for the examination of the cargo and to establish the liability for payment of duties and taxes. Your response is necessary.

Statement Required by 5 CFR 1320.21: The estimated average burden associated with this collection of information is 15 minutes per respondent or recordkeeper depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to U.S. Customs Service, Paperwork Management Branch, Washington, DC 20229, or the Paperwork Reduction Project (1515-0069), Office of Management and Budget, Washington, DC 20503.

Customs Form 3461 (010189)

CNNN FRE 0902.03.3

宁波保税区亿科国际贸易有限公司

NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO.,LTD.

发票

INVOICE

ADD: B09-02 YINXIN GREAT MANSIONS

NINGBO 315040,

CHINA.

INVOICE NO.: ECO04209

DATE: AUG.30, 2004

L/C No.:

S/C No.:

From     SHANGHAI     to     CHICAGO

To Messrs: ACCENT DEPOT

| Marks & Nos | Description of Goods | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| N/M | BRADS | 315 KGS | FOB NINGBO<br>USD 3.05 /KG | USD 960.75 |
| | | | | |
| | TOTAL: | 315 KGS | | USD 960.75 |

7317.00.5590/

c/o
China

110-4531478

宁波保税区亿科国际贸易有限公司

NINGBO FREE TRADE ZONE ECO INTERNATIONAL CO.,LTD.

装箱单

PACKING LIST

INVOICE NO.: ECO04202

DATE: AUG.30, 2004

S/C No.:

SHIPPING MARK: NM

CONSIGNEE: <u>ACCENT DEPOT</u>

SHIPPED BY FROM <u>SHANGHAI</u> TO <u>CHICAGO</u>

| Item No. | Description of Goods | Quantity | Pieces | Gross Weight | Net Weight | Measurement |
|----------|---------------------|----------|--------|--------------|------------|-------------|
| | BRADS | 315 KGS | 35 CARTONS | 350 KGS | 315 KGS | 2.00 CBM |
| | TOTAL: | 315 KGS | 35 CARTONS | 350 KGS | 315 KGS | 2.00 CBM |

<u>SAY THIRTY-FIVE CARTONS ONLY</u>

1/2

SAY US DOLLARS NINE HUNDRED SIXTY CENTS SEVENTY-FIVE

COUNTRY OF ORIGIN: CHINA

NO SOLID WOOD PACKING MATERIALS

宁波保税区亿邦国际贸易有限公司
NINGBO FTZ YIBANG INTERNATIONAL CO., LTD.

1/2

001 PVG 33076126

NINGBO FREE TRADE ZONE ECO      7453709
INTERNATIONAL CO LTD.809-02 YINXIN
GREAT MANSIONS NINGBO 315040
PEOPLES REPUBLIC OF CHINA
TEL:0574-87065432

UPS AIR FREIGHT SERVICES, INC.
55 SECOND STREET
SAN FRANCISCO CA 94105
UNITED STATES OF AMERICA

ACCENT DEPOT            207530
1939 PHAETON CT
NAPERVILLE IL 60565 USA
TEL:630-548-433      0207480

FRITZ LOGISTICS SERVICE (TIANJIN)      Our ref: 540-000446068
SHANGHAI
CHINA      41'

FREIGHT COLLECT

PVG-PUDONG

ORD    QF            USD     C    C    NVD        NVD

O'HARE AIRPORT/CH    QF7583/04      NIL

INV NO:EC004209 & P/L., ATT'D DOOR TO AIRPORT

| | | | | | | |
|---|---|---|---|---|---|---|
| 35 | 350.0 K Q | 350.0 | 3.05 | 1067.50 | BRADS | 15x50x34x41 cm |
| 35CTNS | | | | | | 10x44x37x34 cm |
| SHPT WITH NO SOLID WOODEN PACKING | | | | | | 10x38x36x34 cm |
| MARKS; | | | | | | |
| N/M | | | | | | |

35     350.0                      1067.50 Tot.Vol. : 2.065

1067.50 GENERAL RATE      105.00 Security Cha     49.00
        Fuel Surchar       87.50 Terminal Chg     35.00
        Exp Customs        30.00 Pick Up       150.00

456.50

1524.00           FRITZ LOGISTICS SERVICE (TIANJIN)
                  Rain Lu
        03-Sep-2004     PVG/APT

55.00    1579.00            4

# ...MER CONFIRMATION



SHIPPER NO.:
REF. NO.:

AGENTS NO.:

**UPS Supply Chain Solutions™**

THE MERCHANDISE DESCRIBED BELOW WILL BE ENTERED AND FORWARDED AS FOLLOWS: IF NOT IN ACCORDANCE, PLEASE CONTACT US.

ONSIGNEE:

## LOCATION:

| IMPORTING CARRIER | | DATE OF. ARRIVAL | | LAST FREE DAY | FREIGHT CHARGES |
|---|---|---|---|---|---|
| BILL OF LADING AIR WAYBILL | | | | | |

| NUMBER PACKAGES | DESCRIPTIONS | WEIGHT | RATE | CHK. COL. | |
|---|---|---|---|---|---|

**BILL FREIGHT CHARGES TO:**

UPS SUPPLY CHAIN SOLUTIONS, INC. WILL NOT BE RESPONSIBLE FOR ANY DEMURRAGE, LOADING OR OTHER CHARGES NOT AUTHORIZED IN ADVANCE.

The agreed or declared value of the property is hereby stated by the shipper to be not exceeding            per

**NOTE:** Forwarding instructions of merchandise described has been issued as described above in the event this is not in accordance with your instructions — contact UPS SUPP... CHAIN SOLUTIONS, INC. issuing office immediately by telephone.    THANK YO...

## ACTUAL

Jul 13 invoice

**Summary for 7/13 invoice**

| Code | Description | Amount |
|---|---|---|
| 2064 | Advance to Customs (user Fees | 12.00 |
| 4010 | Documentation | 20.00 |
| 4030 | Services to Entry | 97.50 |
| 4210 | Local Drayage (.10 per kg) | 66.21 |
| 9982 | Freight Charges | 2,440.91 |
| | Total | 2,636.62 |

| | |
|---|---|
| Overbilled | 313.73 |
| Percent overbi | 11.90% |

| # of boxes | Actual Size | cm3 per box | Total Dim | dim kg |
|---|---|---|---|---|
| 67 | 44x36x32.5 | 51480 | 3449160 | 574.86 |
| 3 | 37.5x34.5x32.5 | 42047 | 126141 | 21.02 |
| 5 | 55x42.5x34 | 79475 | 397375 | 66.23 |
| 75 | Total Weight | | 3972.68 | 662.11 |
| | Per kg | | | 2.98 |

| Description | Amount |
|---|---|
| Volume Freight | 1973.10 |
| Fuel Surcharge | 158.91 |
| Terminal Charge | 66.21 |
| Pickup | 150.00 |
| Security Charge | 92.70 |
| Total | 2,440.91 |

Total 1973.10

---

## UPS Billed

Jul 13 invoice

**Summary for 7/13 invoice**

| Code | Description | Amount |
|---|---|---|
| 2064 | Advance to Customs (user Fees | 25.00 |
| 4010 | Documentation | 20.00 |
| 4030 | Services to Entry | 97.50 |
| 4114 | User Fees | 12.00 |
| 4210 | Local Drayage (.10 per kg) | 121.12 |
| 4540 | Airline Terminal Charge | 69.25 |
| 6811 | Telphone Service | 7.50 |
| 6811 | Messenger Service | 15.00 |
| 6841 | Freight Charges | 2,582.98 |
| | Total | 2,950.35 |

| # of boxes | UPS Bill | cm3 per box | Total Dim | dim kg |
|---|---|---|---|---|
| 67 | 44x37x33 | 53724 | 3599508 | 599.92 |
| 2 | 38x35x33 | 43890 | 87780 | 14.63 |
| 5 | 59x43x34 | 86256 | 431290 | 71.88 |
| 1 | 46x21x35 | 33810 | 33810 | 5.64 |
| 75 | Total Volume | | 4118.58 | 686.43 |
| | Per kg | | | 2.98 |

| Description | Amount | |
|---|---|---|
| Volume Freight | 2045.56 | 692.5 |
| Additional Excess Freight | 18.09 | 2.98 |
| Fuel Surcharge | 173.13 | |
| Terminal Charge | 69.25 | |
| Pickup | 150.00 | |
| Security Charge | 96.95 | |
| Exp Customs | 30.00 | |
| Total | 2,582.98 | |

Total 2045.56

2063.65


EXHIBIT F

## ACTUAL

18-Aug

### Summary for 8/18 invoice

| Code | Description | Amount |
|---|---|---|
| 2064 | Advance to Customs (user Fees) | 12.00 |
| 4010 | Documentation | 20.00 |
| 4030 | Services to Entry | 97.50 |
| 4210 | Local Drayage (.10 per kg) + $50 | 100.00 |
| 9982 | Freight Charges | 1,414.04 |
| | Total | 1,643.54 |

| | |
|---|---|
| Overbilled | 128.75 |
| Percent overbil | 7.83% |

| # of boxes | Actual Size | cm3 per box | Total Dim | dim kg |
|---|---|---|---|---|
| 10 | 44x36x32.5 | 51480 | 514800 | 85.80 |
| 12 | 37.5x34.5x32.5 | 42046.875 | 504562.5 | 84.09 |
| 2 | 55x42.5x34 | 79475 | 158950 | 26.49 |
| 15 | 49x33x40 | 64680 | 970200 | 161.70 |
| 39 | Total Weight | | 2148.51 | 358.09 |
| | Per kg | | | 3.05 |

| | |
|---|---|
| Volume Freight | 1092.16 |
| Fuel Surcharge | 85.94 |
| Terminal Charge | 35.81 |
| Pickup | 150.00 |
| Security Charge | 50.13 |
| Total | 1,414.04 |

1092.16

---

## UPS Billed

18-Aug

### Summary for 8/18 invoice

| Code | Description | Amount |
|---|---|---|
| 2064 | Advance to Customs (user F | 2.00 |
| 4010 | Documentation | 20.00 |
| 4030 | Services to Entry | |
| 4114 | User Fees | 12.00 |
| 4210 | Local Drayage (.10 per kg) | 153.20 |
| 4540 | Airline Terminal Charge | 25.00 |
| 6811 | Telephone Service | 7.50 |
| | Messenger Service | 15.00 |
| 6841 | Freight Charges | 1,537.60 |
| | Total | 1,772.30 |

| # of boxes | UPS Bill | cm3 per box | Total Dim | dim kg |
|---|---|---|---|---|
| 10 | 36x34x45 | 55080 | 550800 | 91.80 |
| 12 | 34x35x38 | 45220 | 542640 | 90.44 |
| 2 | 59x45x35 | 92925 | 185850 | 30.98 |
| 15 | 49x33x42 | 67914 | 1018710 | 169.79 |
| 39 | Total Volume | | 2298.00 | 383.00 |
| | Per kg | | | 3.05 |

| | | |
|---|---|---|
| Volume Freight | 1168.15 | |
| differential | 1.53 | |
| Fuel Surcharge | 95.88 | |
| Terminal Charge | 38.35 | |
| Pickup | 150.00 | |
| Security Charge | 53.69 | |
| Exp Customs | 30.00 | |
| Total | 1,537.60 | |

1168.15   1168.15

383.5   3.05

1169.68

## ACTUAL

**13-Sep**

Summary for 9/13 invoice

| Code | Description | Amount |
|---|---|---|
| 2064 | Advance to Customs (user Fees) | 2.00 |
| 4010 | Documentation | 20.00 |
| 4030 | Services to Entry | 97.50 |
| 4210 | Local Drayage (.10 per kg) | 50.00 |
| 9982 | Freight Charges | 1,401.62 |
| | Total | 1,571.12 |

| | |
|---|---|
| Overbilled | 222.50 |
| Percent over! | 14.16% |

| # of boxes | Actual Size | cm3 per box | Total Dim | dim kg |
|---|---|---|---|---|
| 10 | 44x36x32.5 | 51480 | 514800 | 85.80 |
| 10 | 37.5x34.5x32.5 | 42047 | 420468.75 | 70.08 |
| 15 | 55x42.5x34 | 79475 | 1192125 | 198.69 |
| 35 | Total Weight | | 2127.39 | 354.57 |
| | Per kg | | | 3.05 |

| Description | Amount | |
|---|---|---|
| Volume Freight | 1081.43 | |
| Fuel Surcharge | 85.10 | |
| Terminal Charge | 35.46 | |
| Pickup | 150.00 | |
| Security Charge | 49.64 | |
| Total | 1,401.62 | 1081.43 |

## UPS Billed

**13-Sep**

Summary for 9/13 invoice

| Code | Description | Amount |
|---|---|---|
| 2064 | Advance to Customs (user F... | 2.00 |
| 4010 | Documentation | 20.00 |
| 4030 | Services to Entry | 97.50 |
| 4114 | User Fees | 0.00 |
| 4210 | Local Drayage (.10 per kg) | 92.62 |
| 4540 | Airline Terminal Charge | 35.00 |
| 6811 | Telephone Service | 7.50 |
| 6841 | Messenger Service | 15.00 |
| | Freight Charges | 1,524.00 |
| | Total | 1,793.62 |

| # of boxes | UPS Bill | cm3 per box | Total Dim | dim kg |
|---|---|---|---|---|
| 10 | 44x37x34 | 55352 | 553520 | 92.25 |
| 10 | 38x36x34 | 46512 | 465120 | 77.52 |
| 15 | 50x34x41 | 69700 | 1045500 | 174.25 |
| 35 | Total Volume | | 2064.14 | 344.02 |
| | Per kg | | | 3.05 |

| Description | Amount | |
|---|---|---|
| Volume Freight | 1049.27 | |
| differential | 18.23 | |
| Fuel Surcharge | 87.50 | |
| Terminal Charge | 35.00 | |
| Pickup | 150.00 | |
| Security Charge | 49.00 | |
| Exp Customs | 30.00 | |
| General Rate | 105.00 | |
| Total | 1,524.00 | 1049.27 |

350
3.05
1067.50

## ACTUAL

21-Sep

### Summary for 9/21 invoice

| Code | Description | Amount |
|---|---|---|
| 2064 | Advance to Customs (user Fees) | 2.00 |
| 4010 | Documentation | 20.00 |
| 4030 | Services to Entry | 97.50 |
| 4210 | Local Drayage (.10 per kg) | 50.00 |
| 9982 | Freight Charges | 1,749.09 |
| | User Fees | 12.00 |
| | Total | 1,930.59 |

| | |
|---|---|
| Overbilled | 358.96 |
| Percent over | 18.59% |

| # of boxes | Actual Size | cm3 per box | Total Dim | dim kg |
|---|---|---|---|---|
| 29 | 44x36x32.5 | 51480 | 1492920 | 248.82 |
| 23 | 37.5x34.5x32.5 | 42047 | 967078.125 | 161.18 |
| 1 | 34x25x20 | 17000 | 17000 | 2.83 |
| 1 | 35x30x17 | 17850 | 17850 | 2.98 |
| 54 | | Total Weight | 2494.85 | 415.81 |
| | | Actual Weight | | 453.00 |
| | | Per kg | | 3.05 |

| | | |
|---|---|---|
| Volume Freight | | 1381.65 |
| Fuel Surcharge | | 108.72 |
| Terminal Charge | | 45.30 |
| Pickup | | 150.00 |
| Security Charge | | 63.42 |
| Total | | 1,749.09 |

Total 1381.65

## UPS Billed

21-Sep

### Summary for 9/21 invoice

| Code | Description | Amount |
|---|---|---|
| 2064 | Advance to Customs (user Fees) | 2.00 |
| 4010 | Documentation | 20.00 |
| 4030 | Services to Entry | 97.50 |
| 4114 | User Fees | 12.00 |
| 4210 | Local Drayage (.10 per kg) | 170.73 |
| 4540 | Airline Terminal Charge | 45.30 |
| 6811 | Telephone Service | 7.50 |
| 6841 | Messenger Service | 15.00 |
| | Freight Charges | 1,919.52 |
| | Total | 2,289.55 |

| # of boxes | UPS Bill | cm3 per box | Total Dim | dim kg |
|---|---|---|---|---|
| 29 | 45x37x34 | 56610 | 1641690 | 273.62 |
| 23 | 38x35x34 | 45220 | 1040060 | 173.34 |
| 1 | 34x25x20 | 17000 | 17000 | 2.83 |
| 1 | 35x30x17 | 17850 | 17850 | 2.98 |
| 54 | | Total Volume | 2716.60 | 452.77 |
| | | Actual Weight | | 453.00 |
| | | Per kg | | 3.05 |
| | | Total | | 1381.65 |

| | | |
|---|---|---|
| Volume Freight | | 1381.65 |
| Fuel Surcharge | | 113.25 |
| Terminal Charge | | 45.30 |
| Pickup | | 150.00 |
| Security Charge | | 63.42 |
| Exp Customs | | 30.00 |
| General Rate | | 135.90 |
| Total | | 1,919.52 |

## ACTUAL

30-Sep

Summary for 9/30 invoice

| Code | | Amount |
|---|---|---|
| 2064 | Advance to Customs (user Fees) | 58.80 |
| 4010 | Documentation | 20.00 |
| 4030 | Services to Entry | 97.50 |
| 4210 | User Fees | 50.00 |
| 9982 | Local Drayage (.10 per kg) | 1,061.20 |
| | Freight Charges | 2.00 |
| | User Fees | |
| | Total | 1,289.50 |

| | | |
|---|---|---|
| Overbilled | | 123.36 |
| Percent overbilled | | 9.57% |

| Actual Size | cm3 per box | Total Dim | dim kg |
|---|---|---|---|
| 47x39x23 | 42159 | 843180 | 140.53 |

| # of boxes | | | |
|---|---|---|---|
| 20 | | | |
| 20 | | | |

| | | | |
|---|---|---|---|
| Total Weight | 843.18 | 140.53 |
| Actual Weight | 280.00 |
| Per kg | 3.45 |
| Total | | 966.00 |

| | |
|---|---|
| Volume Freight | 966.00 |
| Fuel Surcharge | 67.20 |
| Terminal Charge | 28.00 |
| Total | 1,061.20 |

## UPS Billed

30-Sep

Summary for 9/30 invoice

| Code | | Amount |
|---|---|---|
| 2064 | Advance to Customs (user Fees) | 58.80 |
| 4010 | Documentation | 20.00 |
| 4030 | Services to Entry | 97.50 |
| 4114 | User Fees | 2.00 |
| 4210 | Local Drayage (.10 per kg) | 70.76 |
| 4540 | Airline Terminal Charge | 28.00 |
| 6841 | Messenger Service | 15.00 |
| | Advance to Customs (user Fees) | 12.00 |
| | Freight Charges | 1,108.80 |
| | Total | 1,412.86 |

| UPS Bill | cm3 per box | Total Dim | dim kg |
|---|---|---|---|
| 48x39x24 | 44928 | 898560 | 149.76 |

| # of boxes | | | |
|---|---|---|---|
| 20 | | | |
| 20 | | | |

| | | | |
|---|---|---|---|
| Total Volume | 898.56 | 149.76 |
| Actual Weight | 280.00 |
| Per kg | 3.45 |
| Total | | 966.00 |

| | |
|---|---|
| Volume Freight | 966.00 |
| Fuel Surcharge | 109.20 |
| War Risk | 33.60 |
| Total | 1,108.80 |

# Carrier Agreement



This Agreement ("Agreement") is made and entered into by and between *Accent Depot* ("Customer") and United Parcel Service Inc., an Ohio Company ("UPS").

UPS will provide the pickup and delivery services ("Services") as set forth below subject to the terms of this Agreement. These Services will be provided with the incentives ("Incentives") as also set forth below. These Incentives shall only be available to the locations and account numbers identified in **Addendum A.** Account numbers may be added or deleted only by mutual written agreement by both Parties and require five (5) business days notice to UPS to become effective. Customer is prohibited from reselling or offering Incentives to any other party without the prior written consent of UPS and failure to comply with this prohibition may result in immediate cancellation of this Agreement.

UPS will apply Incentives as set forth in **Addendum B** to the effective UPS rates at the time of shipment, where applicable. Each eligible package (or shipment) and accessorial will receive its applicable Incentive for the term of this agreement. Incentives are applied on a weekly basis unless otherwise specified. Incentives shall be applied to prepaid outbound shipments unless otherwise noted. This Agreement will be subject to periodic review by UPS for Customer compliance.

Customer agrees to supply the UPS Service Provider with a hard copy summary manifest at the time that the packages are tendered to UPS for shipment and provide UPS with Timely Upload of electronic Package Level Detail ("PLD") in a form acceptable to UPS. PLD includes, but is not limited to, consignee's full name, complete delivery address, package weight and zone. Timely Upload is defined as the electronic transmission of PLD to UPS at the time the packages are tendered to UPS. Customer agrees to provide smart labels on all packages tendered to UPS. A smart label, as defined herein and described in the current UPS Guide to Labeling, which may be updated from time to time by UPS, includes, but is not limited to, a MaxiCode, Postal Bar Code, current UPS Routing Code, appropriate UPS Service Icon and a UPS 1Z Tracking Number Bar Code. Customer further agrees that all shipping locations will use a UPS OnLine or OnLine compatible shipping solution that is approved and authorized by UPS as such.

Customer agrees to pay for all shipments in full within the time period required by UPS.

All Services provided by UPS shall be pursuant to the UPS Rate and Service Guide and UPS Tariff in effect at the time of shipping, both of which are incorporated herein by reference and which may be subject to change without notice.

Customer and UPS agree to maintain the confidentiality of this Agreement including its rates, terms and incentives ("Confidential Information") unless disclosure is required by law. Customer agrees not to post or publicly display this Confidential Information.

The Incentives will remain in effect for 75 weeks. At the end of this Agreement, UPS in its sole discretion, reserves the right to extend the terms of this Agreement on a month-to-month basis. Notwithstanding, UPS and Customer agree that either party may terminate this Agreement upon 30 calendar days prior written notice.

This offer is void if not accepted by *5/2/2004* ("Deadline"). Customer may accept Agreement by providing a duly signed copy of this Agreement to UPS by the Deadline. This Agreement supercedes all other agreements between the Customer and UPS regarding these Services. This Agreement is hereby signed and executed by authorized representatives of both parties.

|  | UPS | Customer |
|---|---|---|
|  | United Parcel Service Inc. | Accent Depot |
| By: | Oliver Dewgard | Eileen Bochne |
| Title: | Account Executive | Owner |
| Address: | 102 S. Lombard Rd. | 1939 Phaeton Ct |
|  | Addison, IL 60101-3020 | Naperville, IL 60565- |
| Signature: | *[signature]* | *Eileen S Boehne* |
| Email: | odewgard@ups.com |  |
| Date Signed: | 4/5/04 |  |
| Contract Start Date: | 4/5/04 |  |

**EXHIBIT**
**G**

Page 1



# Addendum A
## List of Account Numbers

Customer's UPS account(s) identified below shall be included in the agreement between United Parcel Service (Carrier) and the Customer (Account):

The following account(s) are eligible for incentives as specified in Addendum B:

| Shipper Number | CWT Tier |
|---|---|
| R183V2 | N/A |

If any account number is currently included in another contract for an identical product incentive, and this offer is accepted, that account will automatically be considered removed from the existing contract and the terms of that contract amended automatically to reflect the deletion.

This addendum supersedes the previous addendum as of the effective date.

# Addendum B
## Incentives



Each Eligible package will receive an incentive per the following schedule based on a <u>52</u> week rolling average of eligible packages tendered to UPS. These incentives apply to all zones. The band determination is based on the cumulative gross transportation charges per week (excluding accessorials and surcharges, unless otherwise specified). The incentives indicated below will also be applied to domestic commercial freight collect movements.

**Portfolio Tier Incentive**

| Product/Service | From To | Average Weekly Gross Revenue | | | |
|---|---|---|---|---|---|
| | From | $1.00 | $100.00 | $200.00 | $300.00 |
| | To | $99.99 | $199.99 | $299.99 | And Up |
| Ground Commercial ** | | 0.0% | 3.5% | 5.0% | 5.3% |
| Worldwide Express Export Letter *** | | 0.0% | 14.0% | 20.0% | 20.0% |
| Worldwide Express Export Document *** | | 0.0% | 14.0% | 20.0% | 21.0% |
| Worldwide Express Export Package *** | | 0.0% | 14.0% | 20.0% | 20.0% |
| Worldwide Expedited Export Document *** | | 0.0% | 3.5% | 5.0% | 5.0% |
| Worldwide Expedited Export Package *** | | 0.0% | 3.5% | 5.0% | 5.0% |

**For each package, Shipper agrees to pay the greater of the net package charge based on the above incentives or the minimum net package charge of a Ground Commercial, Zone 002, 1 pound package for Ground Commercial shipments, and the Ground Residential Zone 002, 1 pound package for Three Day Select shipments. The minimum net package charge will be the base package charge, as published in the UPS Ground Guide / Schedule in effect at the time of shipment.

***Minimum charges may apply to these international services; see minimum charge section in this Addendum for the respective service.

| The following additional products will be used to determine the tier band of the customer: |
|---|
| Ground Residential |

## Addendum B
## Incentives



All incentives contained in this addendum B apply to the effective UPS rate at the time of shipment and shall be applied on a weekly basis unless otherwise specified. In addition to the incentives stated in the portfolio tier section of this agreement the following incentives will be applied.

**Export Worldwide Express Package - Incentive Off Effective Rates**

| Weight (lbs) | Zones | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 80 | 81 | 82 | 84 | 900 | 901 | 902 | 903 | 904 | 905 | 906 | 907 | 908 | China |
| 1 and up | -- | 5.0% | 5.0% | 5.0% | -- | 5.0% | -- | 5.0% | 5.0% | -- | -- | -- | -- | 5.0% |

**Export Worldwide Expedited Document/Package - Incentive Off Effective Rates**

| Weight (lbs) | Zones | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 71 | 72 | 74 | 601 | 602 | 603 | 604 | 605 | 606 | 607 | 608 | 609 | 610 |
| 1 - 150 | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 10.0% | 10.0% | 10.0% | 10.0% | 20.0% | 10.0% |
| 150 - 199 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| 200 - up | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |

# Addendum B
# Incentives



## Minimum Net Charge

Shipper agrees to pay the greater of the net charge based on the above incentives or the minimum net charge as defined below. The minimum net charge will be calculated by applying the following adjustments to the one pound effective rate, for the specified zone, at the time of shipping.

| Service: Export Worldwide Express Document -- Adjustment Per Shipment Per Zone | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 80 | 81 | 82 | 84 | 900 | 901 | 902 | 903 | 904 | 905 | 906 | 907 | 908 |
| -$20.25 | -$20.50 | -$21.25 | -$20.25 | -$19.25 | -$23.25 | -$23.50 | -$28.25 | -$27.25 | -$27.25 | -$32.00 | -$40.25 | -$40.75 |

| Service: Export Worldwide Express Package -- Adjustment Per Shipment Per Zone | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 80 | 81 | 82 | 84 | 900 | 901 | 902 | 903 | 904 | 905 | 906 | 907 | 908 |
| -$17.75 | -$18.00 | -$18.75 | -$17.75 | -$17.25 | -$19.75 | -$18.75 | -$22.50 | -$20.50 | -$20.50 | -$24.25 | -$34.75 | -$35.25 |

| Service: Export Worldwide Expedited Document -- Adjustment Per Shipment Per Zone | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 71 | 72 | 74 | 601 | 602 | 603 | 604 | 605 | 606 | 607 | 608 | 609 | 610 |
| -$19.00 | -$18.25 | -$19.80 | -$21.85 | -$23.15 | -$23.10 | -$27.10 | -$22.35 | -$22.15 | -$25.35 | -$26.35 | -$27.35 | -$27.85 |

| Service: Export Worldwide Expedited Package -- Adjustment Per Shipment Per Zone | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 71 | 72 | 74 | 601 | 602 | 603 | 604 | 605 | 606 | 607 | 608 | 609 | 610 |
| -$19.00 | -$18.25 | -$19.80 | -$21.85 | -$23.15 | -$23.10 | -$27.10 | -$22.35 | -$22.15 | -$25.35 | -$26.35 | -$27.35 | -$27.85 |



## Addendum B
## Incentives

**UPS Ground Prepaid**

UPS will apply the following incentives to the service rates in effect at the time of shipment where applicable. Each eligible package (or shipment) will receive the incentive listed below for the term of the contract. Incentives will be applied on a weekly basis. In addition to the incentives stated in the portfolio tier section of this agreement the following incentives will be applied. The incentives indicated below will also be applied to UPS Ground Commercial freight collect movements.

The rates shown do not reflect charges for services where minimum charges applied.

### UPS Ground Residential

| Weight | Zones | | | | | | |
|---|---|---|---|---|---|---|---|
| | 002 | 003 | 004 | 005 | 006 | 007 | 008 |
| 1 - 5 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 6 - 10 | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| 11 - 20 | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% |
| 21 - 70 | 6.5% | 6.5% | 6.5% | 6.5% | 6.5% | 6.5% | 6.5% |
| 71 - 150 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |



November 26, 2003


MORE THAN INK
1939 PHAETON CT
NAPERVILLE, IL 60565

Shipper Number: 2RV480

Dear Valued Customer,

Thank you for participating in the UPS Customer Technology Program. Another demonstration of how UPS is committed to working together to make this relationship mutually beneficial.

As you know, the UPS Customer Technology Program is based on your business choosing to commit to an annual level of shipping revenues with UPS in exchange for an agreed upon technology incentive. The following table shows your company's actual quarter-to-date and year-to-date revenues compared to your commitment, as well as the amount of incentive earned:

|  | Shipping Revenue | Revenue Commitment | Achievement Level | Planned Subsidy | Earned Subsidy |
|---|---|---|---|---|---|
| Current Quarter | $ 0 | $ 750 | % | $ 41 | $ 0 |
| Cumulative | $1,316 | $6,000 | 22% | $ 328 | $ 72 |

Please use this table in assessing how you are doing in reaching the commitment you made. Should you have any questions or concerns regarding this letter or the program, please contact your UPS Account Executive.

Thank you,



UPS Customer Technology Program

# **EXHIBIT B**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ACCENT DEPOT, LLC on behalf of itself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| UNITED PARCEL SERVICE, INC., and UNITED PARCEL SERVICE SUPPLY CHAIN SOLUTIONS, | ) ) ) ) | Case No. |
| Defendants. | ) ) ) ) ) | |

## DECLARATION OF DANIEL E. OKON IN SUPPORT OF DEFENDANTS' NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. § 1441

I, Daniel E. Okon, declare as follows:

1.  I am employed by United Parcel Service, Inc. ("UPS"), and have been employed by UPS for 29 years. My current position at UPS is as Corporate Revenue Recovery Manager. I submit this Declaration in support of UPS's Notice of Removal in the above-captioned action. This Declaration is made upon my own personal knowledge and information provided to me by other UPS employees, as well as the books and records of UPS, which books and records are kept by UPS in the ordinary course of its business. If asked to testify to the matters in this declaration, I could and would competently do so.

2.  I have reviewed the complaint filed by Plaintiff Accent Depot, LLC ("Accent Depot") in the County Department, Chancery Division, of the Circuit Court of Cook County, Illinois, entitled *Accent Depot, LLC v. United Parcel Service, Inc., et al.*, case number 05CH01029, including the prayer for an injunction preventing UPS "from continuing to deceive the public by utilizing [its] current billing scheme." Although UPS denies that it is liable

1

to Accent Depot or the members of the putative class, for purposes of this Declaration, I have assumed that Plaintiff would be awarded the injunctive relief requested in the Complaint.

3. In my position as Corporate Revenue Recovery Manager, I am familiar with UPS's procedures for measuring the dimensions of packages to calculate dimensional weight. UPS believes that the procedures in place are accurate. However, if Plaintiff were to prevail in this litigation and Plaintiff were to obtain an injunction requiring UPS to change its practices and utilize a different method of measuring packages, the costs to UPS of complying with that injunction would exceed $75,000.

4. UPS has thousands of "dimensioning units" located in 51 locations throughout the United States, and in 29 countries throughout the world. The cost of altering and re-certifying these units alone would exceed $75,000, not to mention the cost of revised training materials, internal certification materials, customer materials, and maintenance materials. Over 6,000 Revenue Recovery employees would also need to be re-trained worldwide to follow the 'new' guidelines. Accordingly, on behalf of UPS, I have a good faith belief that the relief requested by plaintiff, if allowed, would require UPS to incur in excess of $75,000 to comply.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __14__ day of February 2005 at Atlanta, Georgia.

Daniel E. Okon

## EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ACCENT DEPOT, LLC on behalf of itself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| UNITED PARCEL SERVICE, INC., and UNITED PARCEL SERVICE SUPPLY CHAIN SOLUTIONS, | ) ) ) Case No. |
| Defendants. | ) ) ) ) ) ) |

## DECLARATION OF THOMAS BLISS IN SUPPORT OF DEFENDANTS' NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. § 1441

I, Thomas Bliss, declare as follows:

1.    I am employed by UPS Supply Chain Solutions, Inc. ("UPS-SCS") as the City Manager for the International operation, Chicago area.  I submit this Declaration in support of UPS's Notice of Removal in the above-captioned action.  This Declaration is made upon my own personal knowledge and information provided to me by other UPS employees, as well as the books and records of UPS, which books and records are kept by UPS in the ordinary course of its business.  If asked to testify to the matters in this declaration, I could and would competently do so.

2.    I have reviewed the complaint filed by Plaintiff Accent Depot, LLC in the County Department, Chancery Division, of the Circuit Court of Cook County, Illinois, entitled *Accent Depot, LLC v. United Parcel Service, Inc., et al.*, case number 05CH01029, including the prayer for an injunction preventing defendants "from continuing to deceive the public by utilizing [its] current billing scheme." Although UPS-SCS denies that it is liable to Plaintiff or the members of

the putative class, for purposes of this Declaration, I have assumed that Plaintiff would be awarded the injunctive relief requested in the Complaint.

3.    In my position as City Manager, I am familiar with procedures used by UPS-SCS to measure packages for the purpose of determining "dimensional weight." Dimensional weight is based on the the characteristics of the package, including length, width, and height, and is a concept that is widely used in the air freight industry to determine air transportation charges. UPS-SCS believes that the procedures that it uses to measure packages are accurate and appropriate. However, if Plaintiff were to prevail in this litigation and Plaintiff were to obtain an injunction requiring UPS-SCS to change its practices and utilize a different method of measuring packages, such as automation, then I believe that the costs to UPS-SCS of complying with that injunction would exceed $75,000. This would consist of the cost of equipment, developing the new procedures, implementing them in the various UPS-SCS operating facilities, training employees to follow the new procedures, and follow up to ensure that the procedures are being followed. Accordingly, on behalf of UPS-SCS, I have a good faith belief that the relief requested by plaintiff, if allowed, would require UPS-SCS to incur in excess of $75,000 to comply.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of February 2005 at Chicago, Illinois.

# EXHIBIT D

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ACCENT DEPOT, LLC on behalf of itself and all others similarly situated, | ) ) ) | 05 FEB 16 PM 3: 23 |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05 CH 01029 |
| UNITED PARCEL SERVICE, INC. and UNITED PARCEL SERVICE SUPPLY CHAIN SOLUTIONS, | ) ) ) ) | Judge Mary Anne Mason Courtroom 2108 |
| Defendants. | ) ) ) | |

## NOTICE OF FILING

TO:  Clinton A. Krislov
     Jason P. Stiehl
     Krislov & Associates, Ltd.
     20 North Wacker Drive
     Suite 1350
     Chicago, IL  60606

PLEASE TAKE NOTICE that on February 16, 2005 we caused to be filed with the Circuit Court of Cook County, Illinois, County Department, Chancery Division, **FIRST REQUEST TO ADMIT OF UNITED PARCEL SERVICE, INC. AND UPS SUPPLY CHAIN SOLUTIONS, INC.**, a copy of which is attached hereto.

Respectfully submitted,

UNITED PARCEL SERVICE, INC. and
UPS SUPPLY CHAIN SOLUTIONS, INC.

By: _____
                One of Its Attorneys

Leonard S. Shifflett, Esq.
Brendan O'Connor, Esq.
Quarles & Brady LLP
500 West Madison Street
Suite 3700
Chicago, IL  60661
(312) 715-5000
Firm No. 36566

QBCHI\397391.1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ACCENT DEPOT, LLC on behalf of itself and all others similarly situated, | ) ) ) | 05 FEB 16 PM 3: 23 |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05 CH 01029 |
| UNITED PARCEL SERVICE, INC. and UNITED PARCEL SERVICE SUPPLY CHAIN SOLUTIONS, | ) ) ) ) | Judge Mary Anne Mason Courtroom 2108 |
| Defendants. | ) ) ) | |

## FIRST REQUEST TO ADMIT OF UNITED PARCEL SERVICE, INC. AND UPS SUPPLY CHAIN SOLUTIONS, INC.

Defendant, United Parcel Service, Inc. and UPS Supply Chain Solutions, Inc., improperly named as United Parcel Service Supply Chain Solutions (hereinafter collectively referred to as "UPS"), by its attorneys, Quarles & Brady LLP, pursuant to Illinois Supreme Court Rule 216, hereby requests that Plaintiff, Accent Depot, LLC on behalf of itself and all others similarly situated, admit the truth of the following facts set forth herein within twenty-eight (28) days after service hereof.

1. Admit that UPS would incur in excess of $75,000 in compliance costs in the event that Plaintiff, Accent Depot's request for injunctive relief were granted by the Court.

Dated: February 16, 2005

Respectfully submitted,

UNITED PARCEL SERVICE, INC. and
UPS SUPPLY CHAIN SOLUTIONS, INC.

By: _____
One of Its Attorneys

QBCHI\397391.1

Leonard S. Shifflett, Esq.
Brendan O'Connor, Esq.
Quarles & Brady LLP
500 West Madison Street
Suite 3700
Chicago, IL   60661
(312) 715-5000
Firm No. 36566

## CERTIFICATE OF SERVICE

I, Brendan O'Connor, an attorney, certify that I caused a copy of the attached Notice of Filing and the document referenced therein to be served upon:

Clinton A. Krislov
Jason P. Stiehl
Krislov & Associates, Ltd.
20 North Wacker Drive
Suite 1350
Chicago, IL   60606

via Messenger on this 16th day of February, 2005, at or prior to the hour of 5:00 p.m.

Brendan O'Connor

QBCHI\397391.1

CASE NO. _____ 05c 990 _____

FILE DATE: _____ 2·17·05 _____

ATTACHMENT #. _____ 1 _____

EXHIBIT _____ D _____

TAB (DESCRIPTION) _____

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ACCENT DEPOT, LLC on behalf of itself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05 CH 01029 |
| UNITED PARCEL SERVICE, INC. and UNITED PARCEL SERVICE SUPPLY CHAIN SOLUTIONS, | ) ) ) ) | Judge Mary Anne Mason Courtroom 2108 |
| Defendants. | ) ) | |

## NOTICE OF FILING

TO:  Clinton A. Krislov
     Jason P. Stiehl
     Krislov & Associates, Ltd.
     20 North Wacker Drive
     Suite 1350
     Chicago, IL  60606

PLEASE TAKE NOTICE that on February 16, 2005 we caused to be filed with the Circuit Court of Cook County, Illinois, County Department, Chancery Division, **FIRST INTERROGATORY OF UNITED PARCEL SERVICE, INC. AND UPS SUPPLY CHAIN SOLUTIONS, INC.**, a copy of which is attached hereto.

Respectfully submitted,

UNITED PARCEL SERVICE, INC. and
UPS SUPPLY CHAIN SOLUTIONS, INC.

By: _____
              One of Its Attorneys

Leonard S. Shifflett, Esq.
Brendan O'Connor, Esq.
Quarles & Brady LLP
500 West Madison Street
Suite 3700
Chicago, IL  60661
(312) 715-5000
Firm No. 36566

QBCHI\397460.1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| ACCENT DEPOT, LLC on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC. and UNITED PARCEL SERVICE SUPPLY CHAIN SOLUTIONS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 05 CH 01029

Judge Mary Anne Mason
Courtroom 2108

## FIRST INTERROGATORY OF UNITED PARCEL SERVICE, INC. AND UPS SUPPLY CHAIN SOLUTIONS, INC.

Defendant, United Parcel Service, Inc. and UPS Supply Chain Solutions, Inc., improperly named as United Parcel Service Supply Chain Solutions (hereinafter collectively referred to as "UPS"), by its attorneys, Quarles & Brady LLP, pursuant to Illinois Supreme Court Rule 213, hereby requests that Plaintiff, Accent Depot, LLC on behalf of itself and all others similarly situated, answer the Interrogatory set forth herein within twenty-eight (28) days after service hereof.

1.    Identify in detail all the damages that Plaintiff contends it has incurred as a result of the events alleged in the Complaint in this action, and explain how such amounts were calculated.

Dated: February 16, 2005

Respectfully submitted,

UNITED PARCEL SERVICE, INC. and
UPS SUPPLY CHAIN SOLUTIONS, INC.

By: _____
        One of Its Attorneys

Leonard S. Shifflett, Esq.
Brendan O'Connor, Esq.
Quarles & Brady LLP
500 West Madison Street
Suite 3700
Chicago, IL   60661
(312) 715-5000
Firm No. 36566

## CERTIFICATE OF SERVICE

I, Brendan O'Connor, an attorney, certify that I caused a copy of the attached Notice of Filing and the document referenced therein to be served upon:

>Clinton A. Krislov
>Jason P. Stiehl
>Krislov & Associates, Ltd.
>20 North Wacker Drive
>Suite 1350
>Chicago, IL   60606

via Messenger on this 16th day of February, 2005, at or prior to the hour of 5:00 p.m.

Brendan O'Connor

# EXHIBIT E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ACCENT DEPOT, LLC on behalf of itself and all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC. and UNITED PARCEL SERVICE SUPPLY CHAIN SOLUTIONS,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. |

## EXHIBIT OF ELECTRONICALLY PUBLISHED CASES

*Carolina Traffic Servs. of Gastonia – Petition for Declaratory Order*
    STB No. 41689
    1996 STB LEXIS 189 (STB May 31, 1996).............................................. E1

*Constr. Servs., Inc. v. Watkins Motor Lines, Inc.,*
    No. CV 98-N-0628-NE
    1998 U.S. Dist. LEXIS 22818 (N.D. Ala. May 6, 1998)............................. E2

*GVA & BG v. Aeroflot Russian International Airlines,*
    No. 01 C 1435
    2001 U.S. Dist. LEXIS 6549 (N.D. Ill. May 16, 2001)................................ E3

*Iowa Power & Light Co. v. Burlington N. R.R. Co.,*
    No. 81-526-B
    1983 U.S. Dist. LEXIS 11443 (S.D. Iowa Nov. 22, 1983)........................... E4

*Rageb v. DHL Worldwide Express*
    No. 91 C 7334
    1992 U.S. Dist. LEXIS 2822 (N.D. Ill. Mar. 12, 1992)................................ E5

*Ratnaswamy v. Air Afrique,*
    No. 95 C 7670
    1998 U.S. Dist. LEXIS 2683 (N.D. Ill. Mar. 3, 1998)................................. E6

*Sahar v. American Airlines,*
    No. 93 C 3878
    1993 U.S. Dist. LEXIS 17592 (N.D. Ill. Dec. 10, 1993).............................. E7

*V.R. Compoundng Corp. v. Occidental Chem. Corp.,*
    No. 99 C 8087
    2000 U.S. Dist. LEXIS 13624 (N.D. Ill. Sept. 13, 2000)............................. E8

*Yellow Freight Sys., Inc. v. Adams Brush Mfg. Co.,*
    No. 97-2310EEO
    1997 U.S. Dist. LEXIS 13491 (D. Kan. Aug. 5, 1997).................................. E9

# E1

*Carolina Traffic Servs. of Gastonia – Petition for Declaratory Order*
STB No. 41689
1996 STB LEXIS 189 (STB May 31, 1996)

INC.--PETITION FOR DECLARATORY ORDER

CAROLINA TRAFFIC SERVICES OF GASTONIA,

STB No. 41689

SURFACE TRANSPORTATION BOARD

1996 STB LEXIS 189

**SERVICE-DATE:** June 7, 1996

May 31, 1996

**CORE TERMS:** carrier, shipper, notification, billing, rebilling, freight, reasonableness, board determination, right to contest, overcharge, time limit, shipments, applicable statute, applicability, date of enactment, right to collect, limitations period, declaratory order, reenacted, carriage, civil action, moving party, effective, notify, exclusive jurisdiction, primary jurisdiction, classification, clarify, depart, tariff

**PANEL:** [*1]

By the Surface Transportation Board, Chairman Morgan, Vice Chairman Simmons, and Commissioner Owen.

**OPINION:** DECISION

By petition filed May 7, 1996, Carolina Traffic Services of Gastonia, Inc. (CTS) seeks a declaratory order, pursuant to 5 U.S.C. 554(e), interpreting the billing dispute notification requirements of 49 U.S.C. 13710(a)(3). Section 13710(a)(3)(A) provides, in pertinent part:A carrier must issue any bill for charges in addition to those originally billed within 180 days of the receipt of the original bill in order to have the right to collect such charges.

Correspondingly, section 13710(a)(3)(B) provides, in pertinent part:A shipper must contest the original bill or subsequent bill within 180 days of the receipt of the bill in order to have the right to contest such charges.

BACKGROUND

These notification requirements are part of a series of discrete provisions in section 13710(a) governing motor carrier freight billings, adjustments to billings, and disputes regarding billings or rebillings. Subsection (a)(1) requires a trucking company to provide a shipper, upon request, with the underlying rate information that provides the basis for a freight bill (or [*2] rebilling).

Subsection (a)(2) provides that, when a shipper challenges the applicability of the rates and related provisions upon which a motor carrier's freight bill is based, the Board shall determine whether the rates and provisions are applicable. It further provides that, when a shipper challenges the reasonableness of the rates and related provisions, the Board shall make the

reasonableness determination if the reasonableness requirement of 49 U.S.C. 13701 applies. n1 Subsection (a)(2) thus protects the Board's primary jurisdiction over rate applicability issues and its exclusive jurisdiction over rate reasonableness.

> n1 Under section 13701, a motor carrier rate, classification, rule, or practice must be reasonable if it involves (A) a movement of household goods, (B) a rate for a joint motor-water movement in noncontiguous domestic trade, or (C) rates, rules and classifications made collectively by motor carriers under agreements approved pursuant to 49 U.S.C. 13703.

In addition to the notification requirements quoted above, subsection (a)(3) specifically authorizes motor carriers to seek a Board determination of whether the additional charges contained in a rebilling [*3] must be paid (subparagraph (A)), and specifically authorizes shippers to seek a Board determination of whether the charges contained in an original bill or additional charges contained in a rebilling must be paid (subparagraph (B)). By expressly authorizing the parties to obtain a Board determination as to rate applicability (or reasonableness, if the reasonableness requirement applies), subsection (a)(3) forecloses any argument that a lawsuit must first have been initiated and a specific court referral of the question obtained.

These provisions were originally enacted in the Transportation Industry Regulatory Reform Act of 1994 (TIRRA) n2 and were previously codified at 49 U.S.C. 10762(a)(3)-(4). They were reenacted by the ICC Termination Act of 1995 (ICCTA) n3 and codified at 49 U.S.C. 13710(a)(1)-(3) with only two changes. First, section 13710(a)(2) clarifies that the availability of a rate reasonableness determination is limited to those situations in which the underlying statutory requirement of reasonableness is retained by section 13701. See n.1, supra. n4 Second, the provisions of section 13710(a)(3)(B) were explicitly made applicable to a rebilling (as well as an original [*4] freight bill). This served to clarify that a shipper contesting a rebilling has the same right to seek a Board determination of whether the additional charges

must be paid. This also made the 180-day notification requirement applicable uniformly to all billing disputes.

n2 Pub. L. No. 103-311, § 206(c)(4), 108 Stat. 1683, 1685 (1994).

n3 Pub. L. No. 104-88, § 1103, 109 Stat. 803, 876-77 (1995).

n4 Compare former 49 U.S.C. 10701(a).

THE CTS PETITION

CTS provides auditing and consulting services to freight shippers. As part of these services, it audits already-paid freight invoices to detect overcharges. CTS then seeks recovery from the carrier of any such overcharges, and is compensated for its services by a percentage of the recovery. CTS asserts that its clients generally cannot furnish their paid freight invoices to it within 180 days of receipt of the billing. It explains that many of its clients require retention of their business records on their own premises for a full year.

CTS complains that motor carriers have been rejecting overcharge claims that are not submitted to them within the 180-day time frame of section 13710(a)(3)(B). CTS supplies carrier correspondence [*5] suggesting that parties are prohibited from settling billing disputes that are not raised within the 180-day period. CTS argues that carriers are misinterpreting the law and that they should not be allowed to deny overcharge claims on this basis.

DISCUSSION

It is evident from the information and correspondence provided in the CTS petition that there is some misunderstanding--by both shipper and carrier representatives--of the current law pertaining to motor carrier billing disputes. We find that a declaratory order is necessary and appropriate to clear up the confusion in this area.

CTS is wrong in asserting that the 180-day notification requirement does not apply to freight bills (or rebillings) for shipments that moved prior to December 29, 1995 (the date of enactment of the ICCTA). n5 The 180-day notification requirement was first imposed by TIRRA, which became effective on August 26, 1994 (the date of enactment). n6 Thus, the 180-day limitation on a carrier's "right to collect [additional] charges" applies to rebillings from that date forward. The 180-day limitation also applies to a shipper's "right to contest" an **original** freight bill from that date forward. However, [*6] the 180-day limitation on a shipper's "right to contest" a **rebilling** did not take effect until January 1, 1996.

n5 CTS wrongly assumes that the provisions of the ICCTA became effective upon the date of enactment. To the contrary, except where otherwise specified, the ICCTA took effect on January 1, 1996. ICCTA, § 2.

n6 TIRRA, § 212.

CTS further wrongly suggests that, at least for pre-ICCTA shipments, the only time limit on a shipper's right to contest motor carrier freight charges is the applicable statute of limitations for bringing a suit in curt under former 49 U.S.C. 11706. n7 (The current provisions of former section 11706 applicable to motor carriage were reenacted by the ICCTA with only one substantive change, and are now codified at 49 U.S.C. 14705. n8) CTS' argument seems to be that TIRRA could not shorten the applicable statute of limitations period. However, TIRRA did not purport to alter the time limit for bringing a court action.

n7 Former section 11706(b) contained a three-year statute of limitations for a shipper to "begin a civil action to recover overcharges" from a motor carrier for claims that accrued (i.e., for shipments that moved) prior to December 3, 1993--the date of enactment of the Negotiated Rates Act of 1993, Pub. L. No. 103-180, 107 Stat. 2044 (1993) (NRA). The statute of limitations was reduced to two years for shipments that moved between December 3, 1993, and December 2, 1994. It was further reduced to 18 months for shipments after December 2, 1994.

Former section 11706(a) contained equivalent (phased) statutes of limitations for a motor carrier to "begin a civil action to recover charges for transportation or service provided" by it.

In addition, former section 11706(c)(2) contained a two-year statute of limitation for a shipper to "begin a civil action to recover damages" that "result[]' from the imposition of rates for [motor carrier] transportation or service the [Interstate Commerce] Commission finds to be in violation of [the Interstate Commerce Act]" (49 U.S.C. 11705(b)(3)).

Finally, former section 11706(d) contained certain provisions for extending the limitation periods applicable to overcharge suits brought by shippers under section 11706(b).

[*7]

n8 In section 14705(d), an extension provision of former section 11706(d) was expanded to apply to damage suits brought by shippers under section 14705(c).

What TIRRA did was introduce an **additional** legal requirement: the obligation of the carrier to notify the shipper of a billing change, and of the shipper to notify the carrier of a billing dispute, within 180 days of receipt of the bill. This notification requirement must be met in order for the carrier or shipper to have a "right" of action.

This is clear from the language of the statute. If the 180-day requirement were a time limit for seeking a determination by the Board (or by its predecessor, the Interstate Commerce Commission (ICC), prior to the ICCTA) under section 13710(a)(3), it would have been worded as such. Instead, the notification requirement is a broadly worded requirement: it must be satisfied by the carrier "in order to have the right to collect such charges" and must be satisfied by the shipper "in order to have the right to contest such charges." n9 In other words, providing notice to the other party within the statute's 180-day period is a precondition for pursuing a claim, whether the moving party [*8] chooses to pursue that claim initially at the Board or in court.

n9 The wording of the two sentences containing the 180-day notification requirement was not changed by the ICCTA.

Section 13710(a)(3) does not **require** a carrier or shipper to request a Board determination within the 180-day period. n10 So long as the necessary notification is given to the other party within the 180-day period, the moving party preserves its right of action and may bring an appropriate court action within the applicable statute of limitations period. Of course, if a Board determination has not already been obtained, the court will then need to afford an opportunity for the Board to exercise its primary jurisdiction over rate applicability matters (or its exclusive jurisdiction over an issue of rate reasonableness) pursuant to section 13710(a)(2).

n10 Accord, Procedures For Shippers To Contest Or Carriers To Rebill Motor Common Carrier Freight Charges Under Section 206 Of The Trucking Industry Regulatory Reform Act Of 1994, Ex Parte No. MC-222 (Sub-No. 1) (ICC served Dec. 15, 1994), at 4. This is clear from the wording of subparagraphs (A) and (B); Congress used permissive language ("may request") in authorizing parties to seek a

Board determination, but used mandatory language ("must issue" and "must contest") in imposing the 180-day notification requirement.

[*9]

Similarly, a favorable determination by the Board under section 13710(a)(3) will not **obviate** the need for the moving party to bring a court action (within the applicable statute of limitations period). A court action is needed to enforce the Board's determination should the other party not acquiesce in the Board's conclusion.

In summary, a carrier loses any right to collect additional charges if it fails to meet the 180-day time limit of section 13710(a)(3)(A) for rebilling. Likewise, a shipper loses any right to contest charges (whether before the Board, in court, or both) if it does not notify the carrier of its disagreement within 180 days of receiving the disputed bill, as required by section 13710(a)(3)(B).

Thus, where a party has forfeited the right to assert a claim, for failure to satisfy the 180-day notification requirement, the other party is not **required** to pay that claim. This does not mean, however, that it is **prohibited** from paying the claim. There may well be instances, particularly where there is an ongoing business relationship between the carrier and shipper, where a carrier or shipper may wish to pay a claim that was not asserted within the 180-day [*10] time period.

Accordingly, we disagree with the mistaken belief apparently held by some carriers that they are prohibited from paying a claim raised after the 180-day time limit. n11 To the contrary, there is no legal prohibition against correcting a billing error, or settling a claim, that was not timely raised. Indeed, carriers and shippers are expressly authorized to resolve claims by mutual consent that involve a departure from the provisions of a tariff, subject to Board review and approval, pursuant to 49 U.S.C. 14709. n12 If they can voluntarily depart from the terms of a tariff and thus override the filed rate doctrine, subject to Board approval, they surely also can voluntarily depart from non-tariff rate provisions that do not implicate the filed rate doctrine. The argument that such agreements would constitute illegal discrimination, if valid under the old law, can have no validity following enactment of the ICCTA, which repealed the anti-discrimination provisions applicable to motor carriage. n13

n11 CTS asserts that carriers are relying on an opinion given by William W. Pugh, General Counsel, National Motor Freight Traffic Association, Inc.

1996 STB LEXIS 189

n12 Section 14709 is a reenactment of former 49 U.S.C. 11712, which was added by the NRA.

[*11]

n13 See H.R. Rep. No. 104-422, 104th Cong., 1st Sess. 243 (1995) (table in Conference Report showing that former 49 U.S.C. 10741, prohibiting unreasonable discrimination, was not reenacted in Part B of the new statute, which governs motor carriage).

It is ordered:

1. The petition for declaratory order is granted to the extent set forth above.

2. This decision is effective July 7, 1996.

# E2

*Constr. Servs., Inc. v. Watkins Motor Lines, Inc.,*
No. CV 98-N-0628-NE
1998 U.S. Dist. LEXIS 22818 (N.D. Ala. May 6, 1998)

1998 U.S. Dist. LEXIS 22818

CONSTRUCTION SERVICES, INC., Plaintiff(s). vs. WATKINS MOTOR LINES, INC., Defendant(s).

CV 98-N-0628-NE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

1998 U.S. Dist. LEXIS 22818

May 5, 1998, Decided
May 5, 1998, Filed; May 6, 1998, Entered

**DISPOSITION:** [*1] Motion to remand denied, motion to amend and motion to dismiss granted.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff owner of goods filed a motion to remand its damaged goods case against defendant carrier to state court. The carrier filed a motion to dismiss a portion of the complaint and to amend a prior motion to dismiss to encompass the entire complaint filed by the owner of goods.

**OVERVIEW:** An owner of goods filed suit against a carrier in state court, alleging that the carrier breached its transportation contract with the owner of goods by causing or allowing the goods to become damaged during transit and that the carrier negligently transported such goods, resulting in the goods being damaged. The case was removed to the court. The carrier asserted in its notice of removal that, based upon the allegations contained in the owner of goods' complaint, the action was a suit of a civil nature of which the court had federal subject-matter jurisdiction pursuant to the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.S. § 14706. The owner of goods filed a motion to remand the case back to state court. The carrier filed a motion to dismiss the complaint. The court denied the carrier's motion to remand, granted the carrier's motion to dismiss, and held that the artful pleading doctrine supported the exercise of subject-matter jurisdiction and that § 14706 provided the exclusive remedy of a shipper against a common carrier for goods lost or damaged during interstate transportation. The carrier breached a duty integral to the interstate shipment of goods.

**OUTCOME:** The court denied the owner of goods' motion to remand its damaged goods case against the carrier. The court granted the carrier's motion to amend and motion to dismiss.

**CORE TERMS:** Carmack Amendment, preempts, delivery, carrier, damaged, preempted, shipment, duty, motion to dismiss, federal law, subject-matter, occurring, original jurisdiction, untimely, shipper, transported, transport, purchaser, Act of Congress, removal, misdelivery, tariff, motion to amend, breached, steel, Interstate Commerce Act, interstate transportation, burden of establishing, damages resulting, common carriers

### LexisNexis(TM) Headnotes

*Civil Procedure > Removal > Postremoval Remands*

[HN1]A federal district court must remand a removed action if, at any time prior to final judgment, it appears that subject-matter jurisdiction is lacking. 28 U.S.C.S. § 1447(c) (1998). The removal statute, 28 U.S.C.S. § 1441 et seq., must be strictly construed against removal, and any doubts should be resolved in favor of the remand.

*Civil Procedure > Removal > Basis for Removal*

*Evidence > Procedural Considerations > Inferences & Presumptions*

*Civil Procedure > Removal > Removal Proceedings*

[HN2]The general removal statute provides that: except as otherwise expressly provided by act of Congress, any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. 28 U.S.C.S. § 1441(a) (1998). The defendant, as the party wishing to invoke the jurisdiction of the federal court, bears the burden of establishing subject-matter jurisdiction.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Question Jurisdiction*

[HN3] 28 U.S.C.S. § 1337(a) provides: The district courts shall have original jurisdiction of any civil action or proceeding arising under any act of Congress regulating commerce. A cause of action is one arising under an Act of Congress if, ignoring any references to anticipated defenses, a federal question appears from the well-pleaded complaint. A complaint not facially

Page 1

referring to federal law may nonetheless arise under federal law if the plaintiff artfully pleads in terms of state law what is actually a federal claim, or if the claim asserted is truly federal in nature because federal law preempts the entire field in which the claim is brought. Section 1337(a) also states that the district courts shall have original jurisdiction of an action brought under the Carmack Amendment, 49 U.S.C.S. § 14706, only if the matter in controversy for each receipt or bill of lading exceeds $ 10,000, exclusive of interest and costs. The "arising under" provision of 28 U.S.C.S. § 1337(a) is identical in meaning to the "arising under" provision of 28 U.S.C.S. § 1331.

*Transportation Law > Carrier Duties & Liabilities*

*Transportation Law > Interstate Commerce > Federal Preemption*

[HN4]The Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.S. § 14706, preempts all state causes of action for damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination.

*Transportation Law > Carrier Duties & Liabilities > Damages & Reparation*

*Transportation Law > Interstate Commerce > Federal Preemption*

*Transportation Law > Carrier Duties & Liabilities > Duty to Provide Service*

[HN5]Duties of the carrier include those obligations which are an integral part of the normal undertaking of the carrier. Most courts hold that claims not asserted under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.S. § 14706, are preempted if they seek to recover for damage or loss to goods during shipment, for misdelivery or untimely delivery of goods, for failure of the carrier to fulfill duties closely related to its duty of delivery, or for charging an improper rate for transporting goods.

*Transportation Law > Carrier Duties & Liabilities > Damages & Reparation*

*Transportation Law > Interstate Commerce > Federal Preemption*

[HN6]The Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.S. § 14706, provides the exclusive remedy of a shipper against a common carrier for goods lost or damaged during interstate transportation.

**COUNSEL:** For CONSTRUCTION SERVICES INC., plaintiff: Thomas A Caddell, David W Langston, HARRIS CADDELL & SHANKS, Decatur, AL.

For WATKINS MOTOR LINES, INC., defendant: Lawrence J Roberts, HINSHAW & CULBERTSON, Miami, FL.

**JUDGES:** EDWIN L. NELSON, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** EDWIN L. NELSON

**OPINION: MEMORANDUM OF OPINION**

## I. Introduction.

In this case, the plaintiff, Construction Services, Inc., ("CSI"), brings claims against the defendant, Watkins Motor Lines. Inc., ("Watkins"), pursuant to Alabama law. Specifically, the plaintiff contends that the defendant breached its transportation contract with the plaintiff by causing or allowing the transported goods to become damaged during transit from Decatur, Alabama, to Las Vegas, Nevada, and that the defendant negligently transported such goods, resulting in the goods being damaged. *Complaint,* PP 1-9.

This action was originally brought in the Circuit Court of Morgan County, Alabama, and was removed to this court on March 18, 1998. The defendant asserts in its Notice of Removal that, based upon the allegations contained in the plaintiff's complaint, this [*2] action is a suit of a civil nature of which this court has federal subject-matter jurisdiction pursuant to the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706.

The action is presently before the Court on CSI's motion to remand, which was filed on March 31, 1998, and the defendant's March 26, 1998, motion to dismiss Count II of the plaintiff's complaint, together with an April 9, 1998, motion to amend its motion to dismiss to encompass the entire complaint. The motions have been briefed by the parties and are ripe for decision. Upon due consideration, the motion to remand will be denied, the motion to amend the motion to dismiss and the motion to dismiss will be granted.

## II. Allegations of the Complaint.

In its complaint, plaintiff CSI alleges that on or about June 30, 1997, CSI contracted with Watkins for Watkins to transport certain steel material from the CSI facility in Decatur, Alabama, to a purchaser located in Las Vegas, Nevada. The materials were received for transport by Watkins at CSI's facility and were delivered to the purchaser in Las Vegas, Nevada. n1 CSI avers that Watkins breached its contract by causing or allowing [*3] the steel materials to become damaged during transit or otherwise while the materials were in Watkins' custody and control, and

further caused the materials to be delivered to the purchaser in a damaged and unusable condition. *Complaint*, P 5. As a result of this breach, the plaintiff claims damages in the amount of the replacement cost of the materials. $ 24,272.89. *Id.* P 6.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The plaintiff alleges that the materials were in the defendant's custody and control from the date of receipt from the plaintiff until the time of delivery in Las Vegas, Nevada. *Complaint* P4.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The plaintiff also alleges that Watkins negligently transported the steel materials causing the materials to become damaged and impaired, and that Watkins' negligence resulted in the materials being delivered to the purchaser in a damaged and unusable condition. *Complaint* P 8. As a result of this negligence, the plaintiff claims damages in the amount of the replacement cost of the materials, $ 24,272.89. *Id.* P 9.

### III. Discussion.  [*4]

### A. Plaintiff's Motion to Remand.

[HN1]The Court must remand a removed action if, at any time prior to final judgment, it appears that subject-matter jurisdiction is lacking. *See* 28 U.S.C. § 1447(c) (1998). The removal statute, 28 U.S.C. § 1441 *et seq.*, must be strictly construed against removal, and any doubts should be resolved in favor of the remand. *See Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994). [HN2]The general removal statute provides that:except as otherwise expressly provided by act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.28 U.S.C. § 1441(a) (1998).

The defendant, as the party wishing to invoke the jurisdiction of this Court, bears the burden of establishing subject-matter jurisdiction. *See Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97, 42 S. Ct. 35, 37, 66 L. Ed. 144 (1921) [*5] (stating that the defendant bears the burden of establishing subject matter jurisdiction for removed actions). Defendant Watkins argues that jurisdiction is conferred by section 1337(a), because CSI states a cause of action under the Carmack Amendment to the Interstate Commerce Act

("Carmack Amendment"). n2 which regulates the delivery rates charged by carriers in interstate commerce. *See Notice of Removal*, at 2.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 The Carmack Amendment is codified under various provisions appearing in 49 United States Code.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[HN3]Section 1337(a) provides, in pertinent part: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce." 28 U.S.C. § 1337(a); *see also* 28 U.S.C. § 1447(b) (1998) (providing district courts with subject-matter jurisdiction over all removed cases falling within its original jurisdiction). n3 A cause of action is one "arising under an Act of Congress" if, ignoring any references [*6] to anticipated defenses, a federal question appears from the well-pleaded complaint. *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S. Ct. 2425, 2429, 96 L. Ed. 2d 318 (1987) (discussing the meaning of "arising under [federal law]" as used in 28 U.S.C. § 1331)). n4 A complaint not facially referring to federal law may nonetheless arise under federal law if the plaintiff has artfully pled in terms of state law what is actually a federal claim, or if the claim asserted is truly federal in nature because federal law preempts the entire field in which the claim is brought. *See, e.g.*, *Aaron v. National Union Fire Ins. Co. of Pittsburg*, 876 F.2d 1157, 1161 (5th Cir. 1989); *Davis v. North American Van Lines, Inc.*, 934 F. Supp. 245, 248 (S.D. Tex. 1996).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 Section 1337(a) also states that "the district courts shall have original jurisdiction of an action brought under [the Carmack Amendment], only if the matter in controversy for each receipt or bill of lading exceeds $ 10,000, exclusive of interest and costs." *Id.* It appears from the face of the Complaint, and the parties do not dispute, that all requirements concerning the amount in controversy are satisfied in the case at bar.

[*7]

n4 The "arising under" provision of section 1337(a) is identical in meaning to the "arising under" provision of section 1331.



See *Maritime Service Corp. v. Sweet Brokerage De Puerto Rico, Inc.*, 537 F.2d 560, 561 n.1 (1st Cir. 1976) (citing *Carlson v. Coca-Cola Co.*, 483 F.2d 279, 280 n.1 (9th Cir. 1973) and *Russo v. Kirby*, 453 F.2d 548, 551 n.2 (2nd Cir. 1971).


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Watkins tacitly concedes, and the Court independently finds, that the Complaint facially contains no reference to the Carmack Amendment or any other federal law. Instead, Watkins argues that CSI's claims are, in substance, governed exclusively by the Carmack Amendment, and that they are, in actuality, federal claims because they are within the field of claims completely preempted by the Carmack Amendment. *See Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Remand*, at 1-3. The Court notes there is no disagreement among the parties that the Carmack Amendment is "an Act of Congress regulating commerce" within the meaning of section 1337(a). *See Eazor Express v. Pennsylvania R.R. Co.*, 214 F. Supp. 695, 696 (W.D. Pa. 1963)). [*8]

Defendant Watkins contends that CSI's claims are federal in nature because they fall within the scope of claims which are preempted by the Carmack Amendment. As interpreted by the United States Supreme Court, [HN4]the Carmack Amendment preempts all state causes of action for "damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination." *Southeastern Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 29, 57 S. Ct. 73, 74, 81 L. Ed. 20 (1936) (identifying the "underlying principle[s]" guiding the preemptive scope of the Carmack Amendment as being "that the carrier is entitled to base rates upon value and that its compensation should bear a reasonable relation to the risk and responsibility assumed" and noting that the purpose of the enactment is "to compel the establishment of reasonable rates and to provide for their uniform application"); *see also Adams Express Co. v. Croninger*, 226 U.S. 491, 505-06, 33 S. Ct. 148, 151-52, 57 L. Ed. 314 (1913) (describing the purpose of the Carmack Amendment as to create a uniform rule on the liability of common carriers under bills of lading [*9] for "loss, damage or injury" to the property transported).

[HN5]Duties of the carrier include those obligations which are "an integral part of the normal undertaking of the carrier." *New York, Philadelphia, & Norfolk R.R. Co. v. Peninsula Produce Exchange of Md.*, 240 U.S. 34, 38-39, 36 S. Ct. 230, 231-32, 60 L. Ed. 511

(1916). In the instant case, CSI avers that Watkins breached a duty which is integral to the interstate shipment of goods. *See Complaint*. PP 1-9. Most courts, including this one, have held that claims not asserted under the Carmack Amendment are preempted if they seek to recover for damage or loss to goods during shipment, for misdelivery or untimely delivery of goods, for failure of the carrier to fulfill duties closely related to its duty of delivery, or for charging an improper rate for transporting goods. *See Cleveland v. Beltman North American Co., Inc.*, 30 F.3d 373, 379 (2d Cir. 1994) (holding that the Carmack Amendment preempts federal common-law claims for goods lost or damaged during transport and for untimely delivery); *Moffit v. Bekins Van Lines Co.*, 6 F.3d 305, 306-07 (5th Cir. 1993) (holding that the Carmack [*10] Amendment preempts state claims seeking recovery for untimely delivery of goods); *Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 706-07 (4th Cir. 1993) (holding that the Carmack Amendment preempts state claims for damage to property incurred during the course of delivery); *Hughes Aircraft Co. v. North American Van Lines, Inc.*, 970 F.2d 609, 613 (9th Cir. 1992) (holding state claims for damage to goods occurring during their delivery are preempted by the Carmack Amendment); *Underwriters at Lloyds of London v. North American Van Lines*, 890 F.2d 1112, 1121 (10th Cir. 1989) (holding that the Carmack Amendment preempts state claims for property destroyed or damaged during the course of delivery under a bill of lading); *Intech, Inc. v. Consolidated Freightways, Inc.*, 836 F.2d 672, 677 (1st Cir. 1987) (holding that the Carmack Amendment preempts state claims for damages resulting from breach of a carrier's duty to deliver goods); *Paulson v. Greyhound Lines, Inc.*, 804 F.2d 506, 507-08 (8th Cir. 1986) (holding that the Carmack Amendment preempts state claims to recover for breach of a carrier's warranty of [*11] timely delivery if the governing tariff states that timely delivery cannot be guaranteed); *Air Prods. & Chems., Inc. v. Illinois Cent. Gulf R.R. Co.*, 721 F.2d 483, 487-88 (5th Cir. 1983), *cert. denied*, 469 U.S. 832, 105 S. Ct. 122, 83 L. Ed. 2d 64 (1984) (holding that a consignee could maintain an action against the carrier for misdelivery of contaminating chemicals under the Carmack Amendment); *Consolidated Freightways Corp. of Del. v. Terry Tuck, Inc.*, 612 F.2d 465, 466 (9th Cir. 1980) (holding that state claims cannot be asserted to recover for misquotations of shipping rates which are specified in tariffs); *Fulton v. Chicago, Rock Island & Pacific R.R. Co.*, 481 F.2d 326, 331-32 (8th Cir. 1973) (holding that the Carmack Amendment preempts negligence claims against common carriers for damage to goods occurring during transport); *W.D. Lawson & Co. v. Penn Central Co.*, 456 F.2d 419, 421 (6th Cir. 1972) (holding that state claims for damage to

goods occurring during shipment are preempted by the Carmack Amendment); *Pietro Culotta Grapes Ltd. v. Southern Pacific Transp. Co.*, 917 F. Supp. 713, 716-17 (E.D. Cal. 1996) **[*12]** (holding that the Carmack Amendment preempts state claims for untimely delivery and for damage to goods during shipment); *American Eye Way, Inc. v. Roadway Package System. Inc.*, 875 F. Supp. 820, 820-21 (S.D. Fla. 1995) (holding that the Carmack Amendment preempts a shipper's state claims to recover damages for a carrier's failure to acquire cash on delivery from the recipient of the transported goods sold by the shipper); *Adelman v. Hub City Los Angeles Terminal, Inc.*, 856 F. Supp. 1544, 1551-52 (N.D. Ala. 1994) (holding that Carmack Amendment preempts state common law claims of a shipper against a common carrier for goods lost or damaged during interstate transportation); *Schultz v. Auld*, 848 F. Supp. 1497, 1502-04 (D. Idaho 1993) (holding that the Carmack Amendment preempts state claims for recovery for goods which have been lost or damaged during shipment); *United Van Lines, Inc. v. Shooster*, 860 F. Supp. 826, 827-29 (S.D. Fla.1992) (holding that state counterclaims cannot be brought against the carrier to avoid full payment for shipment as determined by the rate specified in the governing tariff); *Margetson v. United Van Lines, Inc.*, 785 F. Supp. 917, 919-20 (D. N.M. 1991) **[*13]** (holding that the Carmack Amendment preempts state claims for improper delivery of goods and damage to goods occurring during shipment); *Pierre v. United Parcel Serv., Inc.*, 774 F. Supp. 1149, 1150-51 (N.D. Ill. 1991) (holding that the Carmack Amendment preempts state claims for loss of goods during delivery and for misdelivery of goods, if the carrier is alleged not to have limited its liability in conformity with the Carmack Amendment); *Suarez v. United Van Lines, Inc.*, 791 F. Supp. 815, 816 (D. Colo. 1992) (holding that claims for damages to goods occurring during shipment are preempted by the Carmack Amendment).

Accordingly, the Court finds that the artful pleading doctrine supports the exercise of subject-matter jurisdiction in this case and the plaintiff's motion to remand will thus be denied.

**B. Defendant's Motion to Dismiss.**

Also pending before the Court are the defendant's March 26, 1998, motion to dismiss Count II of the plaintiff's complaint, together with an April 9, 1998, motion to amend its motion to dismiss to encompass the entire complaint. Because the Court concludes that [HN6]the Carmack Amendment provides the exclusive remedy **[*14]** of a shipper against a common carrier for goods lost or damaged during interstate transportation, *see* Part III(A) *supra*, the defendant's motions will be granted to the right of the plaintiff to

replead within fifteen (15) days any applicable federal claims that may be available to it.

**IV. Conclusion.**

The Court is satisfied that this case was properly removed to this court pursuant to 28 U.S.C. § 1441 *et seq* (1998). Further, the Court is satisfied that the plaintiff's claims against the defendant named in this case arise under the Carmack Amendment. The Court has jurisdiction pursuant to 28 U.S.C. § 1337(a) (1998). As a result, the plaintiff's state law claims are preempted. Accordingly, the plaintiff's motion to remand will be **DENIED**. The plaintiff will be allowed fifteen (15) days in which to amend its complaint to state any applicable federal claims that may be available to it. If no amendment has been filed within the allowed period, the action will be dismissed.

Done, this 5th of May, 1998.

EDWIN L. NELSON

UNITED STATES DISTRICT JUDGE

# E3

*GVA & BG v. Aeroflot Russian International Airlines*,
No. 01 C 1435
2001 U.S. Dist. LEXIS 6549 (N.D. Ill. May 16, 2001)

GVA & BG, an Illinois corporation, Plaintiff, vs. AEROFLOT RUSSIAN INTERNATIONAL AIRLINES, a joint stock company pursuant to the laws of the Russian Federation AEROFLOT CARGO, on information and belief, a wholly-owned subsidiary of AEROFLOT Russian International Airlines; AEROGROUND, INC., an Illinois corporation, Defendants.

Case Number: 01 C 1435

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2001 U.S. Dist. LEXIS 6549

May 16, 2001, Decided
May 17, 2001, Docketed

**DISPOSITION:** [*1] Defendant's motion (Doc 2-1) to dismiss granted. Plaintiff's complaint in its entirety. Complaint dismissed. Ruling set for June 7, 2001 stricken.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant filed a motion to dismiss plaintiff's case arising from the loss of goods destined for international shipment which were handled by defendant.

**OVERVIEW:** Plaintiff was a business that purchased computer equipment in the United States for export to the Russian Federation, the Ukraine, and other foreign nations. Defendant was a common carrier of air passengers and air freight. Plaintiff delivered a box to defendant for international delivery, but the box disappeared. Plaintiff filed a complaint, but defendant moved to dismiss the complaint, claiming it was preempted by the Warsaw Convention, 49 U.S.C.S. § 40105. The court found the Warsaw Convention applied to the case at bar. Plaintiff sought shipment of that which qualified as "goods" under the convention. Both countries were party to the convention and the goods came into charge of the carrier. Plaintiff argued the convention did not apply because defendant never issued an air waybill. The court found the absence of an air waybill did not affect the existence or the validity of the contract of transportation, according to Art. 5(2) of the Warsaw Convention. Plaintiff's causes of action based on state law were, therefore, preempted.

**OUTCOME:** The court granted the motion and dismissed the complaint.

**CORE TERMS:** convention, transportation, box, air waybill, aircraft, air freight, shipment, carrier, air, causes of action, computer equipment, motion to dismiss, cargo, transported, consignee, preempted, warehouse, delivery, destined, handling, flights

**LexisNexis(TM) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN1]For purposes of a motion to dismiss, courts accept as true all well-pleaded allegations.

*International Law > Dispute Resolution > Liability Determinations*

[HN2]The Warsaw Convention, 49 U.S.C.S. § 40105, applies to all international transportation of persons, baggage, or goods performed by aircraft for hire. Art. 1(1) of the Warsaw Convention. The Warsaw Convention defines international transportation as any transportation in which, according to the contract made by the parties, the place of departure and the place of destination are situated within the territories of two High Contracting Parties. Art. 1(2) of the Warsaw Convention. Where the Warsaw Convention applies, it imposes liability for the loss of goods during transportation by air, which comprises the period during which the goods are in charge of the carrier, whether in an airport or on board an aircraft. Art. 18(2) of the Warsaw Convention.

*International Law > Dispute Resolution > Liability Determinations*

[HN3]Under the Warsaw Convention, 49 U.S.C.S. § 40105, the validity of the contract between the parties is unaffected by the absence of an air waybill. Art. 5(1) of the Warsaw Convention. Rather, in cases where the parties failed to issue and accept an air waybill, the contract is still governed by the Warsaw Convention. In such a case, the carrier who accepted the goods without an air waybill shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability. Art. 9 of the Warsaw Convention. The absence of an air waybill does not affect the applicability of the Warsaw Convention, only the availability of limitations of liability.

Page 1

*International Law > Dispute Resolution > Liability Determinations*

[HN4]Courts in several circuits have held that the provisions of the Warsaw Convention provide an exclusive remedy preempting all other state and federal law claims. Although courts in the Seventh Circuit have never reached this question, they have demonstrated at least some approval of the line of cases finding preemption.

**COUNSEL:** For GVA & BG, plaintiff: Douglas R. Cannon, Law Office of Cannon and Weinstein Ltd., Skokie, IL.

For AEROFLOT RUSSIAN INTERNATIONAL AIRLINES, defendant: Michael Gerard McQuillen, Mark Samuel Susina, Austin William Bartlett, Adler, Murphy & McQuillen, Chicago, IL.

**JUDGES:** Charles P. Kocoras, United States District Judge.

**OPINIONBY:** Charles P. Kocoras

**OPINION: MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

Before the Court is the Motion to Dismiss of Defendant Aeroflot-Russian Airlines. For the following reasons, we grant the motion.

BACKGROUND

[HN1]For purposes of a motion to dismiss, we accept as true all well-pleaded allegations. The instant case arises from the loss of goods destined for international shipment. Plaintiff GVA & BG ("GVA") is a business that purchases computer equipment in the United States for export to the member states of the Russian Federation, the Ukraine, and other foreign nations. Defendant Aeroflot Russian International Airlines ("Aeroflot") is a common carrier of air passengers and air freight. It [*2] uses its wholly-owned subsidiary, Aeroflot Cargo, as its agent for freight forwarding processing of goods to be shipped on Aeroflot's aircraft. Aeroflot Cargo's responsibilities include air freight in-processing, scheduling and out-processing of goods to be transported by Aeroflot's aircraft. As Aeroflot's agent, Aeroflot Cargo supervises the handling of goods to ensure safe and secure delivery aboard Aeroflot's scheduled flights.

Defendant Aeroground, Inc. ("Aeroground") conducts the business of air freight warehousemen at O'Hare International Airport ("O'Hare"). In its secured warehouse at O'Hare, Aeroground receives and stores goods designated for transportation by air. Aeroflot

contracts with Aeroground to provide secured storage at the warehouse for goods to be transported on Aeroflot flights.

On August 9, 2000, a GVA representative delivered a 24" x 24" x 24" white cargo box (the "white box") to Aeroflot Cargo's facility at O'Hare. The white box contained computer equipment destined for delivery to a consignee in Kiev, Ukraine. Aeroflot Cargo's representative furnished a receipt for the white box and assigned an air waybill number, but the representative failed to follow company [*3] practices regarding the handling of the box prior to loading onto the aircraft for transportation. At some point between August 9 and 11, the box disappeared.

As a result of the disappearance of the box, GVA brought suit against Aeroflot, Aeroflot Cargo and Aeroground on theories of bailment and negligence. GVA seeks compensatory and consequential damages. Aeroflot now moves to dismiss the complaint, claiming that it is preempted by the Warsaw Convention.

DISCUSSION

Defendant contends that the Warsaw Convention, 49 U.S.C. § 40105, preempts Plaintiff's causes of action. [HN2]The Warsaw Convention applies to "all international transportation of persons, baggage, or goods performed by aircraft for hire." Art. 1(1). The Convention defines "international transportation" as "any transportation in which, according to the contract made by the parties, the place of departure and the place of destination . . . are situated [] within the territories of two High Contracting Parties. . . ." Art. 1(2). Where the Warsaw Convention applies, it imposes liability for the loss of goods during "transportation by air," which comprises "the period during which . . . the goods are [*4] in charge of the carrier, whether in an airport or on board an aircraft. . . ." Art. 18(2).

[HN3]The validity of the contract between the parties is unaffected by the absence of an air waybill. Art. 5(1) ("the absence, irregularity, or loss of this document shall not affect the existence or the validity of the contract of transportation which shall, subject to the provisions of article 9, be none the less governed by the rules of this convention"). Rather, in cases where the parties failed to issue and accept an air waybill, the contract is still governed by the Warsaw Convention. See id. In such a case, the carrier who accepted the goods without an air waybill "shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability." Art. 9. The absence of an air waybill does not affect the

Page 2

applicability of the Convention, only the availability of limitations of liability.

[HN4]Courts in several other circuits have held that the provisions of the Warsaw Convention provide an exclusive remedy preempting all other state and federal law claims. See Husmann v. Trans World Airlines, 169 F.3d 1151, 1153 (8th Cir. 1999); Fishman v. Delta Air Lines, 132 F.3d 138 (2d Cir. 1998); [*5] Boehringer-Mannheim Diagnostics v. Pan American World Airways, 737 F.2d 456, 458-59 (5th Cir. 1984). Although the Seventh Circuit has never reached this question, it has demonstrated at least some approval of the line of cases finding preemption. See Schroeder v. Lufthansa, 875 F.2d 613, 620 n.5 (7th Cir. 1989) (observing that recent courts had held that the Convention itself creates a cause of action; citing cases so holding). Courts in the Northern District have followed this reasoning. See Cheng v. United Airlines, 1995 U.S. Dist. LEXIS 1140, No. 93 C 149, 1995 WL 42157, *2 (N.D. Ill. Jan 31, 1995); Beaudet v. British Airways, PLC, 853 F. Supp. 1062, 1069 (N.D. Ill. 1994); Rageb v. DHL Worldwide Express, 1992 U.S. Dist. LEXIS 2822, No. 91 C 7334, 1992 WL 58753, *2 (N.D. Ill. 1992); Kenner Prods.-General Mills, Inc. v. The Flying Tiger Line, Inc., 1987 U.S. Dist. LEXIS 4304, No. 87 C 126, 1987 WL 11629, *2 (N.D. Ill. May 22, 1987).

The Warsaw Convention applies to the case at bar. According to Plaintiff's allegations, Plaintiff sought shipment of a "white box" which qualifies as "goods" for purposes of the Convention. The shipment was to be sent from Aeroflot's [*6] cargo facility at O'Hare International Airport in the United States to a consignee in the Ukraine. Both parties concede that both countries are party to the Convention; hence the "international transportation" requirement of the Convention is satisfied. Finally, when Defendants' representative at the storage facility accepted the white box from Plaintiff, the goods came into "charge of the carrier," thus triggering liability under Article 18(2).

Plaintiff argues that the transaction does not fall within the scope of the Warsaw Convention because Defendants' representative failed to furnish an air waybill. This argument runs contrary to the plain language of the Convention, however, which states clearly that the absence of an air waybill "shall not affect the existence or the validity of the contract of transportation. . . ." Art. 5(2). Thus, in the case at bar, the absence of an air waybill does not eviscerate the validity of the agreement between the parties. The agreement remains within the scope of the Convention.

Because the Warsaw Convention applies to the case at bar, Plaintiff's causes of action based on state law are preempted. See Cheng v. United Airlines, 1995 U.S.

Dist. LEXIS 1140, No. 93 C 149, [*7] 1995 WL 42157, *2 (N.D. Ill. Jan 31, 1995); Beaudet v. British Airways, PLC, 853 F. Supp. 1062, 1069 (N.D. Ill. 1994); Rageb v. DHL Worldwide Express, 1992 U.S. Dist. LEXIS 2822, No. 91 C 7334, 1992 WL 58753, *2 (N.D. Ill. 1992); Kenner Prods.-General Mills, Inc. v. The Flying Tiger Line, Inc., 1987 U.S. Dist. LEXIS 4304, No. 87 C 126, 1987 WL 11629, *2 (N.D. Ill. May 22, 1987). Accordingly, we dismiss the complaint.

CONCLUSION

For the foregoing reasons, we grant the motion to dismiss Plaintiff's complaint in its entirety.

Charles P. Kocoras

United States District Judge

Dated: May 16, 2001

**JUDGMENT IN A CIVIL CASE**

IT IS HEREBY ORDERED AND ADJUDGED that plaintiff's complaint is dismissed. All matters in controversy having been resolved, final judgment is entered in favor of the defendants and against plaintiff.

Date: 5/16/2001

# E4

*Iowa Power & Light Co. v. Burlington N. R.R. Co.,*
No. 81-526-B
1983 U.S. Dist. LEXIS 11443 (S.D. Iowa Nov. 22, 1983)

IOWA POWER AND LIGHT COMPANY, Plaintiff, v. BURLINGTON NORTHERN RAILROAD COMPANY, Defendant.

CIVIL NO. 81-526-B

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA CENTRAL DIVISION

1983 U.S. Dist. LEXIS 11443

November 22, 1983

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff power company filed an action against defendant railroad that sought to prevent the railroad from breaching an alleged agreement between the parties that concerned rates it charged the power company for unit train transportation of large volumes of coal. The power company sought a declaration that the contract was enforceable, an injunction against violation of the contract, and an order that restored excess payments.

**OVERVIEW:** The court disagreed with the railroad's contention that no contract was ever entered into and that all communications between the parties were merely for the purposes of gaining necessary factual information and some sort of informal understanding so that a tariff could be crafted that minimized the potential for challenges when filed with the Interstate Commerce Commission. The court found that the parties mutually intended to reach an agreement concerning the tariff rate that the railroad would apply for and future increases in the tariff rate, and it was their mutual intention that there would be compliance with the agreement. The court concluded that the parties entered a contract after July 1973, the terms of which were set forth in the proposed letter of understanding, the tariff, and the escalation formula. Furthermore, the court held that the contract was enforceable under the state's law. Accordingly, the court declared the validity of the parties' contract, enjoined the railroad from continued breach of the contract, and ordered the railroad to refund the excess tariffs it received from the power company.

**OUTCOME:** The court declared that the power company and the railroad had a valid, enforceable contract for the movement of coal for approximately 20 years. The court permanently enjoined the railroad from continuing to breach the contract. The court ordered the railroad to refund the power company all monies it received under tariffs that exceeded the specified rates.

**CORE TERMS:** coal, tariff, escalation, formula, shipper, train, vice president, net ton, personnel, lawful, per ton, carrier, Staggers Act, freight rate, transportation, inequity, tonnage, ton, commence, railroad, rail, grandfather, escalator, enclosed, publish, policy statement, mutual assent, Staggers Rail Act, tons of coal, tariff rate

## LexisNexis(TM) Headnotes

### Contracts Law > Formation > Formation Generally

[HN1]A contract is a promise, performance of which the law recognizes as a duty and for breach of which a remedy is given. It is simply an agreement between two or more persons or parties to do or not to do something. The formation of a contract requires a bargain in which there is a manifestation of mutual assent to an exchange and a consideration. The manifestation of mutual assent to an exchange requires that each party either make a promise, or render performance.

### Contracts Law > Formation > Acceptance

[HN2]A written agreement signed by one party, when accepted by the other and acted upon, becomes a binding contract. No special form of words is necessary to create a promise; it is only necessary that a fair interpretation of the words actually used makes it appear that a promise is intended.

### Contracts Law > Formation > Offer

[HN3]Iowa law requires that, to be contractually bound, the parties must manifest a mutual, unequivocal assent to the terms of their agreement. But the parties' meeting of the minds is not determined by subjective mental processes. Long-standing case law holds that the expressed intention of the parties prevails over any secret intention of the drafter, and that once the parties have entered into a written contract, the instrument alone controls.

### Contracts Law > Formation > Formation Generally

[HN4]To constitute a contract by an offer and acceptance, the acceptance must conform to the offer. If there is a qualification which calls for further understanding in order to determine the final meeting point of the minds of the parties, the acceptance fails to effectively create a contract.

### Contracts Law > Formation > Offer

[HN5]A specific belief or intent that the agreement be legally binding is not a requisite of mutual assent.

*Contracts Law > Consideration > Sufficient Consideration*

[HN6]Consideration may take the form of either benefit to the promisor or detriment to the promisee. All contracts in writing shall import a consideration. Iowa Code § 537A.2. The burden is on a party challenging a contract to establish that there is no consideration.

*Contracts Law > Consideration > Sufficient Consideration*

[HN7]An exchange of obligations and promises constitutes consideration.

*Contracts Law > Statutes of Frauds*

[HN8]The Iowa Statute of Frauds, Iowa Code § 622.32, which provides in pertinent part: No evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent: 4. Those that are not to be performed within one year from the making thereof.

*Contracts Law > Statutes of Frauds*

[HN9]The Iowa Supreme Court views the Iowa statute of frauds as simply a rule of evidence.

*Transportation Law > Rail Transportation > Rates & Tariffs*

*Transportation Law > Interstate Commerce > Federal Powers*

[HN10]Until 1976, the Interstate Commerce Commission (ICC) was empowered by Congress to superintend all rates charged by railroads. The Interstate Commerce Act, as it existed prior to 1976, required all rates to meet a just and reasonable standard, and it authorized the Commission to determine what constituted a just and reasonable rate in any given case. 49 U.S.C.S. §§ 1(5), 15(1). Reduction of the Commission's rate-making superintendence commenced with the Railroad Revitalization and Regulatory Reform Act of 1976. In that legislation, Congress confined the ICC's maximum reasonable rate regulation to situations in which the railroad had market dominance over the traffic involved. 49 U.S.C.S. § 1(5)(b).

*Transportation Law > Rail Transportation > Rates & Tariffs*

*Transportation Law > Interstate Commerce > Federal Powers*

[HN11]The Staggers Rail Act of 1980, the pertinent portions of which are codified in 49 U.S.C.S. §§ 10701

et seq., brought about significant deregulation changes. It establishes a threshold formula for "market dominance," and in addition 49 U.S.C.S. § 208(a) establishes procedures by which a carrier and a shipper may enter into, and obtain Interstate Commerce Commission (ICC) approval for service- and rate-setting contracts. 49 U.S.C.S. § 10713. The reasonableness of rates set in contracts authorized under 49 U.S.C.S. § 208(a) is not subject to ICC regulation and the exclusive remedy for any alleged breach of a contract entered into under § 208(a) is an action in an appropriate state court or United States district court, unless the parties otherwise agree. 49 U.S.C.S. § 10713(i)(2). A grandfather clause preserves the status of pre-Staggers Act contracts: The provisions of this section shall not affect the status of any lawful contract between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force and effect as if it had been entered into in accordance with the provisions of this section. Nothing in this section shall affect the rights of the parties to challenge the existence of such a contract.

*Transportation Law > Rail Transportation > Rates & Tariffs*

*Transportation Law > Interstate Commerce > Federal Powers*

[HN12]The Interstate Commerce Commission (ICC) announced that contract rates could be filed in tariff form and that it would approve such rates following close, case-by-case scrutiny to determine whether they are economically justified and not anticompetitive. Railroad Contract Rates; Policy Statement I, Ex Parte No. 358-F, 43 Fed. Reg. 58,189 (1978). A second policy statement declared that where no contract rate was filed but a shipper alleged that a proposed rate violated a private agreement between shipper and carrier, the Commission would take the alleged agreement into account as a factor, bearing upon the reasonableness of the rate. Change of Policy, Railroad Contract Rates, Ex Parte No. 358-F, 45 Fed. Reg. 21,719 (1980) Pre-November 9, 1978, agreements, would be considered case-by-case. No presumption of illegality would attend proposed rates in excess of the rate set by such contracts. However, the ICC elaborated that such alleged contracts will be given great weight in determining whether a proposed rate increase is unreasonable if the shipper demonstrates (1) that the parties intended to be legally bound by the agreement; (2) that the shipper reasonably relied on the contract to its substantial detriment that is, by making large investments that it would not otherwise have

made; and (3) that public interest considerations warrant holding the carrier to the agreement.

### Transportation Law > Rail Transportation > Rates & Tariffs

[HN13]The United States Court of Appeals for the Eighth Circuit has held that a rate contract between a railroad and a shipper entered into before Interstate Commerce Commission Policy Statement Ex Parte No. 358-F was adopted is not illegal per se.

## OPINIONBY: [*1]

VIETOR

## OPINION: FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

This is an action brought by Iowa Power and Light Company (Iowa Power) against the Burlington Northern Railroad Company (BN) to prevent the BN from breaching an alleged agreement between the parties concerning rates to be charged Iowa Power by BN for unit train transportation of large volumes of coal from Wyoming to Iowa Power's generating station located at Council Bluffs, Iowa. Iowa Power seeks a judicial declaration that it has an enforceable contract with BN, an injunction prohibiting BN from violating the contract, and an order for restoration of tariff payments made in excess of the contract rate.

There are numerous issues presented by the pleadings, but because of the resolutions reached on some of them, other issues need not be, and are not, reached. The issues reached are: (1) Is there a contract? (2) If there is a contract is its enforceability barred by the Iowa statute of frauds? (3) If there is a contract, is it an enforceable "lawful contract" under the "grandfather" clause of the Staggers Rail Act of 1980?

The case was tried by the court, and was submitted for decision after extensive [*2] post-trial briefing.

BASIC FINDINGS OF FACT

1. Plaintiff Iowa Power is an Iowa corporation with its sole principal place of business in Iowa, and is an investor-owned publicly held electric utility company doing business in Iowa.

2. Defendant BN is an interstate common carrier by rail, and is a Delaware corporation with its only principal place of business in St. Paul, Minnesota.

3. The Iowa Power Pool is composed of seven utility companies doing business in Iowa, including Iowa Power.

4. On November 8, 1972, the chief executives of the member companies of the Iowa Power Pool agreed that Iowa Power should proceed with the planning for and

construction of a 600 megawatt fossil fuel (coal) generating unit to be in operation by January 1, 1979, to which Iowa Power agreed. Public announcement of the new unit at Council Bluffs, which unit was designed to burn low sulphur coal, was made November 16, 1972, with construction to commence in 1974. Council Bluffs was selected because it is Iowa Power's closest site to the Wyoming and Montana coal fields.

5. On or before November 22, 1972, BN learned that Iowa Power had announced plans to construct the 600 megawatt [*3] coal-fired generating station.

6. By December 1, 1972, BN had been in contact with Iowa Power concerning transportation of low sulphur western coal to the planned facility.

7. Immediately after the announcement of plans to construct a plant, Iowa Power began to seek a source of low sulfur coal capable of supplying two million tons per year for a period of twenty years beginning in 1978. Rex Jorgensen, Iowa Power's manager of purchasing, was given the specific assignment and authority by Iowa Power's vice president and comptroller, William M. Merrill, to seek a long term supply of coal and firm transportation arrangements.

8. In December 1972 Mr. Jorgensen mailed letters to fourteen coal companies announcing Iowa Power's plans to build a coal-fired unit and seeking bids on a coal supply. The letters stated that a decision on a coal supply would be "tentative," since the final decision would be subject to the ultimate development of transportation arrangements. Seven bids were eventually received.

9. A "unit train" is a train composed of a certain number of cars, such as 100 or more, loaded with one product and delivered to one shipper. It is a "turn around" [*4] service using minimal loading and unloading time. The economics of a unit train operation permit significantly lower rates for unit train service than regular rail service.

10. On March 27, 1973, BN personnel met with Iowa Power personnel and the consulting engineers selected by Iowa Power to discuss unit train coal operations for the proposed unit at Council Bluffs, BN's car and locomotive specifications and loading and unloading times, cycle time, annual tonnage requirements and design standards for loop track construction, car ownership, weighing of tonnage, car spare margin, and ownership of locomotives.

11. In April 1973 representatives of the Iowa Power Pool members met and discussed the fact that construction and operating agreements for the generating station should be signed by July 31, 1973,

with the ten current schedule calling for turbine specifications to be put out for bids by that time and for the steam generator specifications to be issued by September 1973. Such specifications were issued by those dates.

12. On June 11, 1973, Mr. Jorgenson issued his analysis of coal proposals. He recommended that Iowa Power select the Amax Coal Company (AMAX) as the source [*5] of coal for the planned unit, to be called Council Bluffs Unit No. 3, and he recommended that Iowa Power announce its intention to purchase to AMAX subject to assistance in obtaining a satisfactory freight rate and subject to the execution of a mutually agreeable contract. On that same day, a meeting was held between Iowa Power's president, executive vice president, vice president and general manager, vice president and comptroller (Mr. Merrill), and manager of purchasing (Mr. Jorgensen), to discuss Mr. Jorgensen's recommendation. The recommendation was approved. Mr. Merrill, who was Mr. Jorgensen's direct superior, specifically sought out and received the approval of Iowa Power's president and chairman of the board to the recommended course of action.

13. On June 15, 1973, Iowa Power executed, and AMAX "accepted," a letter of intent to AMAX to purchase 35 million tons of coal from reserves located near Gillette, Wyoming, at the rate of two million tons per year starting in 1978. The letter stated: "The execution of a mutually agreeable contract is contingent on AMAX's assistance, with Iowa Power, in negotiations to secure a satisfactory freight rate."

14. Iowa [*6] Power was aware as of June 15, 1973, that BN was the only railroad serving the Gillette, Wyoming, area.

15. On June 18, 1973, BN's George Powe, vice president of commodity marketing, requested BN personnel to develop a schedule for the proposed coal movement in order to estimate projected costs, so BN could prepare to quote Iowa Power a freight rate.

16. On June 26, 1973, BN and Iowa Power personnel met to start negotiations with respect to a freight rate. At this meeting BN was informed by Iowa Power of Iowa Power's estimated coal tonnage requirements for its planned unit. BN was also informed that the planned unit would burn 2 million tons of coal per year for the first ten years, and 1.5 million tons of coal per year for the next ten years. At the June 26, 1973, meeting BN first quoted to Iowa Power a freight rate from the Belle Ayr mine of AMAX to Council Bluffs of $3.81 per ton in railroad-owned cars or $3.21 in Iowa Power-owned cars, either quotation subject to annual escalation. BN agreed to send Iowa Power a

letter quoting its prices and describing the proposed escalation arrangements in greater detail.

17. On June 27, 1973, BN's director of pricing, [*7] R. S. Sandgren, sent a letter to Iowa Power's Jorgensen which stated that: "At our meeting on June 26, we agreed to furnish you with a copy of our proposed escalation agreement . . ." The letter enclosed a copy of "BN Standard Escalation Formula for Base Year 1972," along with a copy of the AAR Western District Indexes of Railroad Material Prices and Wage Rates. The June 27, 1973, letter also enclosed a sample tariff.

18. The "BN Standard Escalation Formula" provided a means by which tariff rates could be increased based on an index of railroad industry costs. The escalation formula furnished June 27 contained a productivity ratio. Enclosed with the formula was a copy of a tariff covering a unit coal train movement to a utility in Colorado which Sandgren's letter said would to give Iowa Power "some indication of what provisions BN would consider for publication with the $3.21 rate quoted for movement of unit train coal to Council Bluffs * * *."

19. On July 10, 1973, Mr. Sandgren wrote the following letter to Mr. Jorgensen:

This will confirm our rate tender of 381 per net ton in Burlington Northern cars and 321 in IP&L cars, delivered to you at our recent meeting for moving [*8] unit train coal from the Gillette, Wyoming area to your proposed new electric generating facilities to be located at Council Bluffs, Iowa in the same area as your present generating units which are served by Burlington Northern.

These rates would be subject to escalation under the escalation formula furnished you with our letter of June 27 with the first application of escalation to occur with July 1, 1974.

The rates will apply for unit trains of approximately 110 cars of 100 tons capacity with each train set capable of delivering about 1,250,000 tons per year. Burlington Northern furnished cars would be either steel gons or hoppers with rotory couplers. The round trip schedule would be approximately 73 hours. This would include a maximum of 4 hours for loading and 4 hours for unloading.

Routing would be via BN direct. Rates do not include any expense to BN for construction of additional trackage at destination.

20. On July 3, 1973, Iowa Power's Jorgensen had prepared a written analysis of the "proposed escalation formula" concluding that for the long term the rate of escalation seemed high. On July 12, 1973, he recommended that Iowa Power "accept the rate figures

[*9] proposed subject to further consideration of the escalation formula." John Luhring, vice president and general manager, concurred in a memo dated July 16, 1973, directing Mr. Jorgensen to write BN "accepting their freight rate proposal" but that his letter "should not conclude the issue on escalation" because Iowa Power wanted "to be able to negotiate that item further."

21. On July 25, 1973, Iowa Power's Jorgensen wrote the following letter to BN's Sandgren:

Thank you for your letter of July 10th regarding unit train movement of coal from Gillette, Wyoming to Council Bluffs, Iowa.

We are pleased to accept your offer to establish 381 per net ton in Burlington Northern cars and 321 per net ton in Iowa Power cars. Although I feel that we will choose to own the cars, can the tariff include both possibilities?

The matter of escalation is still being studied and we expect additional discussion, and clarification, may be necessary. Since we can readily understand the need for such provision, it appears unquestionable that we will be able to reach mutual agreement.

22. On August 10, 1973, in response to Iowa Power's question about including both shipper car and carrier rates [*10] in a proposed tariff, BN's Sandgren wrote Iowa Power's Jorgensen advising that normally the tariff would be filed six months to one year before the first movement of coal; that by that time the decision by Iowa Power should have been made with respect to cars; and that BN would publish either a shipper or carrier car rate based on Iowa Power's decision to buy cars or use BN cars.

23. On August 10, 1973, AMAX sent Iowa Power a draft coal agreement. Through August and September, 1973, Iowa Power and AMAX made several revisions in the draft of the coal contract including increasing the quantity of coal from 35 million tons to 40 million tons to be received over 20 years. The base price of the coal specified in the AMAX contract was $2.10 per ton, for 40 million tons, with the price subject to escalation.

24. The AMAX coal supply contract was executed by November 1, 1973, and a copy was forwarded by Mr. Jorgensen to Mr. Luhring to be placed in Iowa Power's "central files," the official repository for Iowa Power contracts. The AMAX coal supply contract was approved by Iowa Power's board of directors on December 26, 1973.

25. BN was not a signatory to the Iowa Power-AMAX [*11] contract nor was it a participant in Iowa Power's

discussions with AMAX. It was never furnished a copy of the coal supply contract.

26. On November 8, 1973, Iowa Power's Jorgensen wrote to BN's Sandgren: "The contract with AMAX Coal Company has been officially executed and is a matter of record. Therefore, it now seems appropriate to pursue necessary formalities between Iowa Power and Burlington Northern to nail down the 321 rate pertaining to this movement. Since I am not sure what documentation is required, I would appreciate your initiation of the paper work. I would hope to reach an agreement prior to "the tariff would be filed perhaps six months to one year before movement of coal"."

27. By letter to Iowa Power's Jorgensen dated November 29, 1973, BN's Sandgren indicated that he would "prepare a draft tariff, letter of agreement, escalator and car maintenance agreement" for Iowa Power's approval and that BN expected no "particular difficulty arriving at an agreement on these matters."

28. By letter to Iowa Power's Jorgensen dated July 15, 1974, BN's Sandgren indicated that he was preparing a draft of a "letter of understanding" and a proposed tariff.

29. On September [*12] 12, 1974, BN's Sandgren sent Iowa Power's Jorgensen an unsigned "proposed letter of understanding, as well as proposed tariff and escalator to cover movement of coal in unit train service from Belle Ayr, Wyoming to [Iowa Power's] new generating unit at Council Bluffs, Iowa, scheduled to receive coal in 1978" and suggested a meeting to discuss all aspects of the proposed move.

30. In forwarding the September 12, 1974, letter and attachment to Iowa Power's general counsel, Mr. Jorgensen asked for "close legal review of the Unit Train Coal Tariff attached as Exhibit A," describing it as the "legal document [which] will govern the transportation of our CBPS fuel supply for many years to come."

31. The September 12, 1974, letter and attached documents included the first proposed form of tariff for the movement; the escalator did not include the productivity factor which had been in the previously furnished escalation formula but did apply to any additional units to be built at Council Bluffs. The tariff rate was not $3.21 per net ton as originally quoted but had been raised to $3.61 per net ton pursuant to BN's escalation formula.

32. On November 20, 1974, Iowa Power's [*13] Jorgensen wrote to BN's Sandgren in response to the letter of September 12, expressing "accord" with the provisions of the documents but agreeing that a further

meeting was in order to continue discussions of "all aspects" of the matter.

33. On January 30, 1975, BN and Iowa Power personnel met to discuss the provisions included in BN's proposed tariff submitted September 12, 1974. Iowa Power requested reduction of the minimum number of cars per unit train and the minimum annual tonnage required by the proposed tariff, and BN advised that it intended to delete any reference in the proposed "escalator" to transportation of coal for future units which might be built at Council Bluffs. BN advised Iowa Power at this meeting that Iowa Power "can contract with BN for running maintenance" and BN would submit a running maintenance contract for Iowa Power's consideration. BN stated that it would rewrite the proposed letter of understanding, tariff and escalator and resubmit them to Iowa Power.

34. On April 1, 1975, Iowa Power's Luhring suggested to Mr. Jorgensen a meeting with BN personnel, indicating "I believe it is time we make every effort to conclude as many open items [*14] as is possible in regard to the subject" of unit train coal to Countil Bluffs Unit No. 3 including among other things to "conclude tariff discussions" and pursuit of a possible coal car maintenance contract.

35. On April 30, 1975, BN and Iowa Power personnel met to discuss operation and design matters for the proposed movement.

36. On September 4, 1975, Iowa Power's Jorgensen wrote to BN's Sandgren that Iowa Power agreed with the form of tariff forwarded July 18th and that BN had Iowa Power's "approval to proceed with publication" of that tariff, and additionally enclosed with that letter a copy of "BN Standard Escalation Formula for Base Year 1973," which BN had transmitted to Iowa Power on September 18, 1974.

37. On October 9, 1975, Iowa Power engineering personnel indicated agreement with Iowa Power's consulting engineers that Iowa Power's coal cars should comply with BN's standards and requirements since those standards were based on operating experience and were justified by expected reduction in maintenance costs and outage time.

38. On January 7, 1976, BN's Sandgren sent to Iowa Power's Jorgensen a "proposed letter of understanding," tariff and escalation formula, [*15] with a cover letter which asked for "your approval and signature of this understanding, returning an executed, signed copy to us." The "proposed letter of understanding," which was addressed to Mr. Jorgensen and signed by BN's R. W. Morrison, assistant vice president, stated:

The attached tariff marked Exhibit A covers transportation of coal by unit train from Belle Ayr, Wyoming to Council Bluffs, Iowa for Council Bluffs Unit No. 3, which is scheduled to commence receiving coal in 1978. Shipments will be handled by the Burlington Northern Inc. direct with the coal movement to continue for approximately 20 years.

If additional units are located at the Council Bluffs site, it is understood that Exhibit A will not apply and that a new freight rate will be negotiated for moving coal to additional units. Exhibit A will be filed with the Interstate Commerce Commission, subject to their approval, in time to become effective for such shipments when it is known that such facilities are available to ship and receive coal under conditions outlined in Exhibit A.

In addition to the proposed tariff, attached as Exhibit B is memorandum of escalation outlining the methods and procedures [*16] that will be used to escalate the rates and charges named in Exhibit A in lieu of application of approved interstate ex parte increases.

Iowa Power and Light Company shall provide the necessary cars required fo ship the scheduled tonnage. Such cars shall be equipped with swivel couplers and constructed to standard acceptable to BN Inc. Cars provided by Iowa Power and Light Company and assigned to this service shall be maintained to applicable standards of the Association of American Railroads and Burlington Northern Inc.

It is understood that Burlington Northern Inc. will bear no part of the expense of track construction at origin or destination except as shall be covered by separate agreement.

Beneath Mr. Morrison's signature was typed the following:

Agreed to and accepted this   day of  , 1976.

IOWA POWER AND LIGHT COMPANY

By

Rex E. Jorgensen, Manager of Purchasing

39. The rate contained in the Exhibit A tariff was $3.61 per ton, which was the $3.21 rate proposed by BN in 1973 as increased by the escalation formula. The escalation formula contained a "gross inequity" clause which stated:

It is the intent of both BN and the shipper that the formula [*17] described above will compensate BN for any increases in the cost of transporting the shipper's coal tonnages above the 1973 cost level. If either party should suffer a gross inequity as a result of unusual economic conditions, which result in the

formula failing to fairly cover cost increases, such inequities will be resolved by mutual agreement between BN and the shipper. Pending such agreement, neither party shall be relieved of its obligation as outlined in the current effective tariff and regular escalation shall continue using the above formula in the interim.

40. On February 16, 1976, Mr. Jorgensen, with the specific authorization of Mr. Merrill, Iowa Power's vice president and comptroller, dated and signed the acceptance form on the "proposed letter of understanding" and returned it to BN.

41. By October 1977 the $3.21 rate proposed in 1973 had escalated in accordance with the escalation formula to $5.23 per ton.

42. On October 28, 1977, BN filed Special Permission Application No. 309, I.C.C. 77-284, with the Interstate Commerce Commission, attaching a $5.23 per ton tariff, and sought I.C.C. permission for short notice filing.

43. Beginning in 1973, [*18] the demand for rail transportation of coal increased dramatically as a result of environmental legislation and the 1973 OPEC embargo, leading BN to make substantial improvements in its tracks and other facilities and to purchase vast quantities of locomotives and other equipment at a cost in excess of one billion dollars.

44. At some point in late 1977 BN determined that the $5.23 rate should not be published with the I.C.C. because it was a low rate compared to other rates being discussed with other shippers and rates to other destinations already published; the $5.23 rate could be used in efforts to force BN to grant other shippers lower rates, the effect of which could be financially adverse to BN in view of the huge investment it had made as a result of the growth of coal traffic from Wyoming and Montana.

45. On December 2, 1977, C. J. Hockaday, BN's vice president of pricing and energy, met with Iowa Power's Jorgensen to advise that BN would not publish the $5.23 tariff because of the unfavorable effect such publication would have in comparison with other established rates and rates then being negotiated with other shippers. Mr. Hockaday proposed a rate of [*19] $6.32 per ton without escalation for the first 18 months.

46. On December 15, 1977, Iowa Power's Merrill wrote to BN's Hockaday rejecting the $6.32 rate and expressing the view that the parties had previously reached "a valid, binding obligation."

47. On December 23, 1977, BN's Hockaday wrote to Iowa Power's Merrill, stating that it was BN's position

"that we have invoked the gross inequity clause of the coal escalation formula to secure relief from uneconomic conditions which resulted in the formula failing to cover cost increases." Mr. Hockaday then concluded that "your December 15 clearly rejects this claim of gross inequity" and he advised BN would seek to establish a rate of $7.38 per ton.

48. On December 23, 1977, BN filed with the Interstate Commerce Commission a notice of intention to file a "capital incentive" rate of $7.38 under section 206 of the Railroad Revitalization and Regulatory Reform Act of 1976. BN also filed an interim tariff at the level quoted in 1973, as escalated, to be applicable while the capital incentive rate was under review by the I.C.C., in order to get Iowa Power's coal moving.

49. Since the filing of the two orignial tariffs, the rate [*20] level has been extensively litigated in the I.C.C. and in the appellate courts, with an I.C.C. decision served in December of 1982, permitting BN to implement a tariff filing pursuant to the Staggers Act, naming an increased rate effective November 1, 1981. That rate is about $2.00 per ton higher than that which Iowa Power contends BN is bound to charge under the alleged contract, and is the presently filed and published rate. The course of this rate litigation is found in three court of appeals decisions: Iowa Power and Light Co. v. United States, 712 F.wd 1292 (8th Cir. 1983); Burlington Northern R.R. v. I.C.C., 679 F.2d 934 (D.C. Cir. 1982); Iowa Power and Light Co. v. Burlington Northern, Inc., 647 F.2d 796 (8th Cir. 1981). It need not be repeated here.

50. Since early 1978, Iowa Power has been shipping coal from AMAX's Belle Ayr mine in Wyoming to Council Bluffs Unit No. 3 in BN unit trains under the published tariffs.

CONCLUSIONS OF LAW RE: JURISDICTION

The court has jurisdiction of the subject matter and parties. 28 U.S.C. §§ 1331, 1332(a)(1), 1337 and the Staggers Rail Act, 49 U.S.C. § 10713(i)(2).

DISCUSSION, CONCLUSIONS OF LAW, [*21] AND ADDITIONAL FINDINGS OF FACT RE: FORMATION OF A CONTRACT

Iowa Power contends that it entered into a contract with BN in July of 1973, when it accepted BN's proposed base rate of $3.81 per net ton in BN cars and $3.21 per net ton in Iowa Power cars. Iowa Power further contends that its acceptance in February of 1976 of BN's January 1976 "proposed letter of understanding" was a final contract between the parties that encompassed and subsumed the 1973 contract, which became merged into the 1976 contract. BN contends that no contract was ever entered into and

that all communications between the parties were merely for the purposes of gaining necessary factual information and some sort of informal understanding so that a tariff could be crafted that would have minimal potential of being challenged when filed with the Interstate Commerce Commission.

There is no dispute that Iowa contract law governs the question of whether a contract was formed by the parties, although federal law governs one of the two issues of enforceability of any such contract.

[HN1]A contract is a promise, performance of which the law recognizes as a duty and for breach of which a remedy is given. Port Huron [*22] Machinery Co. v. Wohlers, 221 N.W. 843, 844, 207 Iowa 826 (1928); Restatement (Second) of Contracts § 1 (1979). It is simply an "agreement between two or more persons or parties to do or not to do something." Campiano v. Kuntz, 226 N.W.2d 245, 249 (Iowa 1975). The formation of a contract requires a bargain in which there is a manifestation of mutual assent to an exchange and a consideration. Ringland-Johnson-Crowley Co. v. First Central Service Co., 255 N.W.2d 149 (Iowa 1977); Restatement (Second) of Contracts § 17(a) (1979). The manifestation of mutual assent to an exchange requires that each party either make a promise, or render performance. Id. § 18.

[HN2]A written agreement signed by one party, when accepted by the other and acted upon, becomes a binding contract. Port Huron Machinery Co. v. Wohlers, supra, 221·N.W. at 845. No special form of words is necessary to create a promise; it is only necessary that a fair interpretation of the words actually used makes it appear that a promise is intended. E.I. DuPont de Nemours & Co. v. Claiborne Reno Co., 64 F.2d 224, 227 (8th Cir. 1933).

[HN3]Iowa law requires that, to be contractually bound, the [*23] parties must manifest a mutual, unequivocal assent to the terms of their agreement. Duhme v. Duhme, 260 N.W.2d 415, 419 (Iowa 1977). But the parties' "meeting of the minds" is not determined by subjective mental processes, Fairway Center Corp. v. U.I.P. Corp., 502 F.2d 1135, 1141 (8th Cir. 1974). Long-standing case law holds that the expressed intention of the parties prevails over any secret intention of the drafter, First Northwestern Nat'l Bank, Denison v. Crouch, 287 N.W.2d 151, 153 (Iowa 1980); Hawkeye Commercial Men's Association v. Christy, 294 F. 208, 214 (8th Cir. 1923), and that once the parties have entered into a written contract, the instrument alone controls. McManis v. Keokuk Savings Bank & Trust Co., 33 N.W.2d 410, 412, 239 Iowa 1105 (1948); Allen v. Highway Equipment Co., 239 N.W.2d 135, 138 (Iowa 1976); State v. Starzinger, 179 N.W.2d 761, 764 (Iowa 1970).

As previously noted, Iowa Power contends that a contract was made in 1973 when it accepted BN's proposed base rate of $3.81 per net ton in BN cars and $3.21 per net ton in Iowa Power cars. BN's proposal, however, included a specific escalation formula, and Iowa Power did not accept [*24] that part of the proposal in 1973.

[HN4]To constitute a contract by an offer and acceptance, the acceptance must conform to the offer. If there is a qualification which calls for further understanding in order to determine the final meeting point of the minds of the parties, the acceptance fails to effectively create a contract. National Produce Co. v. Dye Yaus Co., 199 Iowa 286, 201 N.W. 572 (1925); Shell Oil Co. v. Kelinson, 158 N.W.2d 724 (Iowa 1968).

Iowa Power's acceptance was not an acceptance of the complete proposal of BN, and the court finds and concludes that no contract was formed by the parties in July of 1973 when Iowa Power accepted only part of BN's proposal.

The court makes the following additional findings of fact in respect to the effect of BN's 1973 proposal and in respect to the 1976 "proposed letter of understanding" and its acceptance by Iowa Power.

51. Beginning immediately after July of 1973, Iowa Power substantially relied on the base rate proposed by BN in July of 1973, to which it had indicated acceptance, by entering into the contract with AMAX (whose Belle Ayr mine is served only by the BN) and by spending over eight million [*25] dollars for rail cars and over one million dollars for spur track improvements. From July of 1973 both parties proceeded ahead with confidence that they would enter into a final agreement predicated on the 1973 base rate for a twenty year movement of coal beginning in 1978.

52. Mr. Morrison, who signed the 1976 proposed letter of understanding, had the authority to do so on behalf of BN, and Mr. Jorgensen had the authority to sign the acceptance on behalf of Iowa Power.

53. BN specifically invited Iowa Power's written acceptance of the 1976 proposed letter of understanding.

54. At all times material, BN personnel believed that under the Interstate Commerce Act rate agreements were not legally enforceable.

55. Notwithstanding the preceding finding, it was the mutual intention of BN and Iowa Power to reach an agreement concerning the tariff rate that BN would apply for and future increases in the tariff rate, and it was their mutual intention that the agreement would be complied with. BN's intention did not change until

nearly two years later; Iowa Power's intention has never changed.

56. Iowa Power continuously prepared for the coal movement and in good [*26] faith believed, until notified to the contrary shortly before the coal movement was to commence, that BN would publish a tariff in accordance with the agreement.

It is this court's finding and conclusion that the events after July 1973 culminated in BN and Iowa Power entering into a contract, the terms of which are set forth in the "proposed letter of understanding" of January 7, 1976, and the attached Exhibits A and B (the tariff and the escalation formula). n1

> n1 A factual aspect of this case that has troubled the court is the failure of Iowa Power to handle the agreement in the manner that it ordinarily handles important contracts. It was not signed by the president, executive vice president or senior vice president; it was not initiated by general counsel; it was not approved by the board of directors; it was not placed in Iowa Power's "central files" (the official depository for contracts); and it was not disclosed on Iowa Power's annual Form 10-K reports to the S.E.C. However, compliance by Iowa Power with its customary way of treating important contracts is not a legal requirement and I am persuaded by all of the evidence that Iowa Power indeed intended to contract with BN.

[*27]

BN contends that there was not mutual assent because it, and possibly Iowa Power, did not believe the agreement was lawful or legally enforceable. However, [HN5]a specific belief or intent that the agreement be legally binding is not a requisite of mutual assent. Restatement (Second) of Contracts § 21 (1979). Furthermore, BN's assent to the agreement and its intent to abide by the agreement is clearly evidenced by the fact that when BN attempted to publish a rate higher than that provided by the contract in late 1977, it did not claim that no binding agreement existed, but instead invoked the gross inequity clause of the agreement. In a review of an I.C.C. decision involving the rate dispute between BN and Iowa Power, the Eighth Circuit noted:

It is difficult to imagine why the parties took such pains to negotiate and agree upon terms if they could be unilaterally changed at any time. The railroad itself first attempted to rely upon the agreement it now seeks to repudiate when, in 1977, it stated that it would

publish a higher rate due to the existence of a gross inequity within the meaning of the parties agreement.

Iowa Power and Light Co. v. Burlington Northern, Inc., supra, [*28] 647 F.2d at 809.

Two cases heavily relied on by BN, Kansas Power & Light v. Burlington Northern R. Co., 544 F. Supp. 1336 (D. Kansas 1982), and Public Service Co. of Okla. v. Burlington Northern R.R., No. 82-C-622-B (N.D. Okla. 1983), are distinguishable. The facts in Kansas Power & Light are substantially different from those in this case, and the court found that neither party intended to enter into a contract and that neither party intended to be bound. The facts in Public Service Co. of Okla. are similar to those in this case, but the court found that neither party intended to form a contract. The Tenth Circuit district courts based their findings in great part on a legal perception that at the times material rate contracts between a carrier and a shipper were illegal per se and the parties knew that or were presumed to know it. The Eighth Circuit has not accepted the illegal per se argument and has specifically held that the agreement between Iowa and BN involved in this case "was not illegal per se." Iowa Power and Light Co. v. Burlington Northern, Inc., supra, 647 F.2d at 808.

BN contends that the agreement lacks consideration. [*29] [HN6]Consideration may take the form of either benefit to the promisor or detriment to the promisee. Doggett v. Heritage Concepts, Inc., 298 N.W.2d 310, 311 (Iowa 1980); Test v. Heaberlin, 254 Iowa 521, 118 N.W.2d 73, 74 (1962). "All contracts in writing * * * shall import a consideration." Iowa Code § 537A.2.The burden is on a party challenging a contract to establish that there is no consideration. United States v. Merchants Mutual Bonding Co., 220 F. Supp. 163, 188 (N.D. Iowa 1963). Consideration, in the form of benefit and detriment, is clearly present in this case. BN has benefited from Iowa Power's shipment of millions of tons of coal since the movement began. For its part, in reliance on BN's quoted rate, Iowa Power locked itself into a coal supply served solely by BN, and expended substantial amounts of money for cars and spur track, as the 1976 agreement itself contemplates. n2 Also, the terms of the agreement clearly involve an exchange of obligations and promises. For example, the agreement states that Iowa Power "shall provide the necessary cars" which "shall be maintained" according to certain standards; that shipments "will be handled by Burlington Northern" [*30] for approximately 20 years; that the proposed tariff "will be filed" by BN at the I.C.C. and that the escalation formula "will be used" by BN to escalate the rate. Such [HN7]exchange of obligations and

promises constitutes consideration. See Restatement (Second) of Contracts, §§ 71, 72 and 75 (1979).

> n2 This form of consideration may be supplied by the doctrine of promissory estoppel.

As to BN's contention that no contract was formed, we note without deciding that BN's 1973 rate offer was arguably made irrevocable by IPL's substantial reliance on it. Restatement (Second) of Contracts § 90 (Tent. Draft 1973): Henderson, Promissory Estoppel and Traditional Contract Doctrine, Yale L.J. 343 (1969). Iowa Power expended over $8 million for railcars and $1.3 million for spur track improvements after a rate agreement was struck. I & S 9199. supra, 364 ICC at 192.

Iowa Power and Light Co. v. Burlington Northern, Inc., 647 F.2d 796, 808 n.20 (8th Cir. 1981).

There is a contract between the parties. n3 But is its enforcement barred by the Iowa statute of frauds, and is it an enforceable "lawful" contract under federal law? Those questions must now [*31] be addressed.

> n3 Similar facts resulted in a finding of a contract in Kansas City Power & Light Co. v. Burlington Northern R.R., 534 F. Supp. 1318 (W.D. Mo. 1982). The contract was not enforced by the court because it did not comply with the Missouri statute of frauds. In affirming the decision, the court of appeals expressly found that "the series of letters between the parties did constitute a contract." Kansas City Power & Light Co. v. Burlington Northern R.R., No. 82-1378, slip op. at 2 (8th Cir. June 3, 1983).

DISCUSSION AND CONCLUSIONS OF LAW RE STATUTE OF FRAUDS

BN contends that enforcement of the agreement is precluded by [HN8]the Iowa Statute of Frauds, Iowa Code § 622.32, which provides in pertinent part: "[N]o evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent: * * * 4. Those that are not to be performed within one year from the making thereof." n4

> n4 [HN9]The Iowa Supreme Court has viewed the Iowa statute of frauds as simply a rule of evidence. Johnson v. Ward, 265 N.W.2d 746 (Iowa 1978). Iowa Power argues that because the Federal Rules of Evidence, not state rules of evidence, apply

in federal court, the Iowa statute of frauds is not to be applied by this court.This court assumes, without expressly decising the issue, that the statute of frauds is to be applied by the federal court, and the statute of frauds issue is resolved on the merits.

[*32]

The court finds no merit in BN's contention. The agreement (the 1976 "proposed letter of understanding" and the enclosed tariff and escalation formula) complies with the statute of frauds. The writings contain all the essential elements of the contract. The only aspect of the agreement requiring some discussion is the term of "approximately 20 years." (Emphasis supplied.) "Approximately" means "nearly correct or exact." Webster's New Collegiate Dictionary, at 56 (1979). Item No. 148 in the tariff, which is part of the agreement, provides:

Each period of time for determining the minimum annual tonnage requirements of Item 200, except the first period, shall consist of 12 consecutive months. The first period shall commence with the date specified by consignee in written notification to Burlington Northern Inc. but not before the effective date of the rate, as required in Paragraph (b) of Item 150 and shall end with December 31, 1979. Each period thereafter shall commence with January 1 of each year and shall end with December 31 of the same year.

At the time the agreement was entered into the parties did not know the exact date that the first period would commence, so [*33] they were not able to identify exactly the term of the contract. But by construing "approximately 20 years" together with Item 148, it becomes clear that the term of "approximately 20 years" is one that will end on the December 31st closest to the 20th anniversary date that the first period commenced. It could be no shorter than 19 1/2 years and no longer than 20 1/2 years.

The situation is clearly different from that in Kansas City Power & Light Co. v. Burlington Northern R.R., 534 F. Supp. 1318 (W.D. Mo. 1982), aff'd, No. 82-1378 (8th Cir. June 3, 1983), in which the court concluded that the term "foreseeable future" did not adequately specify the duration of the contract. Id. at 1323. (In Kansas City Power the court found that the writings of the parties did "contain all the essential elements of the contract" except for the period of duration. Id.)

The "approximately 20 years" duration is sufficiently definite to withstand BN's statute of frauds defense.

Page 10

DISCUSSION AND CONCLUSIONS OF LAW RE: LAWFULNESS OF CONTRACT

BN contends that the agreement is not a "lawful" and enforceable contract under federal law.

Charges for rail [*34] transportation of commodities have historically been governed exclusively by tariffs approved by the Interstate Commerce Commission. Recently, however, deregulation changes have occurred that modify the law. The background and the changes that have come to pass are thoroughly recited in Burlington Northern R. Co. v. I.C.C., supra, 679 F.2d at 935-37.

[HN10]Until 1976, the ICC was empowered by Congress to superintend all rates charged by railroads. The Interstate Commerce Act, as it existed prior to 1976, required all rates to meet a "just and reasonable" standard, and it authorized the Commission to determine what constituted a "just and reasonable" rate in any given case. 49 U.S.C. §§ 1(5), 15(1) (1970). Reduction of the Commission's rate-making superintendence commenced with the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94-210, 90 Stat. 31 (4-R Act). In that legislation, Congress confined the ICC's maximum reasonable rate regulation to situations in which the railroad had "market dominance" over the traffic involved. 49 U.S.C. § 1(5)(b) (1976).

Id. at 935-36.

[HN11]The Staggers Rail Act of 1980, Pub. L. 96-448, 94 Stat. 1895 (Staggers Act), [*35] the pertinent portions of which are codified in 49 U.S.C. Ch. 107, §§ 10701, et seq., brought about more significant deregulation changes. It establishes a threshold formula for "market dominance," and in addition section 208(a)

establishes procedures by which a carrier and a shipper may enter into, and obtain ICC approval for service- and rate-setting contracts. 49 U.S.C.A. § 10713 (West Supp. 1981). The reasonableness of rates set in contracts authorized under Section 208(a) is not subject to ICC regulation and "[t]he exclusive remedy for any alleged breach of a contract entered into under [Section 208(a) is] an action in an appropriate State court or United States district court, unless the parties otherwise agree." Id. § 10713(i)(2). A "grandfather" clause preserves the status of pre-Staggers Act contracts:

The provisions of this section shall not affect the status of any lawful contract between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force

and effect as if it had been entered into in accordance with the provisions [*36] of this section. Nothing in this section shall affect the rights of the parties to challenge the existence of such a contract.

Id. § 10713(j).

Burlington Northern R. Co. v. I.C.C., supra, 679 F.2d at 936.

Prior to enactment of the Staggers Act, the legality of a rate agreement between shipper and carrier was less than crystal clear. See ICC Interpretive Statement -- Contract Rates, Nov. 5, 1980, Joint Appendix (J.A.) at 98, 102 ("legality of [pre-Act] agreements was subject to some question at the time they were entered into"). Commencing in November 1978, the Commission attempted to develop and describe a "contract rate policy." Initially, [HN12]the ICC announced that contract rates could be filed in tariff form and that it would approve such rates "following the closest scrutiny [on a case-by-case basis] to determine whether they are economically justified and not anticompetitive." Railroad Contract Rates; Policy Statement, Ex Parte No. 358-F, 43 Fed. Reg. 58,189 (1978) (Policy Statement I).

In a second policy statement, issued in February 1980, the ICC declared that where no contract rate was filed but a shipper alleged that a proposed rate violated [*37] a private agreement between shipper and carrier, the Commission would take the alleged agreement into account as a factor, among others, bearing upon the reasonableness of the rate. Change of Policy, Railroad Contract Rates, Ex Parte No. 358-F, 45 Fed. Reg. 21,719 (1980) (Policy Statement II). * * *

* * * Pre-November 9, 1978, agreements, the Commission said, would be considered case-by-case. No presumption of illegality would attend proposed rates in excess of the rate set by contracts of this vintage. However, the ICC elaborated that

[s]uch alleged contracts . . . will be given great weight [in determining whether a proposed rate increase is unreasonable] if the shipper demonstrates (1) that the parties intended to be legally bound by the agreement; (2) that the shipper reasonably relied on the contract to its substantial detriment (e.g., by making large capital investments that it would not otherwise have made); and (3) that public interest considerations warrant holding the carrier to the agreement.

Id. at 936-37.

As previously noted, [HN13]the United States Court of Appeals for the Eighth Circuit has held that a rate contract between a railroad [*38] and a shipper entered into before ICC Policy Statement Ex Parte No. 358-F was adopted in 1978, specifically the contract

Page 11

between Iowa Power and BN at issue in this case. is not illegal per se. Iowa Power and Light Co. v. Burlington Northern, Inc.. supra, 647 F.2d at 809.

BN contends that the "grandfather" clause of the Staggers Act preserves only contracts that were filed with the ICC after its Policy Statement Ex Parte 358-F was adopted in 1978: that only such contracts are "lawful contracts" that were "in effect" when the Staggers Act became law in 1980. The court has carefully examined the reasoning advanced by BN in support of its position. and is not persuaded by it. The court of appeals has specifically held that the contract in this case is not illegal per se, id., and this court has found and concluded that the contract was a lawful and enforceable agreement under Iowa contract law and has been in effect since its final formation in 1976. This court does not find a more limited meaning to the "lawful contract" and "in effect" language contained in the "grandfather" clause of the Staggers Act. The contrary results reached in Kansas Power & Light v. Burlington [*39] Northern R.R., supra, and Public Service Co. of Okla. v. Burlington Northern R.R., supra, rest on the perception of pre-1978 rate contracts as illegal per se, a perception not shared in this circuit.

This court concludes that the contract is a "lawful contract" and it was "in effect on the effective date of the Staggers Rail Act of 1980" within the meaning of the "grandfather" clause of the Staggers Act.

BREACH OF AGREEMENT

The court finds and concludes that BN has breached the contract it has with Iowa Power.

JUDGMENT

IT IS THE DECLARATORY JUDGMENT of the court that plaintiff Iowa Power and Light Company and defendant Burlington Northern Railroad Company have a valid and enforceable contract for the movement of coal for approximately twenty years, the terms of which are set forth in the January 7, 1976, "proposed letter of understanding" and the attached Exhibits A and B (the tariff and escalation formula).

IT IS THE FURTHER JUDGMENT of this court that defendant Burlington Northern Railroad Company be, and hereby is, permanently enjoined from continuing to breach the contract by doing any act or failing to do any act resulting in an applicable [*40] tariff rate different from that specified in the contract as escalated under the contract escalation formula.

IT IS THE FURTHER JUDMENT of the court that defendant Burlington Northern Railroad Company shall refund to plaintiff Iowa Power and Light Company all monies received by it from Iowa Power under tariffs for unit train coal transportation form Belle Ayr. Wyoming. to Council Bluffs Unit No. 3 in excess of the rates specified in the contract as escalated under the contract escalation formula. together with interest thereon as provided by law.

# E5

*Rageb v. DHL Worldwide Express*
No. 91 C 7334
1992 U.S. Dist. LEXIS 2822 (N.D. Ill. Mar. 12, 1992)

A. SAMI RAGEB, Plaintiff, v. DHL WORLDWIDE EXPRESS, Defendant.

91 C 7334

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

1992 U.S. Dist. LEXIS 2822

March 11, 1992, Decided
March 12, 1992, Docketed

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff customer filed an action against defendant shipper in the Circuit Court of Cook County (Illinois) alleging damages for the late shipment of a package to Egypt. The shipper filed a motion for partial summary judgment.

**OVERVIEW:** The customer retained the shipper to deliver a package of dental supplies to Egypt to be delivered by September 30, 1991, four days after the package was given to the shipper. The package did not arrive until October 12, 1991. The customer sought damages for monetary losses and expenses and for lost confidence. The shipper moved the case to the court on the grounds that it involved a federal question, arguing that this case was governed by the Warsaw Convention, 49 U.S.C.S. § 1502, since it involved a claim for damages resulting from the international carriage of goods by air between two signatory nations. The shipper sought partial summary judgment and a declaration that its liability was covered by the Warsaw Convention's limitations of liability provision. The court noted that although there was a material dispute as to the delay, such was irrelevant to the inquiry of a limitation of liability under the Warsaw Convention. The court granted the motion, holding that the customer's action fell within the ambit of the Warsaw Convention, and a cause of action for delay in international transportation was subject to the Warsaw Convention's liability limits of $ 9.07 per pound.

**OUTCOME:** The court granted the shipper's motion for partial summary judgment and declared the shipper's liability limited to $ 54.42.

**CORE TERMS:** package, shipment, arrive, summary judgment, transportation, partial, airbill, cause of action, delivery, pound, declare, weighed, picked, baggage, air, reverse side, disclaimer, consignee, promised, arrived

### LexisNexis(TM) Headnotes

*International Law > Dispute Resolution > Liability Determinations*

*Transportation Law > Air Transportation > Personal Injury & Property Damage*

[HN1]The Warsaw Convention applies to all international transportation of persons, baggage, or goods performed by aircraft for hire. Warsaw Convention, 49 U.S.C.S. § 1502, art. 1. Article 19 of the Warsaw Convention provides that the carrier shall be liable for damage occasioned by delay in the transportation by air of passengers, baggage, or goods. 49 U.S.C.S. § 1502, art. 19.

*International Law > Dispute Resolution > Liability Determinations*

*Transportation Law > Air Transportation > Personal Injury & Property Damage*

[HN2]A cause of action for delay in international transportation is subject to the Warsaw Convention's liability limits.

*International Law > Dispute Resolution > Liability Determinations*

*Transportation Law > Air Transportation > Personal Injury & Property Damage*

[HN3]Article 22(2) of the Warsaw Convention limits the amount of damages which can be recovered for goods to $ 9.07 per pound, unless the consignor made a special declaration of value before the package was shipped. 49 U.S.C.S. § 1502, art. 22(2). This liability limit applies to all damages, including consequential damages due to delay. Moreover, the provisions of the Warsaw Convention provide an exclusive remedy, preempting all other state and federal law claims.

**JUDGES:** [*1] Kocoras

**OPINIONBY:** CHARLES P. KOCORAS

**OPINION:** *MEMORANDUM OPINION*

CHARLES P. KOCORAS, District Judge:

This matter comes before the court on defendant's motion for partial summary judgment. For the reasons

set forth below, defendant's motion is granted, and we declare that defendant's liability in this action is limited to $ 54.42.

## BACKGROUND

Plaintiff A. Sami Rageb ("Rageb") originally filed this action against defendant DHL Worldwide Express ("DHL") in the Circuit Court of Cook County. In his complaint, Rageb alleges that he sent a package containing dental supplies to Cairo, Egypt via DHL on September 26, 1991. Rageb further alleges that although he was told the package would arrive in Egypt by September 30, 1991, the package did not arrive until October 12. Rageb seeks to recover damages from DHL in the amount of $ 10,000 for "the monetary loss [he] has sustained, for the lost confidence [he has] acquired and for the overseas phone calls and expenses [he] has suffered due to the deliberate deceiving, negligence, in a accuracy [sic] of DHL Worldwide Express."

DHL removed the case to this court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1441 on the grounds that it involves a federal question. [*2] DHL argues that this case is governed by the Warsaw Convention, 49 U.S.C. § 1502, since it involves a claim for damages resulting from the international carriage of goods by air between two signatory nations. DHL now moves for partial summary judgment and asks this court to rule that any liability it may have for delay in delivery of the goods is expressly covered by the Warsaw Convention's limitations of liability provision.

## DISCUSSION

As a preliminary matter, there remains a dispute between the parties regarding the exact date upon which the package was delivered to Cairo. DHL claims that the package arrived in Cairo on September 29, 1991--one day earlier than promised--and that it was picked up by the consignee on September 30. However, Rageb claims that the package did not arrive in Cairo until October 5, 1991, and was picked up by the consignee on October 8. A letter written by a DHL department supervisor in Cairo appears to confirm Rageb's version of the chronology. However, whether or not a delay occurred is irrelevant to our ultimate inquiry: whether the Warsaw Convention limits the amount which Rageb can recover from DHL.

DHL first argues that it is not liable for any [*3] delay because of the disclaimer on the reverse side of the airbill which states in perinent part:

While DHL will endeavor to exercise its best expeditious delivery in accordance with regular delivery schedules, DHL WILL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE FOR DELAY IN PICK-UP, TRANSPORTATION, OR DELIVERY OF ANY SHIPMENT, REGARDLESS OF THE CAUSE OF SUCH DELAY.

To support its argument that in light of the disclaimer, there can be no delay for which DHL can be held liable, DHL cites Jahanger v. Purolator Sky Courier, 615 F. Supp. 29 (E.D. Pa. 1985). In Jahanger, the court held that there was no delay for which liability could be imposed when defendant delivered a shipment to the Netherlands in five days, rather than the four days which plaintiff had been orally promised. In that case, the airbill contained a provision on the reverse side similiar to that employed by DHL. The court found that by allowing the defendant to proceed with the shipment, plaintiff had implicitly accepted the terms of the airbill, including the disclaimer of liability in the event of delay. 615 F. Supp. at 32. More importantly, however, the court went on to note [*4] that the shipment arrived only one day late, and that the delay was occassioned by severe fog en route. Id. Because the delay was "abnormal" and caused by factors outside of defendant's control, the court found that no liability could be imposed within the terms of the Warsaw Convention. 615 F. Supp. at 33.

In the instant case, Rageb claims that despite DHL's promise that the shipment would arrive in Cairo by September 30, it did not in fact arrive until October 5, and was not cleared through customs and picked up until October 8. DHL has offered no explanation for this delay. We therefore find this case distinguishable from the situation presented in Jahanger, and therefore proceed to address DHL's liability under the Warsaw Convention.

[HN1]The Warsaw Convention applies to all international transportation of persons, baggage, or goods performed by aircraft for hire. Warsaw Convention, 49 U.S.C. § 1502, art. 1. Article 19 of the Warsaw Convention provides that "the carrier shall be liable for damage occasioned by delay in the transportation by air of passengers, baggage, or goods." 49 U.S.C. § 1502, art. 19. Therefore, Rageb's cause of action falls within the ambit [*5] of the Warsaw Convention. See Harpalani v. Air India, Inc., 622 F. Supp. 69 (N.D. Ill. 1985).

Moreover, as we stated in Harpalani, [HN2]a cause of action for delay in international transportation is subject to the Warsaw Convention's liability limits. Harpalani, 622 F. Supp. at 72. [HN3]Article 22(2) of the Warsaw Convention limits the amount of damages which can be recovered for goods to $ 9.07 per pound, unless the consignor made a special declaration of value before the package was shipped. This liability

limit applies to all damages, including consequential damages due to delay. Harpalani, 622 F. Supp. at 72; Saiyed v. Transmediterranean Airways, 509 F. Supp. 1167, 1169 (W.D. Mich. 1981). Moreover, the provisions of the Warsaw Convention provide Rageb's exclusive remedy, preempting all other state and federal law claims. See Harpalani, 622 F. Supp. at 73; Kenner Products-General Mills, Inc., v. Flying Tiger Line, Inc., 1987 WL 11629 (N.D. Ill. 1987).

In the absence of a declared value, DHL states that since Rageb's package weighed six pounds, DHL's liability is limited to to $ 54.42. [*6] Rageb claims that his package weighed just over three pounds, thus entitling him to only $ 28.34. Because the airbill states that the package weighed six pounds at the time of shipment, the court will accept that figure as the correct weight. We therefore grant DHL's motion for partial summary judgment, and declare that its liability is limited to $ 54.42.

*CONCLUSION*

Because we find that plaintiff's cause of action is controlled exclusively by the provisions of the Warsaw Convention, we grant defendant's motion for partial summary judgment and declare that defendant's liability is limited to $ 54.42.

Charles P. Kocoras

United States District Judge

Dated: March 11, 1992

# E6

*Ratnaswamy v. Air Afrique,*
No. 95 C 7670
1998 U.S. Dist. LEXIS 2683 (N.D. Ill. Mar. 3, 1998)

John P. Ratnaswamy and, Victoria L. Zimmerman, Plaintiffs, v. Air Afrique, Defendant.

No. 95 C 7670

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

1998 U.S. Dist. LEXIS 2683

February 23, 1998, Decided
March 3, 1998, Docketed

**DISPOSITION:** [*1] Air Afrique's motion for partial summary judgment granted in part and denied in part. Counts I, II, III, IV and VI dismissed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant airline filed a motion for partial summary judgment seeking to limit to out-of-pocket expenses the damages recovered by plaintiff passengers in the passengers' action stemming for a delay in airline transportation. The passengers alleged breach of contract, promissory estoppel, fraudulent misrepresentation, negligence, violations of the Warsaw Convention, and failure to follow the procedures for oversale of a flight segment.

**OVERVIEW:** The airline brought a motion for partial summary judgment in which it sought to limit the amount of damages the passengers could recover in their action resulting from a delay in providing airline transportation. The court held that the passengers' action, in which the passengers sought compensation for damages allegedly arising out of the delay in leaving Africa, came within the purview of the Warsaw Convention. The court held that the passengers' state law claims, arising from a delay in international air transportation, were preempted by the Warsaw Convention art. 19. The court dismissed passengers' action based on ticket oversales, brought under 14 C.F.R. § 250, because the regulation governed only flights originating in the United States. The court held that the passengers were entitled to recover damages for injuries arising from emotional distress under the Warsaw Convention art. 19. The passengers alleged that their emotional distress was evidenced by physical manifestations directly attributable to the disturbing delay in returning to the United States. The court granted in part and denied in part the airline's motion for partial summary judgment.

**OUTCOME:** To the extent that the passengers' state law claims were preempted by the Warsaw Convention, the court granted in part and denied in part the airline's motion for partial summary judgment in the passengers' action seeking damages arising from a delay in providing international air transportation.

**CORE TERMS:** flight, reservations, convention, boarding, transportation, passenger, summary judgment, baggage, airline, emotional distress, air, confirmed, carrier, segment, manifestation, diarrhea, partial, nausea, willful misconduct, out-of-pocket, regulations, distress, oversales, airport, uniformity, bumping, state law, reconfirmation, reconfirmed, anxiety

## LexisNexis(TM) Headnotes

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN1]A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN2]In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the party opposing the motion and determine whether there are any genuine issues of material fact.

*International Law > Dispute Resolution > Liability Determinations*

*Transportation Law > Air Transportation > Personal Injury & Property Damage*

[HN3]The Warsaw Convention is an international treaty which governs the rights and responsibilities of passengers, shippers and carriers in certain aspects of international air transportation. It has a two-fold purpose of establishing world-wide uniformity with regard to liability rules and limiting air carriers' liability in the event of accident.

*International Law > Dispute Resolution > Liability Determinations*

[HN4]The Warsaw Convention art. 19 provides for liability on the part of the carrier for damages

occasioned by delay in the transportation by air of passengers, baggage, or goods. 49 U.S.C.S. § 40105.

### International Law > Dispute Resolution > Liability Determinations

[HN5]The Warsaw Convention art. 19 covers claims for incidental damages due to delay, but it does not cover claims for mere bumping.

### International Law > Dispute Resolution > Liability Determinations

[HN6]The Warsaw Convention art. 24(1) provides that in the cases covered by articles 18 and 19, any actions for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.

### International Law > Dispute Resolution > Liability Determinations

[HN7]The Warsaw Convention is the exclusive basis of recovery for injuries to which it applies. That is, where article 19 conditions are met any state law claim based on such injuries are preempted.

### Transportation Law > Air Transportation > Commercial Airline Regulation

[HN8]A passenger holding confirmed reservations who is denied boarding due to over booking may seek relief in court. 14 C.F.R. § 250.9.

### Transportation Law > Air Transportation > Commercial Airline Regulation

[HN9] 14 C.F.R. § 250.2 states: Applicability. 14 C.F.R. § 250 applies to every carrier, as defined by 14 C.F.R. § 250.1, with respect to flight segments with large aircraft in (1) interstate or overseas air transportation and (2) foreign air transportation originating at a point within the United States.

### Transportation Law > Air Transportation > Commercial Airline Regulation

[HN10]14 C.F.R. § 250 is only applicable to flight segments of foreign transportation originating at a point within the United States.

### Transportation Law > Air Transportation > Personal Injury & Property Damage

[HN11]The Warsaw Convention art. 17 sets forth conditions under which an international air carrier can be held liable for injuries for passengers, but does not allow recovery for mental or psychic injuries unaccompanied by physical injury or physical manifestations of injury.

### Transportation Law > Air Transportation > Personal Injury & Property Damage

[HN12]Warsaw Convention art. 17 plaintiffs may recover damages for emotional distress when that distress arises from the physical injuries that the plaintiff sustained.

### Transportation Law > Air Transportation > Personal Injury & Property Damage

[HN13]The Warsaw Convention art. 17 permits those passengers who suffer physical injury in an accident to recover for pre-impact terror.

**COUNSEL:** For JOHN P RATNASWAMY, plaintiff: Michael Andrew Ficaro, Hopkins & Sutter, P.C., Chicago, IL.

For VICTORIA L ZIMMERMAN, plaintiff: Michael Andrew Ficaro, William Jude McKenna, Hopkins & Sutter, P.C., Chicago, IL.

For AIR AFRIQUE, defendant: Michael J. Sehr, Robert John Marshall, Timothy W. Kelly, Haskell & Perrin, Chicago, IL.

**JUDGES:** GEORGE M. MAROVICH, UNITED STATES DISTRICT COURT.

**OPINIONBY:** GEORGE M. MAROVICH

**OPINION:** MEMORANDUM OPINION AND ORDER

Plaintiffs John P. Ratnaswamy ("Ratnaswamy") and Victoria L. Zimmerman ("Zimmerman") (collectively, "Plaintiffs") initially brought a seven-count action against Defendant Air Afrique ("Air Afrique") stemming from a delay in airline transportation from Dakar, Senegal to the United States. On September 3, 1996, this Court dismissed three of Plaintiffs' counts for lack of subject matter jurisdiction. Plaintiffs then filed a six-count Amended Complaint alleging four state law claims, violations of the Warsaw Convention and violations of regulations regarding the oversales of flight segments, 14 C.F.R. Part 250. [*2] Air Afrique has now filed the instant motion for partial summary judgment, seeking to limit the damages recoverable by Plaintiffs to the out-of-pocket expenses they incurred as a result of being denied boarding on their return flight to the United States. For the reasons set forth below, Air Afrique's motion is denied.

BACKGROUND

The following facts are taken from Plaintiffs' Amended Complaint and are accepted as true for the purposes of this motion. n1 In 1995, Plaintiffs purchased airline tickets for their honeymoon from Air Afrique through Town and Country, Inc. travel agency, located in Illinois. Air Afrique is an international air carrier that provides passenger service between New York and

Africa, among other places. Since Air Afrique does not offer connecting service between New York and Chicago, Plaintiffs made separate arrangements for connecting round-trip flights on American Airlines. Plaintiffs' travel itinerary with Air Afrique began on May 2, 1995 departing from New York City and arriving in Dakar, Senegal; Plaintiffs continued to travel throughout Africa aboard Air Afrique for most of the month of May and they were scheduled to leave Dakar, Senegal and return to [*3] New York City on May 20, 1995.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Air Afrique has indicated in its motion for partial summary judgment that "for the purposes of this motion, [it] accepts as true the allegations contained in Plaintiffs' Amended Complaint." (Def. Summ. J. Mem. at 1.) Yet, for some reason, Air Afrique has also filed a Rule 12(M) Statement, to which Plaintiffs have responded by filing a Rule 12(N) Statement. This Court has reviewed the parties' respective Rule (M) and (N) Statements and finds that none of the disputed facts are relevant for the purpose of resolving Air Afrique's motion for partial summary judgment on damages. Accordingly, the Court will proceed as Air Afrique originally suggested and presume that the facts alleged in Plaintiffs' Amended Complaint are true for purposes of this motion.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

Air Afrique informed Plaintiffs that its sole requirement for reconfirmation was that any reservations needed to be reconfirmed at least three days (72 hours) in advance. n2 Plaintiffs confirmed and reconfirmed their reservations [*4] while they were still in Illinois and repeatedly reconfirmed their reservations throughout their travel in Africa. Each time, Air Afrique indicated that their reservations were confirmed and that nothing further was needed regarding the reconfirmation of their reservations. On May 15, 1995, while in the airport at Johannesburg, Plaintiffs once again confirmed their flight reservations. The Air Afrique representative told Ratnaswamy that Plaintiffs were confirmed on all of their remaining flights and that Plaintiffs did not have to do anything further.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The reconfirmation requirement has been the subject of much controversy and "supplemental" paper filing since the time Air Afrique filed its motion for partial summary judgment on damages. In its initial motion and related pleadings, Air Afrique sets forth only one requirement for reconfirmation--that reservations must be confirmed at least three days in advance. (Def. Summ. J. Mem. at 8-9; Def. Rule 12(M), P 6.) However, in subsequent papers, Air Afrique refers to an additional requirement for reconfirming flight reservations. (Def. Resp. to Pls. Rule 12(N)(3)(B), PP 5, 6, 8.) Specifically, Air Afrique asserts that for each instance in which Plaintiffs were staying in a location more than 72 hours, they were required to reconfirm their reservations 72 hours before their next flight. Air Afrique has attached two affidavits to its reply brief in support of this requirement (Def. Reply, Exs. A, B), and has also filed a supplemental reply brief (with an attached exhibit) on the issue. Plaintiffs have responded to these additional filings by moving to strike Air Afrique's "Response to Plaintiffs' Local Rule 12(N)(b)(3)," reply brief and supporting affidavits.

Unfortunately, all of the flurry of paper on this issue has been for nothing. The focus of this motion is whether or not Plaintiffs can recover damages in this action beyond those out-of pocket expenses they incurred after they were denied boarding on their return flight to New York, assuming, as Air Afrique has proposed, that the allegations contained in Plaintiffs' Amended Complaint are true. The factual dispute regarding whether Plaintiffs timely reconfirmed their reservations is not now before this Court.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*5]

On the night of May 19, 1995, Plaintiffs arrived at the airport in Dakar, Senegal for their 2:30 a.m., May 20, return flight to New York City. When they attempted to get boarding passes for this flight, Air Afrique officials refused to issue them, claiming that Plaintiffs did not have confirmed reservations for the flight.

After waiting in several lines and speaking with several Air Afrique representatives, one of the Air Afrique representatives assured Plaintiffs that they would be placed on a waiting list for the flight.

As the night progressed, Air Afrique began issuing boarding passes to some people on the supposed waiting list and to some people who had just shown up without reservations. Eventually, Plaintiffs were issued boarding passes and asked to check in their baggage. After Plaintiffs reached the boarding area, an Air Afrique representative and an armed man forced the Plaintiffs and another couple--two American missionaries--to leave the boarding area. The Air Afrique representative took Plaintiffs' boarding passes and informed them that their tickets had been canceled, claiming that the they were being prevented from boarding the flight because a check of their passports **[*6]** had raised questions of identity and/or security. Since there were four seats now available on the flight to New York City, Air Afrique permitted four male Japanese travelers, who had no reservations, to board the otherwise full flight.

The flight left without Plaintiffs, but not without Plaintiffs' baggage which contained among other things, all of their clothes and Zimmerman's malaria pills. Plaintiffs, who felt well until these events, suffered increased anxiety and distress with physical symptoms including but not limited to nausea and diarrhea. Zimmerman, who needed to use the rest room due to her diarrhea, was directed by an Air Afrique employee to use a specific rest room in a nearby, unsafe area of the then deserted airport. While she was in the rest room, a man who appeared to be an airport employee grabbed the back of Zimmerman's neck and tried to pull her toward him. Although she escaped without serious physical harm, she was badly frightened and upset by the attack, and it worsened her anxiety, distress, nausea, and diarrhea.

After a long wait, an Air Afrique manager returned the unused tickets to the Plaintiffs, admitting that both couples had confirmed reservations **[*7]** for the flight. However, he was unwilling to put them on a substitute flight on another airline, indicating that they could only take Air Afrique's next flight to New York, which was not scheduled to depart for another three days. The manager did not issue guaranteed seats or boarding passes for the later flight because the flight was scheduled to depart in just under three days and it was too late for Plaintiffs to reconfirm their reservations.

Plaintiffs and the two missionaries, who had never met before that day, were forced to spend the night sharing a single, dirty hotel room with almost no toilet paper, no working telephone, and beds for only two people. Due to Zimmerman's physical condition, the uncertainty about getting onto the next Air Afrique flight, their misplaced baggage, and Ratnaswamy's need to return to work, Plaintiffs were forced to book an earlier more expensive flight on Air France to return to the United States.

Plaintiffs were also forced to pay for and spend another night in an inadequate, dirty hotel in New York City because flight delays caused them to miss their connecting flight to Chicago. Upon their arrival in New York City, Plaintiffs were unable to **[*8]** locate their baggage. Although their baggage was returned two days later, the locks were broken because the baggage was sent to New York ahead of them and was presumably opened for security reasons.

Plaintiffs' anxiety, distress, nausea, and diarrhea continued even after their arrival in Chicago. Zimmerman required diagnostic procedures at a hospital in Chicago and prescription drugs for symptoms including but not limited to a serious fever, nausea, diarrhea, and cramps.

Plaintiffs' Amended Complaint alleges: (1) breach of contract; (2) promissory estoppel; (3) fraudulent or, alternatively, negligent misrepresentation; (4) negligence; (5) violations of the Warsaw Convention; and (6) failure to follow the procedures provided in 14 C.F.R. for oversales of a flight segment. Plaintiffs seek recovery of their out-of-pocket expenses associated with the denied boarding and damages for emotional distress. Specifically, Plaintiffs request a total of $ 43,460.32 in compensatory damages consisting of: (a) $ 3,460.32 in favor of both Plaintiffs; (b) $ 30,000.00 in favor of Zimmerman individually; and (c) $ 10,000 in favor of Ratnaswamy individually.

Air Afrique's motion for partial summary **[*9]** judgment seeks to limit Plaintiffs' damages to the out-of-pocket expenses which they incurred as a result of being denied boarding for the May 20, 1995 flight from Dakar. Air Afrique argues that Plaintiffs' entire action is controlled by the Warsaw Convention and emotional distress damages are not recoverable or, alternatively, that of those counts over which this Court has jurisdiction, Plaintiffs' damages are limited to their out-of-pocket expenditures.

DISCUSSION

I. Summary Judgment Standards

[HN1]A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). [HN2]In deciding a motion for summary judgment, the court must view the evidence in the light most

favorable to the party opposing the motion and determine whether there are any genuine issues of material fact. Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir. 1990). For the purposes of this particular motion, there are no genuine issues of material facts. The question is whether, based on applicable law, Plaintiffs are limited in their recovery to their out-of-pocket expenses. **[*10]** (Def. Summ. J. Mem. at 2.)

## II. Applicability of the Warsaw Convention

Air Afrique asserts that Plaintiffs' claim arises out of a delay in transportation and as such is governed exclusively by the provisions of the Warsaw Convention. [HN3]The Warsaw Convention n3 is an international treaty which governs the rights and responsibilities of passengers, shippers and carriers in certain aspects of international air transportation. It has a two-fold purpose of establishing world-wide uniformity with regard to liability rules and limiting air carriers' liability in the event of accident. Hill v. United Airlines, 550 F. Supp. 1048, 1051 (D. Kan. 1982). The United States has been an adherent to the treaty since 1934. Wolgel v. Mexicana Airlines, 821 F.2d 442, 444 (7th Cir. 1987).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 The Convention for the Unification of Certain Rules Relating to International Transportation by Air, 49 U.S.C. § 40105 (adherence of United States proclaimed October 29, 1934).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[HN4]Article 19 of the Warsaw Convention provides for **[*11]** liability on the part of the carrier "for damage[s] occasioned by delay in the transportation by air of passengers, baggage, or goods." 49 U.S.C. § 40105. The Seventh Circuit has held that [HN5]Article 19 of the Warsaw Convention covers claims for "incidental damages due to . . . delay," but it does not cover claims for mere bumping. Wolgel, 821 F.2d at 444; n4 see also Sassouni v. Olympic Airways, 769 F. Supp. 537, 540 (S.D.N.Y. 1991)(holding that damages stemming from the delay in transportation, rather than from actual bumping, fall within the scope of Article 19).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Although the Seventh Circuit has not addressed these issues since 1987 when Wolgel was decided, contrary to Air

Afrique's suggestions, Wolgel is still good law.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In Wolgel, the plaintiffs filed a claim for discriminatory "bumping" pursuant to section 404(b) of the Federal Aviation Act of 1958, 49 U.S.C. § 1374(b); the district court held that the plaintiffs' claim was time barred by the two-year limitation period of the Warsaw **[*12]** Convention. On appeal, the Seventh Circuit held that the plaintiffs' claims for discriminatory bumping were not covered by the Warsaw Convention. The appellate court reasoned:This case is one of nonperformance of a contract. The Wogels are not attempting to recover for injuries caused by their delay in getting to Acapulco. Rather, their complaint is based on the fact that, as far as the record shows, they never left the airport. Because the Wogels' claim is for total nonperformance of a contract, the Warsaw Convention is inapplicable.

821 F.2d at 445. The Wolgel court concluded that the drafters of the Warsaw Convention did not intend the word "delay" in Article 19 to extend to claims, such as the Wogels', that arise from total nonperformance of a contract. 821 F.2d at 444. However, the court noted that Article 19 does apply to a passenger's claim for incidental damages--such as the cost of renting a van--arising out of the delay itself. 821 F.2d at 445; see Mahaney v. Air France, 474 F. Supp. 532, 534 (S.D.N.Y. 1979).

In this case, Plaintiffs are not attempting to recover for total nonperformance of their contract with Air Afrique. Indeed, Plaintiffs had already **[*13]** traveled with Air Afrique six times prior to the delay of their return flight from Dakar. Rather, Plaintiffs are seeking compensation for damages they allegedly sustained as a result of their delay in leaving Africa. Specifically, Plaintiffs are seeking, among other things, incidental damages due to delay, such as the costs of alternate airline tickets, hotel accommodations, phone calls, and damage to their baggage. It is clear from Wogel that, assuming Plaintiffs have sufficient facts to prove these allegations, Plaintiffs' claim "comes within the purview of the Convention" and the Convention would provide the appropriate remedy. See Duff v. Trans World Airlines, Inc., 173 Ill. App. 3d 266, 271, 527 N.E.2d 498, 501, 123 Ill. Dec. 35 (1st Dist. 1988). n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

N5 Plaintiffs argue that because Air Afrique has engaged in willful misconduct,

Article 25(1) of the Warsaw Convention bars Air Afrique from invoking the protections of the Warsaw Convention. (Pls. Response at 6.) Article 25(1) provides that "the carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit liability if the damage is caused by his willful misconduct." However, even assuming willful misconduct on the part of Air Afrique, the Warsaw Convention would still govern; the provisions of the Convention that "exclude or limit liability" would just be deemed waived. In other words, Article 25(1) merely provides that if the carrier causes harm by its willful misconduct, it is not entitled to the $ 75,000 limitation of liability set forth in the Convention. Pasinato v. American Airlines, Inc., 1994 U.S. Dist. LEXIS 5676, 1994 WL 171522, at *2 (N.D. Ill. May 2, 1994); Harpalani v. Air India, Inc., 634 F. Supp. 797, 799 (N.D. Ill. 1986)(a finding of wilful misconduct produces "an exception to the Convention's limitations on the recovery of compensatory damages, not an authority for a form of damages not permitted elsewhere in the Convention.")

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*14]

III. Preemption of State Law Claims

Air Afrique next argues that if Article 19 governs Plaintiffs' claims for damages resulting from their delay in air transportation, the Warsaw Convention provides Plaintiffs' exclusive remedy. In support of its position, Air Afrique cites to Article 24(1) of the Convention which provides in relevant part: "[HN6]in the cases covered by articles 18 and 19, any actions for damages, however founded, can only be brought subject to the conditions and limits set out in this convention."

A primary function of the Warsaw Convention is to foster uniformity in the laws governing international air travel. Zicherman v. Korean Air Lines, Inc. Co., 516 U.S. 217, 133 L. Ed. 2d 596, 116 S. Ct. 629 (1996). To that end, [HN7]the Warsaw Convention has been found to be the exclusive basis of recovery for injuries to which it applies. That is, where Article 19 conditions are met, as here, any state law claim based on such injuries are preempted. n6 See, e.g., Tseng v.

El Al Israel Airlines, Ltd., 122 F.3d 99, 104 (2d Cir. 1997); Potter, 98 F.3d 881, 884 (5th Cir. 1996); In re Air Disaster at Lockerbie, Scotland, 928 F.2d 1267, 1273 (2d Cir. 1991); [*15] Fischer v. Northwest Airlines, Inc., 1990 U.S. Dist. LEXIS 12209, 1990 WL 139271, at *2 (N.D. Ill. Sept. 14, 1990)("the Convention preempts state law causes of action when the Convention is applicable.").

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n6 In fact, several courts have excluded state law claims even where the events giving rise to the injuries are found to lie outside the Warsaw Convention. See, e.g., Potter v. Delta Air Lines, Inc., 98 F.3d 881, 885 (5th Cir. 1996)("The Convention's goals of uniformity and certainty would be frustrated were [the court] to allow [the plaintiff] to assert her state law claim, even where the Convention does not provide her a remedy.")

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Accordingly, since the Court concludes that Plaintiffs' claim which arises out a delay in international air transportation is governed by Article 19 of the Warsaw Convention, Plaintiffs' state law claims--Counts I-IV-- are preempted. See Boehringer-Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc., 737 F.2d 456, 459 (5th Cir. 1984).

IV. Oversales--14 C.R.R. Part 250

In Count [*16] VI, Plaintiffs allege that "Air Afrique's willful misconduct toward Plaintiffs and their baggage violated . . . 14 C.F.R. Part 250." (Am. Compl., P 45.) Title 14 of the Code of Federal Regulations implements the Federal Aviation Act of 1958, including the airline deregulation provision contained therein. 14 C.F.R.§ 250.1 et seq. Part 250 of that title sets forth regulations pertaining to airline oversales or overbooking of flight segments; these regulations include a provision which expressly contemplates that [HN8]a passenger holding confirmed reservations who is denied boarding due to over booking may seek relief in court. 14 C.F.R. § 250.9. However, as Air Afrique points out, the regulations do not apply to flight segments by foreign carriers originating outside the United States. [HN9]Section 250.2 states:Applicability. [Part 250] applies to every carrier, as defined by § 250.1, with respect to flight segments with large aircraft in (1) interstate or overseas air

transportation and (2) foreign air transportation originating at a point within the United States."14 C.F.R. § 250.2 (emphasis added).

Thus, pursuant to the plain language of the regulations, [HN10] [*17] Part 250 is only applicable to "flight segments [of] . . . foreign transportation originating at a point within the United States." Id. In this case, the flight segment for which Plaintiffs claim oversales is the May 20, 1995 Dakar-New York leg of their transportation. As that flight segment originated in Dakar, not in the United States, Part 250 is inapplicable here. Accordingly, Count VI is also dismissed. n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n7 Plaintiffs assert in their response brief that Air Afrique unreasonably discriminated against them in violation of 49 U.S.C. § 41310(a) by refusing boarding to them so that it could provided seats to four passengers who did not have reservations. (Pls. Resp. at 8.) For its part, Air Afrique contends that 49 U.S.C. § 41310(a) serves only as a Secretary of Transportation oversight device and creates no private cause of action for an individual. (Def. Summ. J. Mem. at 7-8.) It is unnecessary, however, for the Court to resolve this issue as Plaintiffs have not made such a "discrimination" claim part of the present action; Plaintiffs have not included a "discrimination" claim as a formal count in their Amended Complaint, or otherwise sufficiently alleged such a claim.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*18]

V. Emotional Distress Damages Under the Warsaw Convention

Having concluded that the Warsaw Convention is Plaintiffs' sole remedy in this case, the Court now turns to the question of whether the Warsaw Convention allows for the recovery of damages for emotional distress. In support of its claim that Plaintiffs cannot recover purely psychological damages under Article 19 of the Warsaw Convention, Air Afrique cites to Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 551, 113 L. Ed. 2d 569, 111 S. Ct. 1489 (1991). In Eastern Airlines, the Supreme Court held that [HN11]Article

17 of the Warsaw Convention, which sets forth conditions under which an international air carrier can be held liable for injuries for passengers, does not allow recovery for mental or psychic injuries unaccompanied by "physical injury or physical manifestations of injury." Id. at 552; see also Barrett v. United Airlines, Inc., 1994 U.S. Dist. LEXIS 10904, 1994 WL 419637, at *3 (N.D. Ill. Aug. 5, 1994). However, the Supreme Court also made clear that it "expressed no view as to whether passengers can recover for mental injuries that are accompanied by physical injuries [or physical manifestation of injury]." 499 U.S. at [*19] 551 (emphasis added). Courts since Eastern Airlines have allowed [HN12]Article 17 plaintiffs to recover damages for emotional distress when that distress arose from the physical injuries that the plaintiff sustained. See, e.g., In re Aircrash Disaster Near Roselawn, Indiana on October 31, 1994, 954 F. Supp. 175, 176 (N.D. Ill. 1997)(concluding that [HN13]Article 17 of the Convention permits those passengers who suffered physical injury in the accident to recover for pre-impact terror); Wencelius v. Air France, Inc., No. SACV 95-389, 1996 WL 866124 (C.D. Cal. Feb. 29, 1996); Longo v. Air France, 1996 U.S. Dist. LEXIS 21947, 1996 WL 866124 (S.D.N.Y. July 25, 1996); Jack v. Trans World Airlines, Inc., 854 F. Supp. 654 (N.D. Cal. 1994).

In this case, Plaintiffs argue that the Warsaw Convention does not bar them from recovering damages for their non-pecuniary injuries, i.e., their emotional distress, because their injuries were not purely psychological. Specifically, Plaintiffs contend as a result of the delay in transportation, they experienced physical manifestations of injury--nausea and diarrhea requiring medical attention--and these physical manifestations which themselves constitute "bodily injuries" [*20] led to further anxiety and distress. (Pls. Resp. at 9; Am. Compl. at P 22.) If, in fact, Plaintiffs are able to demonstrate that they experienced physical injuries or physical manifestations of injuries which were caused by the delay itself--seemingly a very difficult task--they would be entitled under the Warsaw Convention to recover emotional distress damages. See Hunt v. TACA Int'l Airlines, Inc., 1997 U.S. Dist. LEXIS 18370, 1997 WL 738594, at *3 (E.D. La. Nov. 17, 1997)(genuine issues of material fact concerning whether plaintiff's claims for mental distress are related to any physical manifestations of injuries precluded summary judgment).

The Warsaw Convention was created, not only to establish uniformity and limited liability for the airline, but also to balance the interests of the passenger and the airline. See Tseng, 122 F.3d at 107. In the many decades that have passed since the Warsaw Convention

Page 7

was created, the airline industry has transformed into an established and secure industry. See id. As a result, "the balance has properly shifted away from protecting the carrier and toward protecting the passenger." Id. Here, Plaintiffs allege emotional distress and physical manifestations [*21] of injury such as nausea and diarrhea, resulting from the disturbing delay in their return to the United States. Assuming, as the Court has thus far, that Plaintiffs' allegations are true, this Court finds that Plaintiffs are entitled to recover damages for emotional distress accompanied by physical manifestations of injury under Article 19 of the Warsaw Convention.

CONCLUSION

For the foregoing reasons. Air Afrique's motion for partial summary judgment is granted in part and denied in part. As the Court has concluded that Plaintiffs' sole remedy lies under the Warsaw Convention, Counts I, II, III, IV and VI are dismissed.

ENTER:

GEORGE M. MAROVICH

UNITED STATES DISTRICT COURT

DATED: Feb. 23, 1998

# E7

*Sahar v. American Airlines,*
No. 93 C 3878
1993 U.S. Dist. LEXIS 17592 (N.D. Ill. Dec. 10, 1993)

NAJEEB D. SAHAR, Plaintiff, v. AMERICAN AIRLINES, Defendant.

Case No. 93 C 3878

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

1993 U.S. Dist. LEXIS 17592

December 6, 1993, Decided
December 10, 1993, Docketed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff shipper filed an action against defendant airline carrier alleging that his international shipment was stolen through the negligence of carrier employees. The carrier filed a motion for summary judgment.

**OVERVIEW:** The shipper contracted with the airline carrier to ship Lapis Lazuli stones from Pakistan to Chicago. The shipper signed for the shipment on October 1, 1990, but it the shipping container had been tampered with. The shipper filed a written claim alleging that the stones were stolen from the container, and the carrier denied any liability. The shipper filed an action in state court in May, 1993 for negligence resulting in the loss of his shipped goods, and the carrier had the action removed to federal court. The court granted the carrier's motion for summary judgment. The court held that the carrier was correct in claiming that the Warsaw Convention was applicable because the U.S. and Pakistan were both signatories to the Convention, and the contract made for the international shipment of goods by air was specifically covered by the Convention. Therefore, the Convention's two-year statute of limitations was applicable, and the shipper's filing date did not fall within the limitations period. There was no evidence that the carrier failed to turn over information necessary for the shipper to bring his suit in time, and thus there was no basis for an equitable estoppel claim.

**OUTCOME:** The court granted the carrier's motion for summary judgment in the shipper's action for loss of his shipped goods.

**CORE TERMS:** convention, air, shipment, stolen, summary judgment, transportation, carrier, lapis, theft, air waybill, shipped, treaty, limitations period, limitation period, time limitation, cause of action, removal, airline, misrepresentation, signatory, passengers, baggage, settlement, stones, genuine issue of material fact, statute of limitations, wilful misconduct, federal district, properly removed, nonmoving party

### LexisNexis(TM) Headnotes

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN1]Under Fed. R. Civ. P. 56, summary judgment is appropriate when the record shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. The moving party bears the initial burden of establishing the "absence of a genuine issue of material fact." The nonmoving party must then set forth specific facts through affidavits or other materials that demonstrate disputed material facts that must be resolved at trial. The court must examine all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action*

[HN2]Before a federal court addresses the merits of a claim, it must determine whether it has jurisdiction.

*Civil Procedure > Removal > Basis for Removal*

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Question Jurisdiction*

[HN3]Where a district court could have had original jurisdiction over a claim, removal to federal court is proper. 28 U.S.C.S. § 1441(a). Under § 1441(b), a defendant may remove a cause of action if it presents a federal question. 28 U.S.C.S. § 1441(b). Federal question jurisdiction is founded on a claim or right arising under the Constitution, treaties or laws of the United States. 28 U.S.C.S. § 1441(b).

*International Law > Dispute Resolution > Liability Determinations*

*Transportation Law > Air Transportation > Personal Injury & Property Damage*

[HN4]The Warsaw Convention is a treaty of the United States which defines the rights and duties of

Page 1

international air carriers in transporting passengers and personal property. A contract made for the shipment of goods internationally by air is specifically covered by the Convention in articles 1 (international shipment of goods) and 5-16 (air waybill provisions). 49 U.S.C.S. § 1502 note. Moreover, an airline carrier's liability for destruction or loss of goods is governed by articles 18 (carrier liable for goods during "the transportation by air"), and 24 (actions for damages covered under Article 18 are subject to the conditions and limits in the Convention).

*International Law > Dispute Resolution > Liability Determinations*

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Transportation Law > Air Transportation > Personal Injury & Property Damage*

[HN5]According to article 29 of the Warsaw Convention, the right to damages shall be extinguished if an action is not brought within two years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the transportation stopped. 49 U.S.C.S. § 1502 note. Moreover, article 24 states that in cases covered by articles 18 and 19, any action for damages can only be brought subject to the conditions and limits set out in this convention. 49 U.S.C.S. § 1502, art. 24(1).

*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*

[HN6]The doctrine of equitable estoppel is based upon the principle that no man may take advantage of his own wrong. A defendant is estopped from pleading the statute of limitations when he has made a misrepresentation of a material fact for the purpose of inducing a plaintiff to delay suit and when the plaintiff has actually and reasonably relied on the misrepresentation.

*International Law > Dispute Resolution > Liability Determinations*

*Transportation Law > Air Transportation > Personal Injury & Property Damage*

[HN7]Article 18 of the Warsaw Convention broadly states that the carrier shall be liable for damage sustained in the event of the destruction or loss of, or of damage to, any checked baggage or any goods, if the occurrence which caused the damage so sustained took place during the transportation by air. 49 U.S.C.S. § 1502, art. 18(1). In addition, article 18 also explains that "transportation by air" simply means the time during which the goods are in charge of the

carrier, whether in an airport or on board an aircraft. 49 U.S.C.S. § 1502, art. 18(2). There is no exclusion for losses resulting from theft.

*International Law > Dispute Resolution > Liability Determinations*

*Transportation Law > Air Transportation > Personal Injury & Property Damage*

[HN8]Article 25 of the Warsaw Convention merely states that a carrier may not assert the provisions of this convention which exclude or limit his liability, if the damages are caused by the carrier's wilful misconduct. 49 U.S.C.S. § 1502, art. 25(1). However, neither the exclusion nor the limitation of liability referred to in article 25 of the Warsaw Convention operates to render inapplicable the limitations provisions set forth in article 29 of the said Convention.

**JUDGES:** [*1] Williams

**OPINIONBY:** ANN CLAIRE WILLIAMS

**OPINION:** Plaintiff Najeeb Sahar ("Sahar") brought suit in the Circuit Court of Cook County, Illinois on May 21, 1993 against American Airlines ("American") alleging that property he shipped with American was stolen through negligence on the part of American's employees. Plaintiff requested damages in the amount of $ 6075 for the value of the stolen merchandise. On June 28, 1993, defendant removed the suit to federal district court pursuant to 28 U.S.C. § 1441, claiming that the complaint was a civil action arising under the Convention for Unification of Certain Rules Relating to International Transportation by Air, commonly known as the Warsaw Convention ("Convention" or "Warsaw Convention"). 49 U.S.C. § 1502. Defendant now moves for summary judgment alleging that the complaint is time barred because plaintiff did not bring suit within the Warsaw Convention's two-year time limitation. For the reasons explained below, defendant's motion for summary judgment is granted.

**Background**

Plaintiff contracted with defendant to ship 100 kilograms of Lapis Lazuli ("Lapis") from Pakistan n1 to O'Hare [*2] Airport, outside Chicago, Illinois under air waybill 35413011, dated September 18, 1990. Plaintiff received and signed for the shipment on October 1, 1990. However, it appeared that the shipping container had been tampered with, and Carl Lewis ("Lewis"), an American Airlines manager, stated that he would investigate the matter. On October 12, 1990, American received Sahar's written claim which alleged that twenty-seven pounds of the Lapis stones were stolen from the shipping container sometime after they cleared customs.

- - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n1 Although defendant's Notice of Removal states that plaintiff shipped goods from Afghanistan to O'Hare, the air waybill in question indicates that the point of origin was Peshawar, Pakistan. (Plaintiff's Response ("Response") at 11, Ex. 4; Defendant American Airlines' Motion for Summary Judgment ("Def. Motion") at 3 P 7). Apparently, the lapis stones were purchased in Afghanistan. (Response at 5-6; Def. Motion at 2 P 2).

- - - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

The parties corresponded [*3] several times regarding the missing goods. Sahar received a letter from American dated March 28, 1991, stating that it had reviewed the situation and that it denied any liability in the matter. n2 Subsequent letters dated June 12, 1991 and November 11, 1991, also disclaimed liability. On January 29, 1992, Sahar received a final letter from American reiterating the earlier denials of liability.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n2 American denied liability on the grounds that Sahar's written claim was not filed within the tariff time limit of 120-days. American's November 11, 1991 letter retracted this contention, but still denied that it had any liability in the matter. (Response at 10, 17, 20, Ex. 3, 10, 13).

- - - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

On May 21, 1993, Sahar filed suit in the Circuit Court of Cook County, Illinois alleging that employee negligence resulted in the loss of his goods and requesting damages in the amount of $ 6075. n3 Defendant removed the case to federal district court claiming that the suit arose under the Warsaw Convention, 49 U.S.C. § 1502. [*4] ( Notice of Removal at 1-2 P 2).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n3 The Response states that Sahar is actually requesting a total of $ 12,365 which includes $ 6290 in damages from the loss of Lapis and Tourmaline in a 1988

shipment, in addition to the $ 6075 from this claim.

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

American contends that Sahar's complaint is time barred, and moves for summary judgment. Plaintiff responds that the Warsaw Convention's time limitation is inapplicable here because American deliberately postponed settlement of the claim. Sahar also contends that the time limitation should not apply to loss of goods resulting from theft or misconduct. (Response at 3-5 PP 2, 3).

**Summary Judgment**

[HN1]Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the record shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Wolf v. City of Fitchburg, 870 F.2d 1327, 1329 (7th Cir. 1989). The moving party bears the initial burden of establishing [*5] the "absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The nonmoving party must then set forth specific facts through affidavits or other materials that demonstrate disputed material facts that must be resolved at trial. Id. at 324. The court must examine all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

**Discussion**

[HN2]Before a federal court addresses the merits of a claim, it must determine whether it has jurisdiction. Lingle v. Norge Div. of Magic Chef, Inc., 823 F.2d 1031 (7th Cir. 1987), rev'd on other grounds, 486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877 (1988). Since Sahar's second objection challenges the applicability of the Warsaw Convention to this case, the court will first examine whether plaintiff's claim was properly removed to federal court under this treaty. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n4 It should be noted that plaintiff has not filed any motion objecting to removal of this case to federal court.

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

[*6]

**I. Removal**

[HN3]Where a district court could have had original jurisdiction over a claim, removal to federal court is proper. 28 U.S.C. § 1441(a). Under § 1441(b), a defendant may remove a cause of action if it presents a federal question. See 28 U.S.C. § 1441(b); Lingle, 823 F.2d at 1038. Federal question jurisdiction is "founded on a claim or right arising under the Constitution, treaties or laws of the United States . . . ." 28 U.S.C. § 1441(b) (emphasis added). In the instant case, American removed this case on the grounds that it arises under the Warsaw Convention.

[HN4]The Warsaw Convention is a treaty of the United States "which defines the rights and duties of international air carriers in transporting passengers and personal property." Darras v. Trans World Airlines, Inc., 622 F. Supp. 215, 216 (N.D. Ill. 1985). The Convention is applicable here for the following reasons. First, the United States and Pakistan are both signatories to the Convention. n5 49 U.S.C. § 1502 [*7] note. See also Jamil v. Kuwait Airways Corp., 773 F. Supp. 482 (D.D.C. 1991); Stanford v. Kuwait Airways Corp., 648 F. Supp. 657 (S.D.N.Y. 1986). Also, a contract made for the shipment of goods internationally by air, such as the air waybill involved in this case, is specifically covered by the Convention in articles 1 (international shipment of goods) and 5-16 (air waybill provisions). 49 U.S.C. § 1502 note.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - 
- - - - - - 

n5 Original signatories to the Convention and countries that later ratify the Convention (or file declarations of adherence to it) are known as "High Contracting" parties. 49 U.S.C. § 1502, Arts. 38, 40; Atlantic Mut. Ins. Co. v. Northwest Airlines, Inc., 796 F. Supp. 1188, 1190 (E.D. Wis. 1992).

- - - - - - - - - - - - End Footnotes- - - - - - - - 
- - - - - - 

Moreover, an airline carrier's liability for destruction or loss of goods is governed by articles 18 (carrier liable for goods during "the transportation [*8] by air"), and 24 (actions for damages covered under Article 18 are subject to the conditions and limits in the Convention). Harpalani v. Air India, Inc., 622 F. Supp. 69 (N.D. Ill. 1985) (Article 24 of Warsaw Convention provides exclusive remedy for causes of action under Articles 18 and 19); Magnus Elecs., Inc. v. Royal Bank of Canada, 611 F. Supp. 436 (N.D. Ill. 1985) (Warsaw Convention governs liability for damage to goods internationally shipped by air); General Elec. Co. v. Northstar Int'l, Inc., No. 83 C 0838 slip op. (N.D. Ill.

Sept. 16, 1983) (cause of action brought by plaintiff against defendant airline who failed to deliver international shipment of goods in good condition held to arise under the Warsaw Convention). Since this is an action for damages relating to the international air shipment of goods between signatory countries, Sahar's claim "arises under" the Warsaw Convention and was properly removed to federal court. See Atlantic Mut. Ins. Co. v. Northwest Airlines, Inc., 796 F. Supp. 1188, 1190 (E.D. Wis. 1992) (denying remand of shipper's action against airlines for [*9] damages to goods which were transported pursuant to air waybill because the Warsaw Convention was applicable); Darras, 622 F. Supp. at 216 (noting that passenger's removed claim for damages sustained during hijacked international flight "arose" under the Warsaw Convention because it created the cause of action).

Having determined that the Warsaw Convention is applicable, the court will now address plaintiff's arguments that he should not be bound by the Convention's limitations period.

## II. Time Limitations Period under the Warsaw Convention

[HN5]According to Article 29 of the Warsaw Convention, "the right to damages shall be extinguished if an action is not brought within two years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the transportation stopped." 49 U.S.C. § 1502 note. Moreover, Article 24 states that in cases "covered by articles 18 and 19[.] any action for damages . . . can only be brought subject to the conditions and limits set out in this convention." 49 U.S.C. § 1502, [*10] Art. 24(1). Therefore, the present cause of action can only be maintained if it was brought within the two year limitation period in Article 29. See Magnus, 611 F. Supp. at 440; Data Gen. Corp. v. Air Express Int'l Co., 676 F. Supp. 538, 539 (S.D.N.Y. 1988).

In this case, the facts are clear. Sahar signed for and received the shipment of Lapis on October 1, 1990. (Response at 13, Ex. 6; Def. Motion, Ex. B). Although Sahar alleges that some of the Lapis stones were missing, the whole shipment "ought to have arrived" on October 1, 1990. Moreover, "transportation stopped" no later than October 1, 1990. Clearly, plaintiff's May 21, 1993 filing date did not fall within the Convention's two-year limitation period which, in this case, ended on October 1, 1992.

Sahar contends that his complaint is not barred because: (1) American purposefully refused to cooperate with Sahar in an effort to delay settlement,

and (2) the limitations period of the Convention should not apply because the goods are alleged to have been stolen. n6 (Response at 4-5 PP 2, 3). The court will address each of these defenses.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 Actually, plaintiff's brief does not expressly respond to defendant's claim that his complaint is barred by the Convention's limitations period. Rather, Sahar reiterates the underlying facts and cites general propositions of law that are not applicable here. However, the court recognizes that plaintiff is proceeding pro se, and has liberally construed his brief.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[*11]**

[HN6]"The doctrine of equitable estoppel is based upon the principle 'that no man may take advantage of his own wrong.'" Curry v. A.H. Robins Co., 775 F.2d 212, 218 (7th Cir. 1985) (quoting Glus v. Brooklyn E. Dist. Terminal, 359 U.S. 231, 232, 3 L. Ed. 2d 770, 79 S. Ct. 760 (1959)). A defendant is estopped from pleading the statute of limitations when he has "'made a misrepresentation of a material fact for the purpose of inducing a plaintiff to delay suit'" and when the plaintiff has actually and reasonably relied on the misrepresentation. Curry, 775 F.2d at 218-19 (quoting Ott v. Midland-Ross Corp., 600 F.2d 24, 31 (6th Cir. 1979)); Mull v. Arco Durethene Plastics, Inc., 784 F.2d 284, 292 (7th Cir. 1986).

In this case, plaintiff stated that American's "lack of cooperation" prevented him from getting information he needed in order to file a suit. ( Response at 5 P 3). According to plaintiff, this lack of cooperation included ignoring numerous phones call from Sahar and failure to send a requested form for over one year. Sahar also contends **[*12]** that American was "deliberately postponing the settlement of the problem." ( Response at 5 P 3). The record does not contain evidence that American failed to turn over information necessary for plaintiff to bring suit in time. n7 Nor, is there any support for plaintiff's contention that American misrepresented its intentions with regard to Sahar's claim. Sahar received letters from American on at least four separate occasions stating that American denied any liability in this matter. The court cannot construe these letters to be misrepresentations of American's intent to settle Sahar's claims, or attempts to prevent or delay Sahar

from filing suit. Therefore, there is no basis for an equitable estoppel claim. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n7 In his December 17, 1991 letter, Sahar threatened to "take this case to the courts." (See Response at 21, Ex. 14). After corresponding several times, American sent a final letter disclaiming liability on January 29, 1992. At that time, Sahar had approximately eight months to file a timely complaint.

n8 Furthermore, some courts have held that the two year limitations period is a condition precedent, rather than a statute of limitations. As such, it is not subject to tolling. See Eggink v. Trans World Airlines, Inc., No. 87 Civ. 3403 (SWK), 1990 U.S. Dist LEXIS 588 (S.D.N.Y. Jan 19, 1990); Data Gen., 676 F. Supp. at 540-41. See also Magnus, 611 F. Supp. at 443 (rejecting an Illinois fraudulent concealment defense based on the facts of the case and noting that the Convention limitation was most likely written as a complete bar to actions filed after two years).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[*13]**

Lastly, plaintiff claims that the Convention's limitation period should not apply because the loss of his goods was the result of a crime, namely thievery, or of misconduct on American's part. However, plaintiff cites no authority for his contention that the Convention is inapplicable to loss of goods due to theft. n9 The court rejects this argument since it has already determined that the Warsaw Convention is applicable.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 Although Sahar's legal references discuss the Warsaw Convention, they do not suggest that theft is not covered under the Convention. (See Response at 56-58, Ex. 24).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[HN7]Article 18 broadly states that "the carrier shall be liable for damage sustained in the event of the destruction or loss of, or of damage to, any checked baggage or any goods, if the occurrence which caused the damage so sustained took place during the transportation by air." 49 U.S.C. § 1502, Art. 18(1). In addition, Article 18 also explains that "transportation by air" simply means the time [*14] during which the goods are "in charge of the carrier, whether in an airport or on board an aircraft." 49 U.S.C. § 1502, Art. 18(2). There is no exclusion for losses resulting from theft. In this case, Sahar is plainly alleging that his goods were lost (due to theft or negligence) while they were in American's charge. Thus, this case appears to present a straightforward claim under Article 18 of the Convention. n10 Therefore, the Convention's limitation period would apply here. See 49 U.S.C. § 1502, Arts. 24(1), 29.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 Similar cases include: Chukwuma v. Groupe Air France, Inc., 767 F. Supp. 43 (S.D.N.Y. 1991) (pilfered checked baggage); Republic Nat'l Bank v. Eastern Airlines, Inc., 639 F. Supp. 1410 (S.D.N.Y. 1986) (missing-but-presumed-stolen checked baggage containing cash); Baker v. Lansdell Protective Agency, Inc., 590 F. Supp. 165 (S.D.N.Y. 1984) (jewelry stolen from passenger's purse as she proceeded through security check-point); Hexter v. Air France, 563 F. Supp. 932 (S.D.N.Y. 1982) (jewelry stolen from carry-on bag while plane was in flight); Wing Hang Bank, Ltd. v. Japan Airlines Co., 357 F. Supp. 94 (S.D.N.Y. 1973) (money stolen when shipped as a packaged good).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*15]

The same is true even if Sahar is alleging wilful misconduct by American under Article 25 of the Convention. [HN8]Article 25 merely states that a carrier may not assert "the provisions of this convention which exclude or limit his liability," if the damages are caused by the carrier's wilful misconduct. 49 U.S.C. § 1502, art. 25(1). However, "neither the exclusion nor the limitation of liability referred to in . . . Article 25 of the Warsaw Convention operates to render inapplicable the limitations provisions set forth in Article 29 of the said Convention." Bapes v. Trans World Airlines, Inc., 209 F. Supp. 380, 381 (N.D. Ill.

1962). In short, this court concludes that the Warsaw Convention, and its limitation period, applies to the theft of Sahar's goods. n11 Consequently, this complaint is properly dismissed because it is barred by the Warsaw Convention's two year limitation period.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 Plaintiff makes a fleeting, unsupported contention that "article 20 . . . of international air transportation treaty had been clearly violated." ( Response at 4 P 1). Article 20 states in pertinent part that "the carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures." 49 U.S.C. § 1502, Art. 20(1). Plaintiff's reliance on this provision is clearly misplaced because it is a defense for an air carrier who has allegedly violated the Convention.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*16]

## Conclusion

For the foregoing reasons, the court grants defendant's motion for summary judgment.

**ENTER:**

**Ann Claire Williams, Judge**

**United States District Court**

**Dated:** DEC - 6 1993

# E8

*V.R. Compoundng Corp. v. Occidental Chem. Corp.,*
No. 99 C 8087
2000 U.S. Dist. LEXIS 13624 (N.D. Ill. Sept. 13, 2000)

V.R. COMPOUNDING CORP., d/b/a OVERDALE CORP., Plaintiff, v. OCCIDENTAL CHEMICAL CORP. and BULKAMATIC TRANSPORT CO., Defendants.

99 C 8087

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2000 U.S. Dist. LEXIS 13624

September 13, 2000, Decided
September 15, 2000, Docketed

**DISPOSITION:** [*1] Plaintiff's motion to remand the case to state court denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs moved to remand to state court this action in which plaintiff sued defendants to recover damages resulting from environmental contamination allegedly caused by defendants.

**OVERVIEW:** Since 1995 and continuing to the present, plaintiff has purchased caustic soda beads from defendant chemical corporation. The terms of the sale required defendant chemical corporation to arrange for delivery of the caustic soda beads to plaintiff's chemical storage silo located at plaintiff's chemical processing plant. On various occasions, defendant transport company was hired by defendant chemical corporation to deliver caustic soda to the plaintiff. Defendant transport company employees unloaded the soda beads from the transport trailer into plaintiff's chemical storage silo. Plaintiff claimed that on several occasions defendant transport company personnel caused the release of caustic soda beads into the environment during the deliveries. Plaintiff sued defendants to recover damages resulting from environmental contamination allegedly caused by defendants. Plaintiffs moved to remand this action to state court. The court denied plaintiff's motion, reasoning that the Carmack Amendment was the exclusive remedy for a breach of a contract of carriage provided by a bill of lading. Thus, jurisdiction exclusively lies in federal court.

**OUTCOME:** Plaintiff's motion to remand the case to state court denied; the Carmack Amendment applied and jurisdiction was exclusively in federal court.

**CORE TERMS:** Carmack Amendment, carrier, beads, caustic soda, chemical, silo, delivery, deliver, duty, storage, transportation, delivery contract, damages resulting, state law, preempt, contract of carriage, transport, contamination, consignee, exclusive remedy, destination, misdelivery, contracted, shipment, lawsuit, failure to discharge, common law, transported, damaged, tank

### LexisNexis(TM) Headnotes

*Constitutional Law > Congressional Duties & Powers > Commerce Clause*

[HN1]U.S. Const. amend. I, § 8, empowers Congress to regulate interstate commerce.

*Transportation Law > Commercial Vehicles > Traffic Regulation*

[HN2]The Carmack Amendment to the Interstate Commerce Act provides that carriers who contract to deliver goods are liable to the party receiving the goods for damages arising from a breach of the contract of carriage. 49 U.S.C.S. § 14706(a). The Carmack Amendment describes liability of the carrier under this act as being for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier.

*Governments > Legislation > Interpretation*

*Transportation Law > Commercial Vehicles > Traffic Regulation*

[HN3]The Carmack Amendment to the Interstate Commerce Act should be interpreted as an act of Congress intending to supersede all state regulations and policies dealing with interstate commerce. In referring to the scope of the Carmack Amendment the United States Supreme Court stated that almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it.

*Constitutional Law > Supremacy Clause*

*Transportation Law > Interstate Commerce*

[HN4]The United States Court of Appeals for the Seventh Circuit has held that the Carmack Amendment to the Interstate Commerce Act preempts all state and

common law remedies resulting from negligent performance of an interstate transportation contract.

*Constitutional Law > Supremacy Clause*

*Transportation Law > Commercial Vehicles > Traffic Regulation*

[HN5]It is clear that the United States Supreme Court has interpreted the Carmack Amendment to the Interstate Commerce Act to preempt all state law remedies between a plaintiff consignee and defendant carrier.

*Constitutional Law > Supremacy Clause*

*Transportation Law > Commercial Vehicles > Traffic Regulation*

[HN6]Since the Carmack Amendment to the Interstate Commerce Act was intended to dominate completely the topic of carrier liability, federal law on this topic preempts all state or common law remedies.

*Transportation Law > Commercial Vehicles > Traffic Regulation*

[HN7]Courts have interpreted the scope of carrier liability covered by the Carmack Amendment to the Interstate Commerce Act to extend beyond claims for damages to the property being delivered. Despite the apparent statutory limitation to recovery of damage caused to the property itself transported, the United States Supreme Court from its earliest interpretation has consistently construed the Carmack Amendment as likewise imposing liability upon the carrier for all reasonably foreseeable consequential damages resulting from a breach of the contract of carriage.

*Transportation Law > Commercial Vehicles > Traffic Regulation*

[HN8]The language of the Carmack Amendment to the Interstate Commerce Act is comprehensive enough to cover all damages resulting from the failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination.

*Transportation Law > Commercial Vehicles > Traffic Regulation*

[HN9]Lower courts have also interpreted the Carmack Amendment to the Interstate Commerce Act to be applicable to cases that do not involve property damage during transport.

*Transportation Law > Commercial Vehicles > Traffic Regulation*

[HN10]The Carmack Amendment to the Interstate Commerce Act applies to all foreseeable damages resulting from a breach of a transportation contract. Thus the more precise common thread between the

cases in which the courts applied the Carmack Amendment is that there was a breach of a carrier's duty under a transportation contract that resulted in damages to the plaintiff. Therefore, of paramount importance in determining whether the Carmack Amendment applies is whether the damage resulted from the breach of a duty under a transportation contract. Of little importance is the particular type of breach that occurred.

*Transportation Law > Commercial Vehicles > Traffic Regulation*

[HN11]It is illogical to conclude that the Carmack Amendment to the Interstate Commerce Act only applies where the carrier delivers the incorrect product in breach of the delivery contract.

**COUNSEL:** For V.R. COMPOUNDING CORPORATION, plaintiff: Jerome Wiener, Brian M. Fornek, Schain, Firsel & Burney, Ltd., Chicago, IL.

For OCCIDENTAL CHEMICAL CORPORATION, BULKMATIC TRANSPORT COMPANY, defendants: Joseph A. Strubbe, Vedder, Price, Kaufman & Kammholz, Bruce Craig Spitzer, Christopher A. Kreid, Metge, Spitzer & Kreid, Chicago, IL.

**JUDGES:** HON. RONALD A. GUZMAN, United States Judge.

**OPINIONBY:** RONALD A. GUZMAN

**OPINION: MEMORANDUM OPINION AND ORDER**

V.R. Compounding Corp., doing business as Overdale Corp. ("Overdale"), has sued Occidental Chemical Corp. ("Occidental") and Bulkamatic Transport Co. ("Bulkamatic") to recover damages resulting from environmental contamination allegedly caused by defendants. Although Occidental originally filed this action in state court, Bulkamatic has removed the action to this Court. Overdale now moves to remand the case to state court. For the reasons provided in this Memorandum Opinion and Order, the Court denies Overdale's motion.

**Facts**

Since 1995 and continuing to the present, Overdale has purchased caustic soda beads from defendant Occidental Chemical Corporation. (Cmpl. [*2] P 6.) The terms of the sale require Occidental to arrange for delivery of the caustic soda beads to Overdale's chemical storage silo located at Overdale's chemical processing plant in Alsip, Illinois. (*Id.*)

On various occasions since 1995, Bulkamatic was hired by Occidental to deliver caustic soda to the Overdale using a specially designed transport trailer. (*Id.* PP 7-8.) Bulkamatic employees unloaded the soda beads from the transport trailer into the Overdale's chemical storage silo. *Id.* The beads were "blown" from the truck via a pressurized conveying system that resulted in a positive pressure in the silo. (*Id.*)

Overdale claims that on several occasions Bulkamatic personnel caused the release of caustic soda beads into the environment during the deliveries. (*Id.* P 9.) Overdale claims that while unloading the caustic soda beads, Bulkamatic personnel applied too much pressure to the chemical storage silo causing a safety relief valve to open relieving pressure inside the silo. (*Id.* P 10.) Overdale claims that the caustic soda beads that were being delivered discharged from the silo when the safety valve opened during the delivery. (*Id.*)

As a result of [*3] the alleged discharge of the caustic soda beads to the environment, the Illinois Environmental Protection Agency ("Illinois EPA") commenced an enforcement action against Overdale through the office of the Illinois Attorney General. (*Id.* P 12.) The Illinois EPA alleged that the discharge of caustic soda beads from Overdale's chemical storage silo resulted in contamination of the soil and groundwater underlying the silo. (*Id.* P 13.) Overdale has alleged total damages in excess of $ 200,000 as a result of the spillage of caustic soda beads from the chemical storage silo. (*Id.* P 14.)

On October 28, 1999, Overdale filed its Complaint in the Circuit Court of Cook County against Bulkamatic and Occidental. The Complaint included breach of contract and negligent hiring counts against Occidental, and negligence and trespass to land counts against Bulkamatic. (*Id.* PP 16-33.)

On December 13, 1999, Bulkamatic filed a Notice of Removal and stated that all the Overdale's claims are governed exclusively by the Carmack Amendment to the Interstate Commerce Act. (Defs.' Notice Removal P 4.) Occidental consented to the removal. (*Id.* Ex. 2.) On January 27, 2000, Overdale moved to [*4] remand this case to state court and claimed there is no basis for federal jurisdiction under the Carmack Amendment. (Pl.'s Mot. Remand P 3.)

**Discussion**

[HN1]Article One, Section 8 of the United States Constitution empowers Congress to regulate interstate commerce. Congress has acted on this grant of power by enacting [HN2]the Carmack Amendment to the Interstate Commerce Act, which provides that carriers who contract to deliver goods are liable to the party receiving the goods for damages arising from a breach of the contract of carriage. 49 U.S.C. § 14706(a). The Carmack Amendment describes liability of the carrier under this act as being "for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier . . . ." *Id.*

Bulkamatic is the carrier that Occidental hired to deliver the material to Overdale. Overdale alleges damages in excess of $ 200,000 that occurred as a result of the actions of Bulkamatic during the delivery of the caustic soda beads. Since Bulkamatic is a carrier contracted to deliver goods and Overdale was entitled to receive the goods, the correct parties are present [*5] in this action.

The remaining issues are whether the Carmack Amendment preempts all state law claims relating to the delivery of shipped goods and whether the damages sought by Overdale are of the type that fall within the scope of the Carmack Amendment. If both inquiries are answered in the affirmative, Overdale's state law claims are preempted and the case should be decided in federal court.

The Supreme Court has ruled that [HN3]the Carmack Amendment should be interpreted as an act of Congress intending to supersede all state regulations and policies dealing with interstate commerce. *Adams Express Co. v. E.H. Croninger, 226 U.S. 491, 505-06, 57 L. Ed. 314, 33 S. Ct. 148 (1913).* In *Croninger*, the Court in referring to the scope of the Carmack amendment stated: "Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it." *Id.* [HN4]The Seventh Circuit, relying on *Croninger*, has held that the Carmack Amendment preempts all state and common law remedies resulting from negligent performance of an interstate transportation [*6] contract. *Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1415 (7th Cir. 1987).*

Overdale argues that the preemption of state law claims by the Carmack Amendment might in some instances thwart uniformity and create potential for parallel federal and state litigation because the possibility exists that a lawsuit by an adjacent landowner could be pursued in state court relating to the delivery of the caustic soda beads. (Pl.'s Reply Mem. at 2.) However, the remote possibility of a parallel third party action between an adjacent landowner and a negligent carrier has no bearing on the Court's analysis of the applicability of the Carmack Amendment to the facts of this case. Moreover, [HN5]it is clear that the Supreme Court has interpreted the Carmack Amendment to preempt all state law remedies between a plaintiff consignee and defendant carrier. Since the case at bar is between the consignee

of the shipment at issue and the carrier contracted to deliver the shipment, the Carmack Amendment preempts all state law claims between the parties.

[HN6]Since the Carmack Amendment was intended to dominate completely the topic of carrier liability, federal law on this topic preempts all state [*7] or common law remedies. Therefore, if this lawsuit falls within the scope of the Carmack Amendment, the Court has exclusive jurisdiction over the resolution of the dispute.

[HN7]Courts have interpreted the scope of carrier liability covered by the Carmack Amendment to extend beyond claims for damages to the property being delivered. "Despite the apparent statutory limitation to recovery of damage caused to the property itself transported, the Supreme Court . . . from its earliest interpretation has consistently construed [the Carmack Amendment] as likewise imposing liability upon the carrier for all reasonably foreseeable consequential damages resulting from a breach of the contract of carriage . . . ." *Air Prods. & Chems., Inc. v. Illinois Central Railroad Co.*, 721 F.2d 483, 485-86 (5th Cir. 1983).

In *New York, Philadelphia, & Norfolk Railroad Company v. Peninsula Produce Exchange of Maryland*, 240 U.S. 34, 38, 60 L. Ed. 511, 36 S. Ct. 230 (1916), the Supreme Court addressed the question of whether the Carmack Amendment imposes liability for a delay of shipment without physical damage to the property being transported. The Court held that [HN8]the language [*8] of the Carmack Amendment is comprehensive enough to cover all damages resulting from the failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination. *Id.* at 38 ("The words 'any loss, damage, or injury to such property' . . . are comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination.") Similarly, in *Southeastern Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 29, 81 L. Ed. 20, 57 S. Ct. 73 (1936), the Supreme Court also stated that the Carmack Amendment applied to a suit for damages for the interruption of a plaintiff's business caused by the late delivery of a motion picture.

[HN9]Lower courts have also interpreted the Carmack Amendment to be applicable to cases that do not involve property damage during transport. In *Air Products & Chemicals, Inc. v. Illinois Central Gulf Railroad Co.*, the court stated that the Carmack Amendment provided the exclusive remedy for a breach of a carrier's duty to deliver the correct chemical to a plaintiff that was damaged by the

delivery of the [*9] wrong chemical. 721 F.2d at 485. Similarly, in *American Synthetic Rubber Corp. v. Louisville & Nashville Railroad Co.*, the court rejected plaintiff's argument that the Carmack Amendment was not applicable to a lawsuit for damages resulting from the delivery of a wrong chemical because there was no damage to the correct chemical that was later delivered. 422 F.2d 462, 464-65 (6th Cir. 1970). The *American Synthetic Rubber* court stated that the Carmack Amendment applies to any cause of action arising by virtue of a breach of an interstate contract of carriage. *Id.*

Overdale's argument in support of remand is an overly formalistic one. Overdale argues that because there have been primarily three types of breaches of a contract of carriage in cases in which courts have held that Carmack Amendment applies, this case must fit one of those types in order for the Carmack Amendment to apply. Overdale opines that the Carmack Amendment only applies where: (1) property was damaged during transport, (2) delivery was delayed, or (3) the wrong product was delivered. n1 (Pl.'s Reply Mem. at 2-3.) In making this categorization, Overdale overlooks the broad language [*10] espoused by the Supreme Court and relied on by circuit courts in *Croninger* which states that [HN10]the Carmack Amendment applies to all foreseeable damages resulting from a breach of a transportation contract. Thus the more precise common thread between the cases in which the courts applied the Carmack Amendment is that there was a breach of a carrier's duty under a transportation contract that resulted in damages to the plaintiff. Therefore, of paramount importance in determining whether the Carmack Amendment applies is whether the damage resulted from the breach of a duty under a transportation contract. Of little importance is the particular type of breach that occurred.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Of particular note is that Overdale omits the category in which the carrier loses the property, *i.e.*, the property never makes it to the proper destination. *See, e.g., Gordon v. United Van Lines, Inc.*, 130 F.3d 282 (7th Cir. 1997).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In *Air Products & Chemicals, Inc. v. Illinois Central Gulf Railroad Co.*, a consignee [*11] sued a carrier to recover costs of contamination of a large chemical storage tank when the carrier delivered the wrong

Page 4

YELLOW FREIGHT SYSTEM, INC., Plaintiff, v. ADAMS BRUSH MFG. CO., INC., Defendant.

CIVIL ACTION No. 97-2310-EEO

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

1997 U.S. Dist. LEXIS 13491

August 5, 1997, Decided
August 5, 1997, Filed; August 6, 1997, Entered on the Docket

**DISPOSITION:** [*1] Plaintiff's Motion to Find Defendant's Notice of Removal Improper and Remand Cause of Action to the District Court of Johnson County, Kansas (Doc. # 6) denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff carrier filed a motion for the remand of its suit to a Kansas state court after removal. The carrier, an Indiana corporation, brought suit against defendant manufacturer, a New York corporation, when it did not pay $ 147,708 in charges for transportation of its goods in interstate commerce. The manufacturer obtained removal claiming that federal laws were involved.

**OVERVIEW:** In its notice of removal, the manufacturer claimed federal subject matter jurisdiction pursuant to 28 U.S.C.S. § 1331, which conferred jurisdiction for cases arising under the constitution, laws, or treaties of the United States. The carrier's billings were subject to federal regulation. Denying the motion, the court ruled that removal was proper on that ground, adding that federal jurisdiction might also have been proper under 28 U.S.C.S. § 1332(a)(1), which provided for diversity jurisdiction over matters in controversy exceeding $ 75,000. Rejecting the carrier's argument that the court acquired no jurisdiction because the state court had none, the court pointed out that Congress abrogated the derivative jurisdiction doctrine in 1986, when it enacted 28 U.S.C.S. § 1441(e), which very explicitly provided: The court to which such civil action was removed was not precluded from hearing and determining any claim in such civil action because the state court from which such civil action was removed did not have jurisdiction over that claim.

**OUTCOME:** The court denied the carrier's motion to remand to state court the suit it brought against the manufacturer for unpaid transportation charges.

**CORE TERMS:** removal, federal law, derivative jurisdiction, federal question, civil action, cause of action, transportation, original jurisdiction, federal jurisdiction, carrier, subject matter jurisdiction, principal place of business, petitioner-defendant, diversity, citizens of different, matter in controversy, freight, tariff, reply

**LexisNexis(TM) Headnotes**

*Civil Procedure > Removal > Basis for Removal*

[HN1]A civil action is removable only if plaintiff could have brought the action in federal court originally. 28 U.S.C.S. § 1441(a). The court is required to remand an action to state court if at any time before final judgment it appears that the district court lacks subject matter jurisdiction. 28 U.S.C.S. § 1447(c). Defendant has the burden of demonstrating that the court has original jurisdiction. Because the courts of the United States are courts of limited jurisdiction, there is a presumption against federal jurisdiction. Accordingly, the court must strictly construe the federal removal statute. Any doubts concerning removability must be resolved in favor of remanding the case to state court. The court determines defendant's right of removal by examining the record and the status of the pleadings at the time defendant filed its petition for removal.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Question Jurisdiction*

[HN2]A case "arises under" federal law only when a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief depends on resolution of a substantial question of federal law.

*Transportation Law > Commercial Vehicles > Rates & Tariffs*

[HN3]The federal provisions of 49 U.S.C.S. § 13710 and 49 U.S.C.S. § 14704(b) concern the billing and collecting practices of motor carriers' rates in interstate transportation, and the rights and remedies of persons injured by carriers, respectively.

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Amount in Controversy*

Page 1

# E9

*Yellow Freight Sys., Inc. v. Adams Brush Mfg. Co.,*
No. 97-2310EEO
1997 U.S. Dist. LEXIS 13491 (D. Kan. Aug. 5, 1997)

chemical into the tank. 721 F.2d at 485. The court stated that because the misdelivery resulted from a breach in the carrier's duty to deliver to Air Products the right product into the holding tank, the Carmack Amendment provided the exclusive remedy. *Id.* at 485-87.

In this case, Bulkamatic was contracted to deliver the caustic soda beads into the Overdale's storage silo. Overdale alleges that defendants breached this contract by failing to deliver the caustic soda beads properly into the silo as promised. As a result of the alleged breach of the delivery contract, Overdale claims to have suffered damages in excess of $ 200,000.00 resulting from the clean up of the environmental contamination after an investigation by the Illinois EPA.

The only difference between the facts of this case and the facts in *Air Products* is that the damage in this case allegedly occurred as a result of the misdelivery of the correct chemical outside of the holding container instead of a misdelivery of the incorrect chemical into the holding container. [HN11] [*12] It is illogical to conclude that the Carmack Amendment only applies where the carrier delivers the incorrect product in breach of the delivery contract. Say, for example, if a carrier simply pumped hydrochloric acid onto the floor of a consignee's warehouse instead of into the proper tank, such would be a breach of the delivery contract and surely the Carmack Amendment would apply. That is the case at bar, except that Bulkamatic allegedly delivered the caustic soda beads outside of the silo instead of inside of it in breach of the delivery contract. Because this case arises from an alleged breach of the delivery contract, the Carmack Amendment applies and jurisdiction exclusively lies in federal court. The plaintiff's motion to remand the case to state court is therefore denied.

**Conclusion**

For the foregoing reasons, the Court denies plaintiff's motion to remand the case to state court. Because the Carmack Amendment is the exclusive remedy for a breach of a contract of carriage provided by a bill of lading, the case is properly before this Court.

**SO ORDERED.**

**ENTERED: 9/13/00**

**HON. RONALD A. GUZMAN**

**United States Judge**

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship*

[HN4]28 U.S.C.S. § 1332(a)(1) provides: The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and is between citizens of different states.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN5]Kan. Stat. Ann. § 60-308(b) is the Kansas long-arm statute. Its provisions apply in federal diversity cases, as well as in Kansas state court actions.

*Civil Procedure > Removal > Basis for Removal*

[HN6]Congress abrogates the derivative jurisdiction doctrine in 1986, when it enacts 28 U.S.C.S. § 1441(e), which very explicitly provides: The court to which such civil action is removed is not precluded from hearing and determining any claim in such civil action because the state court from which such civil action is removed did not have jurisdiction over that claim. The 1986 amendment by its terms permits removal in all cases where removal was previously barred by the derivative jurisdiction doctrine. The doctrine is inapplicable to all actions commenced in state courts after June 19, 1986. The law, as it stands today, allows a federal court to exercise jurisdiction on removal without regard to whether the state court from which the action was removed had jurisdiction over the dispute. 28 U.S.C.S. § 1441(e).

**COUNSEL:** For YELLOW FREIGHT SYSTEM, INC., plaintiff: Russell C. Purvis, William M. Gentry, Purvis & Gentry, L.L.C., Kansas City, MO.

For ADAMS BRUSH MFG. CO., INC., defendant: Daniel R. Lykins, Bryan, Lykins & Hejtmanek, P.A., Topeka, KS.

**JUDGES:** EARL E. O'CONNOR, United States District Judge.

**OPINIONBY:** EARL E. O'CONNOR

**OPINION:** MEMORANDUM AND ORDER

This matter is before the court on the following motion of plaintiff Yellow Freight System, Inc.: Motion to Find Defendant's Notice of Removal Improper and Remand Cause of Action to the District Court of Johnson County, Kansas (Doc. # 6). Defendant Adams Brush Manufacturing Co., Inc., has responded and opposes the motion. Plaintiff has filed a reply, and the motion is ready for ruling. For the reasons set forth below, plaintiff's motion is denied.

I. Standards for Remand.

[HN1]A civil action is removable only if plaintiff could have brought the action in federal court originally. 28 U.S.C. § 1441(a). The court is required to remand an action to state court "if at any time before final [*2] judgment it appears that the district court lacks subject matter jurisdiction . . . ." 28 U.S.C. § 1447(c). Defendant has the burden of demonstrating that the court has original jurisdiction. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 80 L. Ed. 1135, 56 S. Ct. 780 (1936). Because the courts of the United States are courts of limited jurisdiction, there is a presumption against federal jurisdiction. Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974). Accordingly, the court must strictly construe the federal removal statute. Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 814, 92 L. Ed. 2d 650, 106 S. Ct. 3229 (1986); Fajen v. Foundation Reserve Ins. Co., Inc., 683 F.2d 331, 333 (10th Cir. 1982); J.W. Petroleum, Inc. v. R.W. Lange, 787 F. Supp. 975, 977 (D. Kan. 1992). Any doubts concerning removability must be resolved in favor of remanding the case to state court. J.W. Petroleum, Inc., 787 F. Supp. at 977.

The court determines defendant's right of removal by examining the record and the status of the pleadings at the time defendant filed its petition for removal. Farm Bureau Mutual Ins. Co., Inc. v. Eighmy, [*3] 849 F. Supp. 40, 42 (D. Kan. 1994) (court must have jurisdiction both at the time the original action was filed in state court and at the time defendant sought removal); Ruiz v. Farmers Ins. Co., 757 F. Supp. 1196, 1197 (D. Kan. 1991).

II. Discussion.

In its Notice of Removal, defendant asserts that this court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which confers jurisdiction upon federal district courts for cases "arising under the Constitution, laws or treaties of the United States." [HN2]A case "arises under" federal law only when "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief depends on resolution of a substantial question of federal law." Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 27-28, 77 L. Ed. 2d 420, 103 S. Ct. 2841 (1983).

Plaintiff's petition filed in state court alleges, in pertinent part:That from 1991 to April 17, 1997, a contract or agreement, in or by which defendant tendered freight to plaintiff for transportation in interstate commerce, existed between plaintiff and

Page 2

defendant. Plaintiff accepted said freight [*4] and performed the transportation services subject to the common carrier tariff rates and rules provisions plaintiff had on file with the Interstate Commerce Commission ("ICC") and subsequently at its Overland Park, Kansas headquarters. Plaintiff also maintained intrastate tariffs at various state regulatory agencies.

. . . .

That defendant, despite plaintiff's demand for payment, has failed and refused to pay the outstanding balance of one hundred forty-seven thousand seven hundred eight and 89/100 dollars ($ 147,708.89), that defendant currently owes to plaintiff for the transportation services described herein.

Defendant contends that removal is appropriate because the allegations contained in the complaint invoke federal law, namely [HN3]49 U.S.C. § 13710 and 49 U.S.C. § 14704(b). These federal provisions concern the billing and collecting practices of motor carriers' rates in interstate transportation, and the rights and remedies of persons injured by carriers, respectively.

Plaintiff seeks to remand this action to state court on several grounds. First, plaintiff contends that the controversy does not involve a federal question. Second, plaintiff argues that even if [*5] the court were to find a federal question, the case should be remanded because "defendant, through its course of dealings with Yellow, has voluntarily submitted itself to the jurisdiction of the courts of the State of Kansas." Plaintiff's Brief, at 2. Third, plaintiff maintains that any claim of diversity jurisdiction would fail "for the same reason that the presence of federal question is irrelevant: Petitioner-defendant has submitted itself to the jurisdiction of the courts in the State of Kansas." Id. Fourth, plaintiff argues against removal on the basis that "it is well settled law that proper jurisdiction must exist in the state court before there can be any removal to the federal court. See, Minnesota v. United States, 305 U.S. 382, 59 S. Ct. 292, 83 L. Ed. 235 (1939)." Id. at 3.

The court finds no merit to any of plaintiff's arguments. Plaintiff's argument that the controversy does not involve a federal question consists of two sentences, wherein plaintiff asserts that "the matter is a simple civil dispute involving an unpaid account balance owed by petitioner-defendant to Yellow." Defendant responds that provisions of federal law are implicated by the cause of [*6] action alleged in plaintiff's complaint. Plaintiff, in its reply, does not dispute this contention. Thus, from the facts as presented to the court, it appears that removal is proper

on the ground that this court has original jurisdiction founded upon a claim or right arising under the laws of the United States. 28 U.S.C. § 1441(b).

Although not specifically relied upon by defendant as a basis for federal jurisdiction, it appears from the facts that federal jurisdiction may also be proper under [HN4]28 U.S.C. § 1332(a)(1), which provides:(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and is between--(1) citizens of different States.

Plaintiff's petition seeks damages for $ 147,708.89, a sum well in excess of the minimum $ 75,000 matter in controversy requirement. It also appears that diversity of the parties exists. Plaintiff's petition states that plaintiff is an Indiana corporation with its principal place of business in Kansas; defendant's Notice of Removal indicates that defendant is a New York corporation with its principal place [*7] of business in New York. Thus, pursuant to 28 U.S.C. § 1332(c), the two corporations are deemed to be citizens of different states for purposes of § 1332(a)(1) and 28 U.S.C. § 1441..

Plaintiff next claims that the case should be remanded because defendant, through its course of dealings with plaintiff, has voluntarily submitted itself to the jurisdiction of the courts of the state of Kansas "by virtue of notice provided in Exhibit A." Plaintiff's Brief, at 3. Exhibit A is a photocopy of an internal Yellow Freight rule, which states, in part: "Any person or their agent(s), utilizing or arranging for continuing transportation services of the carrier, may be made subject to the extension of jurisdiction to the courts in the State of Kansas, as authorized by and pursuant to K.S.A. (Kansas Statutes Annotated) 60-308(b)(11) 1990 Supp."

[HN5]K.S.A. § 60-308(b) is the Kansas long-arm statute. Its provisions apply in federal diversity cases, as well as in Kansas state court actions. Mark D. Hinderks & Steve A. Leben, "Long Arm Jurisdiction in Kansas," 62 J.K.B.A., no. 4, 26, 27 (1993). Thus, plaintiff's argument that Exhibit A militates that plaintiff has surrendered itself only to the Kansas [*8] state courts is unpersuasive. Moreover, to the extent Exhibit A attempts to create by internal rule something more than provided for by law under K.S.A. § 60-308(b), plaintiff has made no showing that such rule was ever agreed to by, made binding upon, or is otherwise applicable to, defendant.

Finally, plaintiff's argument premised upon Minnesota v. United States, 305 U.S. 382, 83 L. Ed. 235, 59 S. Ct. 292 (1939), is wholly without merit. This case stood for the proposition that the jurisdiction of a federal

Page 3

court on removal is a derivative jurisdiction. That is, where a state court lacked jurisdiction of the subject matter or of the parties, the federal court acquired none, even though in a like suit originally filed in federal court it would have had jurisdiction. Id. at 389. Plaintiff ignores the fact that [HN6]Congress abrogated the derivative jurisdiction doctrine in 1986, when it enacted 28 U.S.C. § 1441(e), which very explicitly provides:

The court to which such civil action is removed is not precluded from hearing and determining any claim in such civil action because the State court from which such civil action is removed did not have jurisdiction over that claim.
  [*9]

"The 1986 amendment by its terms permits removal in all cases where removal was previously barred by the derivative jurisdiction doctrine." Foss v. United States, 705 F. Supp. 537, 538 (D. N.M. 1989). The doctrine is inapplicable to all actions commenced in state courts after June 19, 1986. Morda v. Klein, 865 F.2d 782, 783 (6th Cir. 1989).

Thus, the derivative jurisdiction doctrine upon which plaintiff relies in support of remand is clearly inapplicable to the case at bar. The law, as it stands today, allows a federal court to exercise jurisdiction on removal without regard to whether the state court from which the action was removed had jurisdiction over the dispute. 28 U.S.C. § 1441(e).

IT IS THEREFORE ORDERED that plaintiff's Motion to Find Defendant's Notice of Removal Improper and Remand Cause of Action to the District Court of Johnson County, Kansas (Doc. # 6) is denied.

Dated this 5th day of August, 1997, at Kansas City, Kansas.

EARL E. O'CONNOR

United States District Judge

## CERTIFICATE OF SERVICE

I, Brendan O'Connor, an attorney, certify that I caused a copy of the foregoing Defendants' Notice of Removal Pursuant to 28 U.S.C. §1441, together with the documents referred to therein, to be served upon:

> Clinton A. Krislov
> Jason P. Stiehl
> KRISLOV & ASSOCIATES, LTD.
> 20 N. Wacker, Suite 1350
> Civic Opera House
> Chicago, IL 60606

via messenger on or before 6:00 p.m. on this 17th day of February, 2005.


_____
Brendan O'Connor